UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
-------------------------------------------------------------------x
SYLVESTER OSAGIE, as Representative of the
Estate of Osaze Osagie, Decedent

                               Plaintiff,                20 Civ. _____

               -against-                **COMPLAINT**
                                                 **JURY DEMANDED**

BOROUGH OF STATE COLLEGE
and JOHN DOES # 1- # 10,

                             Defendants.

-------------------------------------------------------------------x

## INTRODUCTION

1.     On March 19, 2019, Sylvester Osagie, Ph.D.—a Penn State University administrator and professor—asked the State College Police Department ("SCPD") to help him find and secure treatment for his missing 29-year-old son, Osaze Osagie, who was then suffering a serious mental health crisis.

2.     When Dr. Sylvester Osagie decided to ask the police for help, he did so with trepidation.  "As an academic who, in his Social Problems course, taught police officers, members of the marine corps, military veterans and many students who went on to law enforcement careers," Dr. Osagie was acutely aware of the staggering number of tragic police encounters with those experiencing a mental health crisis and with young African American males like his son.

3.      But Dr. Osagie feared that his typically quiet, religious, and gentle, autistic son, who suffered from schizoaffective disorder, had stop taking his medications.  He was concerned that he was unable to find Osaze.  His concern turned to alarm after Osaze called to tell him that he was going to die and then texted him that there would be trouble with the police "in a little bit," that he was "fast approaching deep sleep . . ." and that "any poor soul whose life I take today, if any poor soul at all, may God forgive his sins if he has any."

4.      Although Dr. Osagie's decision to ask the police for help was a difficult one, he immediately recognized the grave threat that Osaze's condition presented.  He felt that, as a father, he needed to do everything possible to make sure that his son and others would be safe.

5.      And Dr. Osagie *did* do everything possible to make sure that his son and others would be safe:  he provided the State College Police with as much information as he had about his son's condition, whereabouts, and frame of mind. He held nothing back.  On the evening prior to the shooting, Dr. Osagie provided the police with Osaze's text messages, as well as information about his mental health history, diagnosis, treatment providers, and medication issues.  He told the police that Osaze had recently called to tell him he was going to die and had sent a similar text message to one of his treatment providers.

6.      Dr. Osagie made the decision, along with the police, to seek an involuntary mental health commitment and, with the help of police, he petitioned for and obtained a so-called 302 warrant to secure medical and psychiatric treatment for Osaze.  He spent the remainder of the evening and the next day looking for Osaze.

7.      Throughout the evening of March 19, 2019, and the early morning of the 20th, Dr. Osagie and the SCPD remained in contact as they both searched for Osaze.

8.      The SCPD night shift patrol lieutenant made the 302 warrant and supporting petition, the text messages, and other critical background information available to the day shift patrol lieutenant.  That lieutenant, in turn, briefed a detective and the day shift patrol officer and assigned them to take the lead in working with Dr. Osagie to safely locate Osaze so that he could get the medical attention he so desperately needed.

9.      In the early afternoon on March 20, 2019, Osaze's prior mental health caseworker reported seeing him walking toward his home from a local market.

10.      Instead of dispatching the detective and patrol officer who had been fully briefed on Osaze's condition and situation, the SCPD sent an officer, John Doe #1, to respond to the sighting of Osaze.  John Doe #1 was wholly unaware of the circumstances surrounding Osaze's status, condition, needs, or the risk

associated with those circumstances.  John Doe Officer #1 was selected to respond simply because he happened to be in the neighborhood where Osaze had been sighted.

11.    Inconceivably, the officer dispatched to lead the response neither had nor was given *any* of the critical background information about Osaze Osagie; he did not review the readily available averments and historical narrative laid out in the 302 petition; he knew nothing of the "suicidal" text messages  and other suicide threats, Osaze's mental health history or diagnosis; and he was not informed that Osaze's father was nearby and ready to assist in communicating with and helping his son.

12.    Although Officer John Doe #1 knew that a mental health provider with knowledge of Osaze's circumstances was available to assist, the only effort he took to ascertain critical information was to ask the dispatcher to ask the mental health worker what Osaze was wearing and the direction he was walking.

13.    Upon his arrival at Osaze's address, John Doe #1 circled his police vehicle around the building awaiting the arrival of backup officers.

14.    Two other SCPD officers—John Doe #2 and John Doe #3, both supervisors—also responded to Osaze's home address.  Although John Doe #2 and #3 knew more about Osaze and the circumstances at hand than did John Doe #1, neither assumed control of the situation, shared what they knew with John Doe #1,

nor implemented or even suggested that they devise a plan to facilitate their contact with Osaze.

15.    Instead, John Doe #2 and John Doe #3 deferred completely to John Doe #1, despite his complete lack of knowledge regarding any of the available, detailed, and critical facts regarding Osaze's perilous circumstances.

16.    Inexcusably, the State College Police Department, as a whole, took no steps to provide information relating to the potentially volatile circumstances to John Doe #1 before he undertook to confront and detain Osaze.

17.    John Doe #1 determined that the encounter—whose purpose was to involuntarily apprehend an individual in a documented mental health crisis that by definition, involved a "clear and present danger" to himself or others, and who had expressed both suicidal and homicidal ideations—amounted to a "routine" call that did not require him to seek background information, which were readily available from a variety of sources, or to plan the confrontation.

18.    The three responding officers did not discuss what they would do when they got to the apartment.  They had no plan for how they would convince Osaze to accept help, and they had no plan for avoiding or minimizing the risk that deadly force would need to be applied in an encounter with him.  They also had no plan for involving a mental health worker, despite the fact that SCPD policy required them to do so.  Solely because of the happenstance of John Doe #1 being

closest to Osaze's apartment at the time the dispatcher requested assistance from the field, the SCPD, by way of its dispatcher, placed John Doe #1 in charge of leading the confrontation and taking Osaze into custody.

19.    John Doe #1 decided, in contravention of fundamental critical incident training principles, to surprise Osaze, much as he would approach serving a search warrant on a drug trafficker or arresting a burglar.

20.    Following John Doe #1's lead, John Doe #2 and John Doe #3 parked their cars down the street from the apartment building to remain hidden from Osaze's view.  John Doe #1 led the group into the building and down a narrow set of steps.   He progressed into a tight hallway which the officers knew, from previous calls (unrelated to Osaze's case), would provide no opportunity to de-escalate or retreat.  John Doe #1 banged on Osaze's door and did not announce his presence.  He covered the peephole on the front door and sought to deceive Osaze, a severely mentally ill man known to be paranoid and delusional into granting the officers' access.

21.    John Doe #1 pressed Osaze to leave his apartment even after he told the officer that he did not want to.

22.    When Osaze reacted to police presence and pressure exactly as he had threatened to do, John Doe #1 shot Osaze multiple times and killed him.

23.    Osaze's death is not the story of misconduct by a single "bad apple." It is the story of years of systematic failings by the Borough of State College Police Department to meaningfully implement and enforce common-sense policies and practices to protect the rights of people with mental health disabilities during encounters with the police.

24.    These failures led directly to and caused Osaze's tragic death. Osaze's family brings this lawsuit to remedy the violation of Osaze's civil rights by the Borough of State College, the State College Police Department, and the police officers whose conduct resulted in Osaze's senseless death.

## THE PARTIES

25.    Plaintiff Sylvester Osagie ("Sylvester") is the father of Osaze Osagie ("Osaze"), who died on March 20, 2019.   Sylvester is the duly appointed representative of Osaze's estate.

26.    Defendant Borough of State College (the "Borough") is a municipality organized under the laws of the State of Pennsylvania.  The Borough operates the State College Police Department ("SCPD"), a municipal police agency that provides law enforcement services throughout the Borough.  The State College Borough's address is 243 S. Allen Street, State College, Centre County, Pennsylvania.

27.   Defendants John Does # 1 - # 10 are natural persons who at all relevant times were employees and/or agents of the Borough and/or State College Police Department. Each of them was personally involved in violations of Osaze Osagie's rights, privileges, and immunities under the United States Constitution and applicable law.   They are sued in their individual capacities under fictitious designations because Plaintiff has not been able to ascertain their names, notwithstanding reasonable efforts to do so.   John Does #1-#10 worked at the Borough building located at 243 S. Allen Street, State College, Centre County, Pennsylvania.

## JURISDICTION AND VENUE

28.   This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff's claims arise under the laws of the United States, namely 42 U.S.C. § 1983 and the Americans with Disabilities Act, and seek redress of the deprivation, under color of state law, of rights guaranteed by the Constitution and laws of the United States.

29.   Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the Middle District of Pennsylvania.

## JURY DEMAND

30.   Plaintiff demands trial by jury in this action.

## FACTUAL ALLEGATIONS

### *Background: Osaze's Background and History of Mental Health Issues*

31.     Osaze Osagie was the beloved child of Sylvester and Iyunolu Osagie, two academic professionals who have resided for the past many years in State College, near the Pennsylvania State University campus.

32.     Osaze suffered chronic and severe mental illness for a number of years before his death.  He had been diagnosed with paranoid schizophrenia and Asperger Syndrome, among other disorders.  He had been psychiatrically hospitalized at least six times.

33.     Throughout his struggles with mental illness, however, Osaze responded well to medication and therapy designed to abate his symptoms. Properly medicated, Osaze was a quiet, soft-spoken, deeply religious, and committed Christian who worshipped at State College Access Church and regularly volunteered at local nonprofits, including the Community Service Group where he helped the intellectually and developmentally disabled.

34.     Sylvester and Iyunolu, as well as other Osaze family members, were in close touch with Osaze throughout his adult years, and conscientiously assisted him in getting treatment as he needed it.  Far from being isolated or disconnected from his family, Osaze was always close with his parents, sibling, aunts, uncles, and cousins.  Osaze had a well-established and committed support network that

included family, but that also extended to clergy and members of his church, treatment providers, and friends in the State College community.

35.     Nonetheless, entirely as a result of his mental health struggles, Osaze had prior contact with law enforcement and the legal system.  Specifically, Osaze had a history of aggressive behavior in response to delusions caused by lapses in medication.  Since 2009, there had been several such instances, which resulted in police and mental health intervention.

36.     Osaze never *hurt* anyone, but, on one occasion prior to March 19, 2019, in the midst of a mental health crisis, Osaze had displayed a knife in an incident involving a basketball.  When Osaze was later approached by police and asked if he had a knife, he peacefully responded in the affirmative, removed the knife from his pocket, and dropped it on the ground.

37.     The SCPD was aware of Osaze's mental health struggles and symptoms as of March 19, 2019.

**March 2019: Osaze Faces a Mental Health Crisis; His Family Goes to the SCPD for Help**

38.     On March 19, 2019, Sylvester received disturbing text messages from Osaze in which Osaze expressed disjointed and frightening suicidal and homicidal thoughts.  In addition to including rambling and largely incoherent remarks about religion, Osaze's text messages suggested that he was preparing to attempt "suicide by cop," a form of self harm; the messages stated, among other things, that there

would be "trouble" with the police "in a little bit" that would "soon" result in Osaze's death.

39.    After having difficulty getting a hold of Osaze, Sylvester went to the SCPD to report his concerns.

40.    Sylvester met with two SCPD officers (John Doe #4 and John Doe #5) and explained that Osaze had gone missing, had a history of mental illness, and had probably stopped taking his medication.

41.    Sylvester expressed concern that Osaze might be suicidal and he showed John Doe #4 and John Doe #5 the text messages he had received from Osaze.

42.    The warning signs were clear.  John Doe #4 later reported to the SCPD during a deadly force review that the clarity of Osaze's text messages "concerned" him and that the report had a "weird feel" to it.

43.    The two SCPD officers, John Doe #4 and John Doe #5, went to Osaze's apartment with Sylvester that evening and spoke to Osaze's roommate. They learned that Osaze had not been seen home since 2:00 p.m. that afternoon.

44.    Another officer, John Doe #6, then contacted the "Can Help" hotline, a mental health crisis intervention service in Centre County.  John Doe #6 learned that Osaze was receiving services from Strawberry Fields, a community-based

organization for people with disabilities, but had had no recent contact with his case manager.

45.     John Doe #6 attempted to find Osaze by pinging his cell phone and checking known hangouts, all without success.

46.     John Doe #6 then took Sylvester to the local Emergency Department to meet with a Can Help crisis worker.   There, a petition and warrant for involuntary mental health evaluation and treatment was completed and provided to the SCPD to serve pursuant to Section 302 of the Pennsylvania Mental Health Procedures Act.

47.     Consistent with the statutory requirements for 302 warrants, the application for involuntary emergency examination and treatment indicated that Osaze posed a clear and present danger to himself because there was "a reasonable probability of suicide unless adequate treatment is afforded."   The application did not indicate that Osaze posed a clear and present danger to others.

48.     SCPD officers searched for Osaze overnight and the following morning without success.

49.     At the conclusion of the State College PD's night shift, the night shift patrol lieutenant informed the day shift patrol lieutenant, John Doe #7, about the ongoing search for Osaze.   The information the night shift patrol lieutenant provided to the day shift commander included photographs of Osaze's worrisome

text messages, which were a part of the mental health warrant packet.  These materials were all available to the day-shift police officers on March 20, 2019.

50.    On the morning of March 20, 2019, John Doe #7 assumed responsibility for the investigation of Osaze's whereabouts.  John Doe #7 read the 302 warrant, which included copies of Osaze's text messages.

51.    John Doe #7 later acknowledged to investigators that he knew that Osaze had had encounters with the police in the past due to mental health crises.  But he also claimed he did not believe Osaze was likely to become violent on March 20, 2019.

52.    John Doe #7 assigned a detective and a patrol officer to Osaze's case.  Upon information and belief, however, John Doe #7 did not provide copies of Osaze's text messages, or any other materials from the mental health warrant application, to the SCPD officers who were looking for Osaze in the field.

53.    On information and belief, during the morning of March 20, Osaze's caseworker reported receiving a worrisome text from Osaze the evening before.  It read: "Please please tell [redacted] I'm sorry for not being able to reply to her and to Jeremiah.  Tell her I'm sorry about her lost relative.  Also tell her that I'm sorry but I don't have time to see any of you guys in the near future because I myself may be uh, hurt very soon. Very soon - - - maybe even no longer alive.  I am so sorry.".

*Osaze's Fatal Encounter with the Police*

54.    Around 1:48 p.m. on March 20, 2019, Osaze's mental health case worker reported to Can Help that he had just spotted Osaze leaving a grocery store with two grocery bags, walking in the direction of his apartment.  Can Help, in turn, reported this to the SCPD.

55.    Inexplicably, SCPD and John Doe #7 did not dispatch the detective and officer whom John Doe #7 had previously assigned and briefed about Osaze's situation.  Instead, John Doe #1 took the lead on the response.  Moreover, on information and belief, a dispatch operator "selected" John Doe #1 for this sensitive task for no other reason than that he happened to be eating lunch nearby at the time of the call.

56.    John Doe #1 did not ask for, and was not provided, information about Osaze's situation:  He did not receive or review the 302 petition; was unaware of the text messages Osaze had sent; did not know Osaze had threatened self-harm; did not have awareness of Osaze's history of mental health struggles and police interactions; and did not know that Osaze's father was then actively looking for his son and was ready, willing, able and expecting to assist the officers once his son was located.

57.    John Doe #1, in the absence of this critical information and despite the "clear danger to self" 302 requirement, concluded that this was a "routine" matter

and took no steps to inform himself or plan for the encounter.  Instead, he simply asked dispatch to ask Osaze's mental health case worker what clothing Osaze was reported to be wearing and what direction he was headed.

58.    Neither John Doe #7, nor anyone else from SCPD, provided John Doe #1 with any of this crucially relevant information.

59.    John Doe #1 later told investigators that he considered the response— whose purpose was to apprehend a schizophrenic man who had threatened suicide by cop and transport him for involuntary psychiatric treatment—to be a "routine" call.

60.    It was not.  Indeed, no reasonable police officer would consider any encounter with an individual in the midst of an ongoing mental health crisis to be routine, much less when the goal of the encounter is to carry out a warrant for involuntary evaluation and psychiatric treatment.

61.    John Doe #2 and John Doe #3 arrived at the scene shortly after John Doe #1.  Unlike John Doe #1, both John Doe #2 and John Doe #3 had at least some familiarity with Osaze or his then-ongoing crisis.  John Doe #1 was nonetheless allowed to continue leading the response, not based on seniority (he was not senior) or because he had more or better information (he did not), but apparently because he was the first to arrive at the location.

62.    In fact, John Doe #1 was the least experienced and most junior of the three officers and had the least mental health-related training.  He had not undergone crisis intervention training in approximately six years.

63.    Apparently, because they considered the imminent encounter to be "routine," the three officers made no plan whatsoever for how they would address Osaze and convince him to leave with them to be evaluated and treated.  They did not discuss what they would do to persuade him to accept assistance, what they would do if he refused to cooperate or threatened violence, nor how they would retreat or otherwise de-escalate the situation if it became dangerous for Osaze or themselves.

64.    The officers did not call Sylvester, even though he was nearby actively looking for Osaze at the time and even though Osaze's written behavioral health plan listed "call my dad" as an emergency response plan.  The officers also did not plan for or contact any mental health service provider for assistance in the encounter, in violation of the SCPD policy.

65.    Basic, universal precepts of police procedure and training dictate that, in a situation like the one the officers were facing, officers should remain calm, display a genuine desire to help, avoid disruptions and distractions, and assess any potential safety concerns.  Any reasonable officer would have understood that aggressive behaviors, "cornering" a person in crisis, approaching him by

"surprise," or using threats would be inappropriate to the circumstances and would foreseeably heighten the risk of harm to both Osaze and the officers.

66.   Nonetheless, the officers decided to take Osaze by surprise and approach him like an at-large, criminal suspect.

67.   The officers hid their police vehicles away from Osaze's apartment so he would not know they were coming.

68.   The officers deployed a tactic known as "contact and cover," in which one officer (here, John Doe #1) takes charge of interacting with a suspect while backup officers provide a force presence nearby to send a message to the suspect that they are willing and able to protect the contact officer, including with deadly force if necessary.

69.   John Doe #1 led the other officers into the building and down a narrow stairway.   The officers entered a tiny hallway which they knew both provided no practical means of retreat and was too small and crowded to allow for any meaningful de-escalation. This narrow space in which the officers chose to approach Osaze's apartment made the use of non-deadly force to prevent harm impossible in the event the encounter became violent.

70.   John Doe #1 knocked on the door to Osaze's apartment and did not announce who he was.   Instead, he covered the peephole on the front door and sought to trick Osaze into opening it.

71.    John Doe #1 later told investigators that he covered the peephole because he did not want Osaze to know that the police were outside the door until the door was opened.

72.    John Doe #1 was standing directly in front of the apartment door in the hallway.  John Doe #2 was on the first step of the stairwell across from the entrance to Osaze's apartment, while John Doe #3 (who was in plainclothes) was further up the stairs behind John Doe #2.

73.    After John Doe #1 knocked, a voice from inside said he was coming.

74.    Osaze answered the door after a longer-than-typical response time; he refused to let the officers in and he refused to come into the hallway to talk with them, as they had requested.

75.    According to John Doe #3, at this point the encounter was "non-confrontational."

76.    According to John Doe #2, at this point the tone of the encounter was normal and pleasant.

77.    Given the state of Osaze's mental health crisis, his previous threats of self-harm, the officers' lack of any plan to advance the encounter toward a positive outcome, and the dangerous lack of any means of egress from the officers' positions, any reasonable police officer would have sought to terminate or de-escalate the encounter at this point and attempt an alternative approach, such as

seeking to have a family member or mental health professional come to the apartment to provide assistance, or regroup and re-attempt the encounter in a less tense and dangerous setting.

78.     Nonetheless, the officers did not leave, request back-up, nor seek to have a family member or mental health professional come to the apartment to provide assistance.

79.     Osaze took a step back and John Doe #1 allegedly saw that he was holding a serrated steak knife in his right hand.

80.     John Doe #3 later told investigators he could not see any knife from his vantage point on the stairs.

81.     According to the after-the-fact account he provided to investigators, John Doe #1 immediately drew his gun and ordered Osaze to drop the knife.  At the same time, John Doe #3 asked John Doe #2 to unholster his Taser.

82.     Osaze briefly backed into the apartment, saying he wanted to die and that the officers should kill him.

83.     For some number of seconds, Osaze was not visible to the officers. He then exited the apartment, moving toward the officers, allegedly while continuing to hold a knife.

84.     John Doe #2 fired his Taser at Osaze as he exited the apartment.

85.    According to the officers, immediately after the Taser was deployed—nearly simultaneously—John Doe #1 fired his gun multiple times.

86.    Osaze was approximately two to three feet from John Doe #1 and John Doe #2 when John Doe #2 deployed the Taser and John Doe #1 fired his gun.

87.    Three bullets entered Osaze's body, killing him.

88.    Autopsy analysis showed that all three bullets entered Osaze on the back of his body (one in his lower left back, one in his right back, and one in his left shoulder).

89.    In the weeks that followed the shooting, the SCPD Assistant Police Chief was tasked with "compiling and presenting" materials to a Conduct and Procedures Review Board -- a SCPD captain, lieutenant, sergeant, and two officers.  The SCPD Police Chief charged the Board with "reviewing State College Police Department Policy and Procedure as it relates to this event. This includes reviewing officer actions leading up to the final interaction with Osaze Osagie . . . as they relate to department policy."

90.    The Board concluded that the actions taken by the Department generally, and the John Doe officers specifically, were "within policy."

***SCPD's Constitutionally Inadequate Policies and Practices Concerning Encounters with People in Mental Health Crisis***

91.    The Borough requires all SCPD officers to undergo Crisis Intervention Team ("CIT") training.  Upon information and belief, the Borough

instituted this requirement because it recognized that, in the absence of appropriate and effective training in responding to situations involving people suffering from a mental health crisis, and the use of such training in the field by officers in real-life encounters with persons in crisis, encounters between people with mental illness and the SCPD would be highly likely to result in injury or death to such persons.

92.    The Borough has described its CIT program as being "designed to educate first responders about mental illness, understand[] the symptoms that people with mental illness experience, and develop[] the skills to de-escalate a crisis situation."

93.    CIT, first developed in Memphis, TN in 1988 (sometimes called the "Memphis Model"), is an internationally-recognized approach to improving collaboration between law enforcement and community stakeholders and bridging the gap between mental health treatment and police response.  Research has shown that, when implemented properly by officers with the skills and commitment to do so, the Memphis Model can improve outcomes in cases where police encounter someone in a mental health crisis.

94.    Unfortunately, the Borough's inept and deliberately indifferent implementation of its CIT program training foreseeably failed to provide those benefits and instead created a heightened risk that people undergoing mental health crises would be harmed in encounters with SCPD.

95.   A fundamental and core Memphis Model principle is that CIT training and certification should be limited to a *subset* of officers within a department who self-select and volunteer to receive CIT training, and that those officers assume responsibility for responding to mental health crisis situations.  For instance, CIT International, Inc., an international non-profit organization supporting efforts to improve responses to people affected by mental illness, emphasizes that "[a]t the heart of effective CIT programs is officers who *volunteer* to be identified as a CIT officer and who are skilled and passionate about responding to these calls."[1] (Emphasis added).   CIT International's guidance to law enforcement agencies make clear that CIT programs should aspire to be "[a]n elite assembly of specially trained uniformed patrol officers, and should "**NOT** require the training of every officer" because "experienced officers who volunteer and are interested in CIT perform best.  It is just not for every officer."[2]

96.   Authoritative guidance on the core elements of CIT programs promulgated by the University of Memphis and co-authored by the creator of the Memphis Model similarly explains that CIT programs should be *voluntary* for officers, and *selective* for departments, so that the right people are trained in -- and later assigned to implement in the field -- the techniques taught in CIT: "Officers

---

[1] CIT International, Inc., 2017 CIT Program Overview, *available at*
http://www.citinternational.org/resources/Documents/CIT%20Program%20Overview.2017.pdf.

[2] CIT International, Inc., Crisis Intervention Team Program Broad Overview,
http://www.citinternational.org/resources/Pictures/CIT_Broad_Overview.pdf (emphasis in original).

within a patrol division should voluntarily apply for CIT positions.  Each candidate then goes through a selection process, which is assessed according to the officer's application, recommendations, personal disciplinary police file, and an interview. Once selected, each of the CIT Officers maintains their role as a patrol officer and gains new duties and skills through the CIT training, serving as the designated responder and lead officer in mental health crisis events."[3]  Put another way, CIT programs are about more than training; they are about a sustained investment by both the police agency as a whole and the committed individuals within that agency of fostering cooperation among community stakeholders, including mental health professionals.

97.    According to the U.S. Department of Justice Bureau of Justice Assistance's Police Mental Health Collaboration, "CIT is based on the idea that experienced officers who volunteer are best at responding to mental illness calls. Agencies select a group of qualified patrol officers (representing approximately 25 percent of the patrol force) who volunteer to take on this responsibility in addition to their normal patrol duties."[4]

98.    As explained by the former Director of Training for the Akron, OH Police Department: "I have encountered many administrators that want the entire

---

[3] The University of Memphis, "Crisis Intervention Team Core Elements" at 12, *available at* http://www.citinternational.org/resources/Pictures/CoreElements.pdf.

[4] U.S. Department of Justice, Bureau of Justice Assistance, Police Mental Health Collaboration, "Crisis Internvetion Teams," *available at* https://pmhctoolkit.bja.gov/learning/types-of-pmhc-programs/crisis-intervention-teams.

department to go through the training. *We do not recommend this for urban departments.* By only training those officers who have an interest and a compassion for this segment of the population, CIT officers build an expertise resulting in a win-win."[5] (Emphasis added).

99. The Borough ignored this widely accepted principle of CIT implementation and mandated CIT training for all SCPD officers.

100. Because of the Borough's improper implementation of its CIT program, *all SCPD* officers were deemed prepared to respond to mental health crisis situations, without any assessment of their individual ability to effectively absorb and operationalize their CIT. The Borough had no CIT selection process, let alone one rationally designed to ensure that officers designated to respond to mental health emergencies would have the appropriate interest, compassion, disciplinary history, and other predictors of success in crisis intervention.

101. The Borough's implementation of its nominal CIT program is fundamentally inconsistent with core tenets of the Memphis Model. For instance, the Memphis Model dictates that a specialized lead CIT officer should be dispatched to the scene of any mental health crisis call and assume control of the scene, advising other officers as to how they might help facilitate an appropriate

---

[5] Michael S. Woody, "Dutiful Minds—Dealing with Mental Illness," Law Enforcement News (John Jay College of Criminal Justice) 29, no. 593 (February 14, 2003): 1051 –1056, *available at* http://law.capital.edu/WorkArea/DownloadAsset.aspx?id=20602.

disposition.   Because the SCPD had *no* specialized CIT officers—but instead misguidedly considered all officers equally well-equipped to respond to mental health crises—John Doe #1 was dispatched to oversee the encounter with Osaze despite his obvious lack of appropriate training, knowledge, and disposition.

102.  Moreover, it is a Memphis Model foundational precept that responding officers obtain and analyze *all available intelligence* about the mental health status and history of an individual in crisis before responding, and use that information to plan the encounter in a manner calculated to achieve a positive outcome.

103.  An appropriate CIT program also requires that emergency dispatchers be trained to ask appropriate questions and provide critical information that will assist the responding CIT officer in successfully approaching someone in crisis.

104.  In contrast, the SCPD's mental health policy guidance, which consists of approximately one page, includes no such requirements.  The Borough, in direct conflict with CIT training, had no policy that the responding officers should be made aware of relevant information when responding to a mental health crisis.

105.  As a direct and proximate result of this SCPD policy, John Doe #1 was never informed of, and never inquired or learned about, Osaze's suicidal text messages, his mental health history prior to the fatal encounter, or any of the circumstances that led to the issuance of the 302 warrant.

106. In short, the Borough's police officers receive CIT training *in name only* – i.e., as a formality, by rote, in contradiction to the Memphis Model's dictates, and not as part of the lived experience of an officer at the SCPD. Indeed, upon information and belief, the trainings provided to SCPD officers concerning mental health issues have no standardized curricula. The SCPD's mental health policy states that "[a]ll personnel shall receive update training on mental illness recognition at least once every 3 years," but contains no requirements whatsoever concerning what such training should cover.

107. Upon information and belief, the Borough's improper crisis intervention training practices has created a known risk that people suffering from mental health crises would be harmed during encounters with SCPD officers. For example, in 2016, SCPD officers tasered four individuals during the entire year, and at least two individuals tased were in the midst of mental health crises. In at least five additional instances that year, officers armed their TASERs and pointed them at a person in the midst of a mental health crisis while threatening to fire. In 2017, SCPD officers tasered at least three individuals who were in the midst of mental health crises—out of six TASER deployments that entire year. In at least three additional instances, officers armed their TASERs and pointed them at a person undergoing a mental health crisis while threatening to fire.

108. Osaze's death was the predictable result of the Borough's failure to implement a meaningful and effective CIT program and policies and practices for handling encounters with mentally ill people. The officers who responded to his apartment on March 20, 2020 were neither volunteers for CIT training nor selected by the SCPD for such training; they made no plan for how they would approach Osaze and did not discuss how his mental illness might affect their selection of approach tactics; they did not request any assistance or input from family members or mental health professionals in formulating their approach; and they did not request or review any information about the 302 involuntary-treatment warrant or the events that led to its issuance.

109. Had a properly trained CIT officer been dispatched to lead the response, Osaze's tragic death could have been avoided. Osaze's father, Sylvester, was in the neighborhood looking for his son when the officers appeared at Osaze's apartment. The officers made no effort to reach Sylvester or to ask him to meet them at the apartment; if they had, they would have learned that he was just a few minutes away.

110. Likewise, the officers made no effort to reach out to mental health service providers or case workers known to Osaze and trusted by him prior to approaching the apartment. Had they done so, it is possible that one or more of them could have assisted in approaching Osaze in a way designed to minimize the

risk of violence.  This failure is all the more glaring in view of the fact that it was Osaze's former caseworker and a Can Help crisis worker who reported Osaze's whereabouts to the SCPD only minutes before.

111.  Moreover, SCPD's written policies contemplate that officers should be dispatched to assist crisis workers in serving 302 warrants.  In Osaze's case, the officers simply took it upon themselves to serve the warrant and take Osaze into custody by force, without involving any mental health professional at any stage of the planning or execution of the encounter.  The fact that none of the responding officers made any attempt to contact mental health professionals or family members knowledgeable about and trusted by Osaze speaks to the absence of the kind of substantive relationships between officers and stakeholders that CIT training under the Memphis Model requires.

112.  Instead, the officers approached Osaze's apartment in a manner that appears almost calculated to ensure a violent escalation.  They secreted their patrol cars to ensure that their presence would surprise Osaze.  Instead of choosing a back entrance to the apartment that opened up to the outdoors and provided de-escalation space, they confronted Osaze in a hallway with steps that they knew from previous calls to be too tight and confined to allow for egress.  The officers filled a cramped vestibule, blocking the only path of egress, then covered the peephole in an apparent attempt to trick Osaze into opening the door without

realizing that the people knocking were police officers.  Given that Osaze had specifically threatened to instigate "trouble" with the police that would lead to his death, this approach foreseeably and needlessly led to the officers' tragic use of deadly force and to Osaze's death.

113. The Borough's woefully inadequate policies and practices for protecting the rights of people suffering from mental health crises during encounters with the police directly caused the utterly senseless loss of Osaze Osagie's life.

## FIRST CAUSE OF ACTION
### Fourth/Fourteenth Amendment – Excessive Force (Against John Doe # 1-10)

114.  Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

115.  By reason of the foregoing, by shooting, and using gratuitous, excessive, and unconscionable force against Osaze, resulting in his death, by failing to prevent their fellow officers from doing the same, and by engaging in unreasonable conduct that foreseeably led to the use of deadly force, Defendants John Does #1 - # 10 deprived Osaze of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

116.   Defendants John Does #1 - #10 acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as SCPD officers.  Said acts by Defendants John Does #1 - #10 were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  Defendants John Does #1 - #10 acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

117.   Osaze's death was a direct and proximate result of the misconduct and abuse of authority detailed above.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – *Monell* Liability (Against the Borough of State College)

118.   Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

119.   At all relevant times, the Borough was aware that its existing policies and practices made it substantially likely that individuals suffering from mental health crisis would be denied their federally protected rights under the Fourth and Fourteenth Amendments in the course of encounters with SCPD, and acted with deliberate indifference in failing to act to prevent or mitigate the denial of those rights.

120.    The Borough caused the violation of Osaze's constitutional rights by deliberate indifference to the risk that people undergoing mental health crises would be subjected to unlawful and excessive use of deadly force during encounters, including without limitation by improperly implementing its CIT program and failing to institute policies and procedures to protect the rights of individuals with mental illness during police encounters despite the known and obvious risk that such persons would suffer harm in the course of these encounters, as illustrated by a pattern of past uses of excessive force by SCPD officers against such persons.

121.    At all relevant times, the Borough's policies and practices concerning SCPD encounters with individuals suffering from mental health crises were inadequate to respond to a pattern of past incidents similar to Osaze's fatal encounter on March 20, 2019.  The Borough nonetheless failed to address those inadequacies, of which it was or should have been aware.

122.    As a direct and proximate result of the City's policies, practices, and customs, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CAUSE OF ACTION
### Title II of the Americans with Disabilities Act (Against the Borough of State College)

123.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

124.   At all times material to this action, the Borough and the SCPD were public entities that operated services, programs, and/or activities, including service of warrants for involuntary mental health evaluation and treatment pursuant to Section 302 of the Pennsylvania Mental Health Procedures Act.

125.   Osaze was a qualified individual with a disability within the meaning of 42 U.S.C. § 12132.

126.   The Borough is responsible for ensuring that services, programs, and activities conducted by and through the SCPD comply with Title II the Americans with Disabilities Act, and for remedying any non-compliance.

127.   Acting through the State College PD, the Borough denied Osaze the benefits of the services, programs, or activities of the SCPD and the Borough, and subjected Osaze to unlawful discrimination by, *inter alia*, failing to provide reasonable accommodations for his disability during the fatal encounter on March 20, 2019.

128.   The Borough was aware that its existing policies and practices made it substantially likely that disabled individuals would be denied their federally protected rights under the Americans with Disabilities Act in the course of encounters with SCPD, and acted with deliberate indifference in failing to act to prevent or mitigate the denial of those rights.

129.   At the time of Osaze's death, the Borough's policies and practices concerning SCPD encounters with individuals suffering from mental health crises were inadequate to respond to a pattern of past incidents similar to Osaze's fatal encounter on March 20, 2019.  The Borough nonetheless failed to address those inadequacies, of which it was or should have been aware.

130.   Osaze's death was a direct and proximate result of the Borough's violations of Title II of the Americans with Disabilities Act.

### FOURTH CAUSE OF ACTION
### Rehabilitation Act of 1973 (Against the Borough of State College)

131.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

132.   At all times material to this action, the Borough received federal financial assistance within the meaning of 29 U.S.C. § 794(a).

133.   At all relevant times herein, Decedent was a person with a "disability" within the meaning of 29 U.S.C. § 705(9)(B).

134.   At all relevant times herein, Decedent was an "individual with a disability" within the meaning of 29 U.S.C. § 705(20)(B).

135.   At all relevant times herein, Defendant Borough of State College constituted a "programs or activity" within the meaning of 29 U.S.C. § 794(b) in that said Defendant (1) was an instrumentality of the state or local government; and (2) provided the program and activity of taking a person, such as Decedent, who

allegedly as a result of a mental disorder, was a danger to others, or to himself, or gravely disabled, into custody pursuant to Section 302 of the Pennsylvania Mental Health Procedures Act.

136.   At all relevant times herein, Decedent was otherwise qualified, with or without reasonable accommodation, within the meaning of 29 U.S.C. § 794(a), to participate in the programs and activities of the Defendant Borough.   Such programs and activities included being safely and appropriately being taken into custody pursuant to Section 302 of the Pennsylvania Mental Health Procedures Act if and when he, as a result of a mental disorder, was allegedly a danger to others, or to himself, or gravely disabled.

137.   At all relevant times herein, in engaging m the conduct alleged above, the Defendant Borough discriminated against Decedent within the meaning of 29 U.S.C. § 794(a) with regard to their services, programs, and activities.   The Borough violated Decedent's federally guaranteed right to be free from discrimination on the basis of disability by: (a) failing to make reasonable modifications to their policies, practices and procedure to ensure that his needs as an individual with a disability would be met; and (b) failing to appropriately train John Doe #1-#10 on how to safely and appropriately take a person, such as Decedent, who was allegedly a danger to himself and/or others, into custody pursuant to Section 302 of the Pennsylvania Mental Health Procedures Act.   Such

actions constitute (a) discrimination solely because of Decedent's disability; and (b) deliberate indifference to Decedent's rights in that the Borough knew that harm to Decedent's federally protected rights was substantially likely and failed to act upon that likelihood.

138.   Osaze's death was a direct and proximate result of the Borough's violations of the Rehabilitation Act of 1973.

## FIFTH CAUSE OF ACTION
### Assault (Against all Defendants)

139.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

140.   By reason of the foregoing, Defendants John Does #1 - # 10 did, with the intent to put another in reasonable and immediate apprehension of a harmful or offensive contact, in fact cause such apprehension in plaintiff, thereby committing the tort of assault upon him.

141.   Plaintiff suffered injuries proximately caused by such conduct by defendants.

## SIXTH CAUSE OF ACTION
### Battery (Against all Defendants)

142.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

143.   By reason of the foregoing, Defendants John Does #1 - #10 did, with the intent to put another in reasonable and immediate apprehension of a harmful or offensive contact, in fact cause such apprehension in plaintiff, thereby committing the tort of battery upon him.

144.   Plaintiff suffered injuries proximately caused by such conduct by defendants.

**SEVENTH CAUSE OF ACTION**
**Wrongful Death—42 Pa. C.S. § 8301 (Against all Defendants)**

145.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

146.   Plaintiff, as Administratrix of the Estate of Osaze Osagie, brings this action on behalf of Mr. Osagie's heirs under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301.

147.   Mr. Osagie's heirs under the Wrongful Death Act are:

    a.   His father, Sylvester Osagie, State College, Pennsylvania, a plaintiff in this action, and;

    b.   His mother, Iyunolu Osagie, State College, Pennsylvania, a plaintiff in this action.

148.   Mr. Osagie did not bring an action against defendants for damages for the injuries causing his death during his lifetime.

149.   Mr. Osagie's heirs have, by reason of Mr. Osagie's death, suffered pecuniary loss, and have or will incur expenses for the costs of Mr. Osagie's funeral, the costs of Mr. Osagie's headstone, and the costs of administering Mr. Osagie's estate.

## EIGHTH CAUSE OF ACTION
### Pennsylvania Survival Statute—42 Pa. C.S. § 8302 (Against all Defendants)

150.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

151.   Plaintiff also brings this action on behalf of the Estate of Osaze Osagie under the Pennsylvania Survival Statute, 42 Pa. C.S. § 8302, under which all claims Mr. Osagie would have been able to bring had he survived, may be brought by Mr. Osagie's estate.

152.   As a direct and proximate result of the conduct of all defendants, Mr. Osagie experienced extraordinary physical and emotional pain and suffering before his death.

153.   Plaintiff, via this survival action, seeks damages for these harms caused to Mr. Osagie.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.     Compensatory damages in an amount to be determined;

2.     Punitive damages in an amount to be determined;

3.     An order awarding Plaintiff reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

4.     Such other further relief as the Court may deem just and proper.


Dated: November 2, 2020

SHUBIN LAW OFFICE

By:_____/s/_____
        Andrew Shubin
        333 South Allen Street
        State College, PA 16801
        (814) 867-3115


STEINBACHER, GOODALL & YURCHAK

By:_____/s/_____
        Kathleen Yurchak
        328 South Atherton Street
        State College, PA 16801
        (814) 237-4100

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:_____/s/_____
        Andrew G. Celli, Jr.*
        Earl S. Ward*
        David Berman*

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*

*\* Pro hac vice application forthcoming*