## IN THE UNITED STATE DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SYLVESTER OSAGIE, as       :
Representative of the         :
Estate of Osaze Osagie, Decedent   :
                             :
             Plaintiff,     :   Docket No.  4:20-cv-02024
                             :
         v                 :
                             :
BOROUGH OF STATE COLLEGE,   :
et al.,                       :
                             :
           Defendants.    :
                             :

## DEFENDANTS, BOROUGH OF STATE COLLEGE, OFFICER M. JORDAN PIENIAZEK, SERGEANT CHRISTOPHER HILL, LIEUTENANT KEITH ROBB AND CAPTAIN CHRISTIAN FISHEL'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendants, the Borough of State College, Officer M. Jordan Pieniazek,

Sergeant Christopher Hill, Lieutenant Keith Robb and Captain Christian Fishel

(collectively "Answering Defendants," and individually, "Ofc. Pieniazek," "Sgt.

Hill," "Lt. Robb," "Capt. Fishel," "Borough", or "SCPD"), by and through their

attorneys, MacMain, Connell & Leinhauser, LLC, hereby files this Answer and

Affirmative Defenses to Plaintiff's First Amended Complaint (ECF Doc. No. 15) as

follows, denying each and every averment set forth therein except those as

expressly admitted:

1

## INTRODUCTION

1-4.   Admitted in part and denied in part.  It is admitted that Sylvester Osagie ("Plaintiff" or "Dr. Osagie") requested SCPD to assist in locating his son, Osaze Osagie ("Osaze"), on March 19, 2019 after receiving text messages from Osaze stating:

> "Tell him I will not be able to attend any more of our appointments ... although the police hid the secret reason, I have run into trouble with them before for the very reason I am about to run into trouble with them again in a little bit. The detective's hidden reason for getting me in trouble in the past was because of my love for God and my love for his creation...
>
> God is dead in this country, and soon I hopefully will be dead also. My fast - approaching deep sleep will result from a struggle between God and evil ... and a battle between the citizens of the US and the American government.
>
> [I]f my mission is successful, if I die for my God today... Any poor soul whose life I take today, if any poor soul at all, may God forgive his sins if he has any. And I pray there is no friendly fire. Lets see how much time I have left before finding out what life after death is really about."

This was followed by calls by Osaze to Dr. Osagie, and a text message to a caseworker that Osaze was going to die soon.

It is unclear why, or if, Dr. Osagie had hesitation to involve SCPD in this instance, as there were many prior times that Dr. Osagie or other Osagie family

members called SCPD (and other neighboring police departments) for assistance with his son, including several of which Osaze was threatening violence or acting violently.  These incidents included being suspected of setting his parents' home on fire, brandishing a knife in committing an armed robbery, throwing a brick through a window of his parents' home when he was evicted due to his behavior, attempting to enter another home in the early morning hours, and other dangerous and unpredictable actions as relayed by the Osagie family where they also reported, both orally and in writing, that they feared for their safety, that of their other children and the neighborhood. At least two of these occasions were in relation to a 302 involuntary mental health commitment of Osaze, and one was a mental health crisis in which SCPD officers assisted Dr. Osagie in safely securing Osaze so that Dr. Osagie could transport his son to a facility to be evaluated. Notably, when the evaluation resulted in Osaze being discharged from the hospital, officers from SCPD – including an officer currently named in this lawsuit - personally paid out of their own pocket to pay for a hotel room for Osaze because the Osagie family did not want him returning to their home. In none of the prior encounters did Osaze use violence toward SCPD Officers, nor SCPD officers toward Osaze – rather, they all ended peaceably and safely.

  5.  Admitted in part. Denied in part. It is admitted that Dr. Osagie shared recent communications from Osaze's with SCPD. It is further admitted that SCPD

3

was very familiar with Osaze and assisted the Osagie family on numerous prior occasions with de-escalating often violent encounters.  The remaining averments of this paragraph are denied.

6.     Admitted in part. Denied in part.  It is admitted that SCPD Officer Kurt Stere took Dr. Osagie to Mount Nittany Medical Center Emergency Room so that he could meet with a 'Can Help' crisis worker and a 302 warrant could be completed.  Once the 302 warrant was completed and issued, it was given to SCPD to serve on Osaze.  Notably, Dr. Osagie reported his son's address to be 904 Southgate Drive in State College on the 302 warrant, not the address where the incident occurred. SCPD was very proactive in their search for Osaze, despite the fact that there were other investigations, and calls for service happening for other citizens who also had need for police and emergency services.  The remaining averments of this paragraph are denied.

7.     Admitted in part. Denied in part.  SCPD continued proactive contact with Dr. Osagie via telephone calls from SCPD Detective Kris Albright and SCPD Officer Amanda Estep.  Dr. Osagie informed the SCPD officers of locations commonly frequented by Osaze, both on and off the Penn State campus, in an attempt to locate his son.  SCPD Officer Tlumac checked the locations off campus, and Penn State University Police were informed to check the locations on campus,

but Osaze was not located.  The remaining averments of this paragraph are denied.[1]

8.     Admitted with clarification.  The entire SCPD patrol from March 20, 2019 were briefed regarding the ongoing issue of Osaze to include SCPD Detective Kris Albright, who was assigned to look for Osaze by Lt. Keith Robb of SCPD.  By way of further response, there was an alert on the SCPD Law Incident Report also known as the SCPD "hot sheet" that Dr. Osagie made a report regarding Osaze and Osaze's text messages stating that he "wanted to die and made indirect threats to harm those that tried to help."  The hot sheet also indicated that a 302 warrant was obtained for Osaze and for the SCPD officers to be on the lookout for Osaze.

9.     Admitted in part. Denied in part. It is admitted only that this paragraph references a news article which purports to cite to data. It is denied that the data is accurate, and/or the study authoritative or binding. It is admitted that all police calls have potential danger, with those involving mental health crisis, coupled with homicidal and suicidal threats as reported here, being even more dangerous, and can result in innocent people or officers being killed by the person in mental health

---

[1] It is unknown what efforts were made by Dr. Osagie unrelated to his communication with SCPD, and what, if any, other information Dr. Osagie may have had relevant to this incident as, based upon information and belief, Dr. Osagie declined to be interviewed as part of the investigation into this incident.

crisis. *See*, e.g. https://people.com/crime/mississippi-officer-once-saved-childs-life-killed-line-duty/.   That is why mental health professionals and family members, with whom the person at issue has cut off all contact such as here, ask police officers to respond to these calls.

10. – 11.     Admitted in part. Denied in part.  It is admitted that responding to critical mental health crisis calls, requires training and experience, which SCPD provides to its officers.  SCPD has extensive policies, and progressive training in a number of relevant areas to include policies regarding mental health encounters and use of force.  Further, SCPD's history of successful policing and effective policies is evident in SCPD's accreditation by The Pennsylvania Chiefs of Police Association ("PCPA").  SCPD had a CIT program in place for about ten (10) years when this incident occurred and all three officers involved at Osaze's apartment had extensive training and experience in CIT, serving mental health warrants, and interactions with persons with mental health.  Since 2009, SCPD has served over 1400 mental health warrants such as this (including at least two (2) with Osaze), and handled thousands of other mental health related calls (including several with Osaze), with a number of these calls involving threats of violence and weapons, and none previously ended with a negative result and/or the need to deploy deadly force.

11.     Admitted in part and denied in part.  It is admitted that SCPD required all officers, after receiving training, to respond to assist those experiencing mental health issues.  It is denied that Answering Defendants disregarded or ignored any "foundational" principles of responding to mental critical mental health incidents.

12. – 13.     Denied.  Officer Pieniazek served his Country in the United States Army and was highly decorated, including being awarded the Purple Heart. He was also part of the rescue and recovery effort at the Pentagon following the attacks of September 11, 2001.  He likewise served his community as a police officer with the SCPD for 12 years with many accolades and appreciation from those he served in his role as a patrol officer including several life-saving awards; served as a member of the tactical unit, the bomb squad and as a Crisis Intervention Team Instructor; and voluntarily provided counseling to military veterans and officers interacting with veterans.  Officer Pieniazek successfully handled countless high stress incidents, including mental health crisis calls such as this, and received letters of appreciation and life-saving awards from those he helped.

In early 2019, Ofc. Pieniazek voluntarily sought counseling for issues in his personal life wholly unrelated to his performance as an officer.  There were no concerns raised or made to Chief Gardner, Captain Fishel or any member of SCPD, that Officer Pieniazek was unfit to perform his duties as an officer. Nevertheless,

7

his performance as an officer was monitored both before the counseling was sought, and when Ofc. Pieniazek returned to active patrol on March 11, 2019. There were no indications that his performance or service was in any way impacted, and Ofc. Pieniazek's personal, treating professional assured Ofc. Pieniazek and the Borough that Ofc. Pieniazek was fully fit to perform his functions as an officer with no restrictions or limitations.

The investigation of the March 20, 2019 shooting was comprehensive and included members of the Pennsylvania State Police and various professionals such as experts in ballistics, forensics, bias, and use of force. It also included a standard blood test of Ofc. Pieniazek immediately following the shooting for any indication of drugs or alcohol in his system – for which there was none.

In short, Officer Pieniazek – who is a father, son and brother, like all persons in all walks of life, had some stressors in his off-duty personal life, that had nothing to do with his actions in the present incident, or made his actions or right to protect his life and that of his fellow officers any less justified when Osagie charged at him with a knife within a 6' confined hallway.

14.     Denied. It is denied that Ofc. Pieniazek failed to apply standard police training to de-escalate and/or use less lethal options. On the contrary, Ofc. Pieniazek, when conversing with Osaze, spoke in a calm, conversational manner until it was revealed that Osaze was concealing a knife. Officer Pieniazek ordered

Osaze to drop the knife, but within seconds, Osaze charged at Ofc. Pieniazek and Sgt. Hill.

Officer Pieniazek, in response to Osage charging at the officers with a knife, justifiably and necessarily, and in defense of his life and that of his fellow officers, employed deadly force which, as determined by the Centre County District Attorney's Office and the Pennsylvania State Police, was reasonable, lawful, justifiable and in response to Osaze Osagie's deadly actions.

15.    Denied.  Ofc. Pieniazek was fully aware of the threatening text messages as reported at roll call in the morning of March 20, 2019 via the SCPD hot sheet.  He was also aware of the 302 warrant for Osaze.  By way of further denial, it is denied that Dr. Osagie requested SCPD to call him prior to making contact with Osaze.

16.    Denied.  Perhaps tellingly, the caseworker, who is believed to have been familiar with Osaze, and was from Strawberry Fields Inc., a mental health service who is believed to have provided services to Osaze, did not attempt to engage, intervene or assist Osaze or SCPD; but instead called Can Help, a mental health service who is believed to have provided services to Osaze who, perhaps tellingly, likewise did not attempt to engage, intervene or assist Osaze or SCPD; but instead called the Centre County Emergency Communications Center who then contacted SCPD to try to locate and make contact with Osaze. By way of further

answer, it is believed that Osaze had cut off all contact with his mental health providers, which is part of the reason why the 302 warrant was sought, and the police necessarily involved.  Further, Ofc. Pieniazek requested information regarding Osaze's clothing and direction of travel because Officer Pieniazek could not locate Osaze after a search of the area near where Osaze was last spotted by the caseworker.

17.     Admitted in part and denied in part.  It is admitted that Ofc. Pieniazek waited upon arrival near Osaze's apartment for other SCPD officers to arrive as it was unknown if Osaze was even at the apartment.

18.     Denied.  Sergeant Christopher Hill ("Sgt. Hill") of SCPD and Lieutenant Keith Robb ("Lt. Robb") of SCPD also responded to Osaze's apartment on March 20, 2019.  It is denied that Ofc. Pieniazek, Sergeant Hill and Lt. Robb did not devise a plan, nor share what they knew about Osaze.  Prior to making contact with Osaze, Lt. Robb called Detective Albright to confirm the apartment and the location of the hard copy of the 302 warrant to ensure it was still active. All SCPD officers working on March 20, 2019, including Ofc. Pieniazek, Sgt. Hill and Lt. Robb, were aware of Osaze's situation based on information passed at roll call that morning and from the hot sheet which included Osaze's threats and the 302 warrant.

19.     Denied.  It is denied that Sgt. Hill and Lt. Robb completely deferred to Ofc. Pieniazek who Plaintiff's incorrectly allege "had a complete lack of knowledge of the situation".  On the contrary, the three SCPD officers at Osaze's apartment in the afternoon of March 20, 2019, along with all other SCPD officers working the day shift were aware of Osaze's threats and the 302 warrant based on information passed at roll call that morning. All three officers had training in Crisis Intervention, had handled countless mental health calls without incident, and were very familiar with Osaze.

20.     Denied.  By way of further denial, all SCPD officers working on March 20, 2019—which included Ofc. Pieniazek, Sgt. Hill, and Lt. Robb —were fully aware of Osaze's threats and the 302 warrant for Osaze based on information passed at roll call that morning and on the SCPD hot sheet.

21.     Denied.  It is denied that the encounter with Osaze on March 20, 2019 was "routine" in the context that Plaintiff's Complaint implies.  The only thing routine about making contact with Osaze on March 20, 2019, was that the police officers of SCPD, including Ofc. Pieniazek, serve mental health warrants and are involved with persons in mental health crisis on an almost daily basis.  Ofc. Pieniazek, Sgt. Hill, and Lt. Robb were aware of the 302 warrant for Osaze and the threatening text messages.  The three SCPD officers confirmed the 302 warrant prior to knocking on Osaze's door to see if he was home and answered the door.

11

Along with Sgt. Hill and Lt. Robb, Ofc. Pieniazek had knowledge of Osaze's background and been involved in prior calls involving Osaze. The three officers present that afternoon on March 20, 2019, combined, had over fifty (50) years of service as police officers, had extensive training and had handled thousands of similar calls without incident or complaint.

22.     Denied. It is admitted only that Ofc. Pieniazek, Sgt. Hill and Lt. Robb were aware of Osaze's threats and developed a plan to make contact with Osaze to see if he was at his apartment to serve the 302 warrant. Ofc. Pieniazek was chosen to make contact with Osaze because he was in uniform.

23.     Denied. It is denied that Ofc. Pieniazek decided to "surprise" Osaze on March 20, 2019. On the contrary, Ofc. Pieniazek—who was in full uniform—made initial contact by knocking on the apartment door.

24.     Denied. By way of further denial, Ofc. Pieniazek, Sgt. Hill and Lt. Robb parked their vehicles, one of which was a marked police car, on the same block as Osaze's below-ground apartment. After developing a plan, confirming Osaze's apartment number and the 302 warrant, the three SCPD officers proceeded to the front door of Osaze's basement apartment to see if he was there. It is normal police practice to go to the front door of a residence when trying to make contact as opposed to "surprising" someone at their back door. Ofc. Pieniazek knocked normally on Osaze's door and covered the peep hole on Osaze's apartment door so

that if Osaze was at home, he would not see that it was the police, and would open the door, and not, among other concerns, barricade himself in the apartment (where his roommate was also located) attempt to flee the apartment or ready himself to attack the officers should he look through the peephole and see a uniformed officer standing at his door.[2]

25.     Denied.  Upon knocking on the door to Osaze's apartment, Osaze willingly opened the door for the officers.  Once the door was open, Ofc. Pieniazek calmly asked Osaze if the officers could enter the apartment and speak with him. Osaze refused the officer's request to enter the apartment.  Since Osaze refused to allow the SCPD officers to enter the apartment, Ofc. Pieniazek calmly asked Osaze to step out of the apartment and speak with him.

26.     Denied.  Upon asking Osaze to step out of the apartment, Ofc. Pieniazek noticed Osaze was concealing something in his right hand.  After seeing the concealed object in Osaze's hand was a knife, Ofc. Pieniazek drew his firearm and ordered Osaze to drop the knife multiple times.  Despite Ofc. Pieniazek

---

[2] Officers appearing at the door of a subject of a warrant as here, are exposed to the person looking through the peephole or some other security device to see who is awaiting them on the other side of the door, which exposes officers to greater danger including being killed. *See, e.g.* https://www.miamiherald.com/news/local/crime/article248942479.html  (Two FBI Agents murdered when suspect shot them through the front door after observing the waiting agents through a doorbell camera)

ordering Osaze to drop the knife multiple times, Osaze refused to drop the knife and initially went deeper into his apartment and out of view.  Seconds later, Osaze charged out of the apartment—running at full speed at Ofc. Pieniazek and Sgt. Hill who were several feet away with the knife at shoulder level. Sgt. Hill discharged his taser, and in response to the deadly threat, and in fear for his life, Ofc. Pieniazek fired his service weapon three (3) to four (4) times at Osaze while retreating backwards and falling onto the steps exiting the apartment hallway.  At no time prior to Osaze's deadly knife charge did any of the SCPD officers threaten Osaze. To the contrary, Officer Pieniazek spoke calmly with Osaze to try get him to cooperate with the officers so that they could get him help.

27.    Denied.  It is denied that there has been a "systemic failing" by the Borough and SCPD to implement and enforce policies and practices to protect persons with mental health disabilities during encounters with police.  SCPD has extensive policies, and progressive training in a number of relevant areas to include policies regarding mental health encounters and use of force.  Further, SCPD's history of successful policing and effective policies is evident in SCPD's accreditation by The Pennsylvania Chiefs of Police Association ("PCPA").  SCPD had a CIT program in place for about ten (10) years when this incident occurred and all three officers involved at Osaze's apartment had extensive training and experience in CIT, serving mental health warrants, and interactions with persons

14

with mental health.  Since 2009, SCPD has served over 1400 mental health warrants such as this (including at least two (2) with Osaze), and handled thousands of other mental health related calls (including several with Osaze), with a number of these calls involving threats of violence and weapons, and none previously ended with a negative result and/or the need to deploy deadly force.

28.     Denied.  As determined by the Centre County District Attorney's Office and the Pennsylvania State Police, Osaze's death, while tragic, was a necessary act of self-defense, and a justifiable and reasonable use of force by Ofc. Pieniazek in response to Osaze charging at him and Sgt. Hill at full speed with a knife and placing the lives the officers in imminent danger.

## THE PARTIES

29.     Admitted.

30.     Admitted.

31.     Admitted in part and denied in part.  It is admitted that at the time of the allegations that form the basis of the Amended Complaint, Ofc. Pieniazek was employed by SCPD as a police officer, acting under color of state law, and whose offices are located at 243 S. Allen Street, State College, Centre County, Pennsylvania.  It is denied that Ofc. Pieniazek violated Osaze Osagie's rights, privileges, and/or immunities.

32.    Admitted in part and denied in part.  It is admitted that at the time of the allegations that form the basis of the Amended Complaint, Sgt. Christopher Hill was employed by SCPD as a police Sergeant, acting under color of state law, and whose offices are located at 243 S. Allen Street, State College, Centre County, Pennsylvania.  It is denied that Sgt. Hill violated Osaze Osagie's rights, privileges, and/or immunities.

33.    Admitted in part and denied in part.  It is admitted that at the time of the allegations that form the basis of the Amended Complaint, Lt. Keith Robb was employed by SCPD as a police Lieutenant, acting under color of state law, and whose offices are located at 243 S. Allen Street, State College, Centre County, Pennsylvania.  It is denied that Lt. Robb violated Osaze Osagie's rights, privileges, and/or immunities.

34.    Admitted in part and denied in part.  It is admitted that at the time of the allegations that form the basis of the Amended Complaint, Capt. Christian Fishel was employed by SCPD as a police captain, acting under color of state law, and whose offices are located at 243 S. Allen Street, State College, Centre County, Pennsylvania.  It is denied that Capt. Fishel violated Osaze Osagie's rights, privileges, and/or immunities.

## JURISDICTION AND VENUE

35.    Admitted only as to This Honorable Court's Jurisdiction.

36.    Admitted only as to the appropriateness of venue in this District.

## **JURY DEMAND**

37.    Admitted only as to Plaintiff's demand for a jury trial.

## **FACTUAL ALLEGATIONS**

38.    Admitted upon information and belief.

39.    Admitted upon information and belief.

40. – 43.    Admitted in part.  It is admitted that Osaze suffered from mental health issues, and while properly medicated and/or monitored may have been a quiet, soft-spoken individual.  Sadly, like some other persons who suffer from mental illness, when Osaze was not using his required medication, was not monitored by his support system and/or cut off ties with his support system, Osaze sometimes caused a danger to himself, his family, neighbors and/or other members of the community to which SCPD officers and officers from other law enforcement agencies were called to address. Such incidents included setting his parents' home on fire, brandishing a knife in committing an armed robbery and dropping the knife only when ordered to do so by an officer armed with a firearm, throwing a brick through a window of his parents' home when he was evicted due to his behavior, attempting to enter another home in the early morning hours, and other dangerous and unpredictable actions as relayed by his parents where they reported, both orally and in writing, that they feared for their safety, that of their other children and

others. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of this allegation, and therefore, they are denied.

44.     Admitted.  By way of further response, all SCPD officers working on March 20, 2019 were informed of Osaze's threats and the 302 warrant.  These officers were told to be on the lookout for Osaze.

45.     Denied.  Osaze Osagie's text messages are written messages that speak for themselves and Plaintiff's characterization thereof is denied.  Although SCPD was aware of Osaze's messages indicating that he wanted to die and made threats of harm to those that he might encounter — at no point did Dr. Osagie inform the SCPD that Osaze would attempt "suicide by cop."  By way of further denial, when Osaze was sighted by his caseworker in the Weis grocery store parking lot, Osaze was carrying two bags of groceries, which would indicate that Osaze was not suicidal, but planning for the future.

46.     Admitted upon information and belief.

47.     Admitted in part and denied in part.  It is admitted that Dr. Osagie met with SCPD Officers to tell of Osaze's present situation on March 19, 2020.  Dr. Osagie first met Officer John Tlumac of SCPD and Officer Kurt Stere of SCPD on the evening of March 19, 2019.  Osaze's history of mental illness was known to SCPD and its officers, and they were very familiar with him because of their

18

numerous encounters with him over the past several years all of which ended peaceably and in none of which Osaze used violence against a SCPD officer, nor was force needed by the SCPD officers.

48.    Admitted in part and denied in part.  It is admitted that Dr. Osagie informed Officers Tlumac and Stere of Osaze's condition, however, Dr. Osagie never informed the SCPD officers that his son was going to attempt suicide by cop.

49.    Denied.  The statement of Officer Tlumac made to Capt. Matthew E. Wilson is a statement that speaks for itself and Plaintiff's characterization thereof is denied.  It is specifically denied that "warning signs" were clear that Osaze would attempt to kill the officers who were trying to help him. To the contrary, the officers of SCPD addressed several prior situations involving Osaze, that included violent incidents and threats of violence, one of which was with a knife as here, and all ended peacefully with Osaze complying with, and not attacking a SCPD officer.

50.    Denied as stated.  On March 19, 2019, Officers Stere and Tlumac of SCPD went to Osaze's apartment that night and learned from Osaze's roommate that Osaze had not been at the apartment.

51.    Denied.  On March 19, 2019, Officer Kurt Stere of SCPD contacted the Can Help hotline and learned that Osaze was not in contact with his case manager from Strawberry Fields.

52.     Admitted.  By way of further response, Officer Stere's attempted to "ping" Osaze's cell phone on March 19, 2019, but was without success because it is believed that the phone with either turned off, or the battery was dead.

53.     Admitted.  By way of further response, Officer Stere also entered Osaze as a missing person, placed a notice for all officers to be on the lookout for Osaze, and placed information regarding Osaze in the SCPD hot sheet.

54.     Denied.  The application for involuntary emergency examination and treatment is a document that speaks for itself and Plaintiff's characterization thereof is denied.

55.     Admitted.

56.     Denied.  Lt. Todd Scholton, the night shift lieutenant, informed day shift officers Lt. Chad Hamilton and Lt. Robb about the search for Osaze.  Lt. Hamilton, along with all other SCPD Officers on day shift, were all informed that Osaze was a threat to himself and others who might try to help.  This information was available to all day shift SCPD officers via the department hot sheet and during roll call on the morning of March 20, 2019.

57.     Denied.  On March 20, 2019, Lt. Keith Robb of SCPD, reviewed the daily bulletin board and observed the missing person case for Osaze.  Lt. Robb, who was well versed with Osaze's history to include the prior mental health calls and arson, assigned the investigation for Osaze to Detective Kris Albright.  Det.

Albright contacted Dr. Osagie to confirm that Dr. Osagie did not hear from his son. Det. Albright also called Osaze's roommate and pinged Osaze's cell phone without success.

58.     Admitted in part and denied in part.  Lt. Robb of SCPD knew Osaze's prior encounters with police and he did not believe Osaze would likely become violent based on prior encounters in which Osaze was not violent with, or towards law enforcement.

59.     Denied. Lt. Charles Hamilton, who was aware of the active 302 warrant and of Osaze's threats to himself and others, assigned Officer Amanda Estep of SCPD to locate Osaze.  Lt. Hamilton and Officer Estep when to Osaze's apartment at approximately 9:30 a.m. on March 20, 2019 to look for Osaze but were unsuccessful.  All SCPD officers, to include Lt. Hamilton and Officer Estep, were informed of Osaze's current situation as well as his threats against himself and others as provided in the SCPD hot sheet and at roll call on March 20, 2019.

60.     Admitted upon information and belief and with clarification. Despite receiving this text message, it is not believed that Osaze's caseworker attempted to locate Osaze, or volunteered to accompany SCPD if Osaze was located.

61.     Admitted.  By way of further answer and perhaps tellingly, the caseworker, who is believed to have been familiar with Osaze, and was from Strawberry Fields Inc., a mental health service who is believed to have provided

services to Osaze, did not attempt to engage, intervene or assist Osaze or SCPD; but instead called Can Help, a mental health service who is believed to have provided services to Osaze who, perhaps tellingly, likewise did not attempt to engage, intervene or assist Osaze or SCPD; but instead called the Centre County Emergency Communications Center who then contacted SCPD to try to locate and make contact with Osaze. By way of further answer, it is believed that Osaze had cut off all contact with his mental health providers, which is part of the reason why the 302 warrant was sought, and the police necessarily involved.

62.    Denied.  Lt. Chad Hamilton and Sgt. Christopher Hill were dispatched to Osaze's location.  Ofc. Pieniazek was dispatched because he was in the area and available to respond to the report.  Lt. Robb, who was at the SCPD station, chose to respond to assist in locating Osaze.

63.    Denied.  Ofc. Pieniazek did not need information about Osaze's situation because he was at the morning briefing and aware of Osaze's threatening text messages and the 302 warrant.  Ofc. Pieniazek, along with Sgt. Hill and Lt. Robb confirmed the 302 warrant prior to making contact with Osaze.  Ofc. Pieniazek was familiar with Osaze's history because he assisted with prior cases involving Osaze.  It is denied that Dr. Osagie requested the SCPD officers contact him before the SCPD officers made contact with Osaze.

64.     Denied.  It is denied that the encounter with Osaze on March 20, 2019 was "routine" in the context that Plaintiff's Amended Complaint implies.  The only thing routine about making contact with Osaze on March 20, 2019, was that the police officers of SCPD interact with persons in mental health crisis on an almost daily basis.  Those prior encounters with persons in mental health crisis often involve dangerous individuals and weapons such as knives and firearms.  Ofc. Pieniazek was aware of the 302 warrant for Osaze and the threats made by Osaze.  Ofc. Pieniazek was also involved with prior cases involving Osaze.  After failing to locate Osaze in the surrounding area, Ofc. Pieniazek requested a more detailed description and Osaze's last direction of travel.  He was informed that Osaze was last seen walking towards the area of his apartment.

65.     Denied.  It was not necessary to provide information regarding the 302 warrant for Osaze as well as the threats Osaze made because Ofc. Pieniazek was aware of circumstances.  In addition, Ofc. Pieniazek, Sgt. Hill and Lt. Robb discussed the 302 warrant and threats made by Osaze prior to making contact.

66. – 67.     Denied.  The alleged statement of Ofc. Pieniazek to investigators is a statement that speaks for itself and Plaintiff's characterization thereof is denied.  By way of further denial, the encounter with Osaze on March 20, 2019 was not "routine."  The only thing routine about making contact with Osaze on March 20, 2019, was that the police officers of SCPD serve mental

health warrants such as here and are involved with persons in mental health crisis on an almost daily basis. Those prior encounters with persons in mental health crisis often involve dangerous individuals and weapons such as knives and firearms.

68.    Admitted in part and denied in part. It is admitted that Sgt. Hill and Lt. Robb arrived on the scene after Ofc. Pieniazek. It is denied that Ofc. Pieniazek did not have the same information as Sgt. Hill and Lt. Robb regarding Osaze's threats and 302 warrant.

69.    Admitted in part and denied in part. It is admitted that Ofc. Pieniazek was junior to a Sergeant and Lieutenant. However, Ofc. Pieniazek had approximately 12 years of police experience on March 20, 2019. Combined, all three SCPD officers had over fifty (50) years of experience between them. It is denied that Ofc. Pieniazek had the least amount of mental health training and had not undergone crisis intervention training in approximately six years. On the contrary, Ofc. Pieniazek was highly experienced in mental health-related training, and was qualified as an instructor in certain areas of mental health. He received SCPD mental health identification training on February 13, 2017 and training on Surviving Verbal Conflict on February 5, 2019. Ofc. Pieniazek was current on his mandatory in-service training as of March 20, 2019. He also attended an annual

SCPD policy review in 2019 that included a review of the departmental policy on mental health procedures.

70.     Denied.  It is denied that the SCPD officers considered this matter to be "routine" in the context that Plaintiff's Amended Complaint implies.  Prior to making contact with Osaze, Lt. Robb called Detective Albright to confirm the apartment and the location of the hard copy of the 302 warrant to ensure it was still active.  The three SCPD officers discussed the situation and that Osaze was a dangerous to himself and others.  Furthermore, all SCPD officers working on March 20, 2019 were aware of Osaze's threats and 302 warrant based on information passed at roll call that morning and from the hot sheet.

71.     Denied.  At no point did Dr. Osagie request the SCPD officers call him before making contact with Osaze when he was found.  By way of further denial, SCPD would not have known of Osaze's whereabouts had they not received a call from Osaze's Strawberry Field's case worker via Can Help and the Centre County Emergency Communications Center that Osaze was spotted near the Weis Market, and thus both mental health providers were aware that SCPD officers were trying to locate Osaze and could have, but did not, offer to dispatch mental health workers to assist.  Osaze's mental health case worker who saw Osaze did not request the SCPD officers first call Dr. Osagie, nor offer to assist SCPD officers. It is admitted that SCPD was not informed of, nor provided with, a

"written behavioral health plan" (which is presumed to be a medical record protected by HIPAA and available to medical providers and perhaps the Osagie family only) by Dr. Osagie nor anyone else.

72.     Admitted in part and denied in part.  It is denied that there are "basic, universal precepts" of how police calls such as this are handled. There are various and sometimes opposite approaches and opinions as to how to best respond to mental health calls with none of the various approaches as binding, authoritative or without criticism. Further, just as each human being is unique, each mental health crisis is unique and each incident is unique, the response to the same does not call for, nor is capable of a simple, uniform and risk-free response. By way of further answer, Ofc. Pieniazek, Sgt. Hill, and Lt. Robb remained calm, displayed a genuine desire to help, avoided disruptions and distractions, and addressed safety concerns.  These three officers were highly trained and experienced in handling a mental health crisis calls including those involving scenarios such as this, and calls with Osaze.

73.     Denied.  It is denied that Ofc. Pieniazek, Sgt. Hill, and Lt. Robb tried to take Osaze by surprise and treated him like an "at-large criminal suspect". To the contrary, they approached and handled this call as they had with many before it with professionalism, calmness and a genuine desire to secure Osaze safely to get him the help that he needed.  By way of further answer, the officers did not know if

Osaze was even at his home when they arrived, and if so, if he would answer his door.

74.     Denied.  By way of further denial, the three SCPD officers parked their vehicles, one of which was a marked police car, on the same block as Osaze's below-ground apartment.

75.     Denied.  "Contact and cover" is a common tactic employed by police departments throughout the United States and Plaintiff's characterization thereof is denied.  It is also common police practice for more than one officer to respond to a call for police assistance.  While the SCPD officers used the tactic of "contact and cover" in the afternoon of March 20, 2019, it was not used to "send a message" to Osage that the officers were "willing to protect the contact officer" and would use "deadly force if necessary."  To the contrary, it was to provide protection and safety to the officers and Osaze and try to secure him with as little risk to him and the officers as possible.

76.     Denied.  Plaintiff's characterization of the police tactics utilized, and the decisions made by the SCPD officers—with over fifty (50) years of combined police experience—in the afternoon of March 20, 2019 are denied.  It was reported to SCPD that Osaze was last seen heading towards his basement apartment.  After not locating Osaze following a search of the surrounding area, the SCPD officers proceeded to Osaze's apartment to see if he was at the apartment.  Osaze's

apartment was located below ground and required the officers to occupy the small vestibule to knock on Osaze's front door. Sgt. Hill deployed non-deadly force in the form of his SCPD issued Taser as Osaze charged at the officers with a knife in his hand, but which appeared to have no effect on Osaze, nor did it stop or prevent his attempted deadly attack.

77. – 78.    Admitted in part and denied in part.  It is admitted that Ofc. Pieniazek knocked on Osaze's front door and covered the peephole.  It is denied that this was an attempt to "trick" Osaze.  On the contrary, Ofc. Pieniazek covered the peephole to the door so that if Osaze was home, he would not see it was the police and, among other things, barricade himself in the apartment (where his roommate was located), attempt to flee the apartment, or ready himself to attack the officers.  In this instance, shortly after Ofc. Pieniazek knocked on Osaze's door, Osaze willingly opened the door for the officers with a knife in his hand and initially hidden from the officers' view. The remaining averments of these paragraphs are denied.

79. – 83.      Admitted.  By way of further answer, Ofc. Pieniazek first asked Osaze if he could come in and talk with him, and when he refused, asked if Osaze was willing to come out and have a conversation with the officers. During their conversation, Ofc. Pieniazek noticed Osaze had something concealed behind

the wall in his right hand—which turned out to be a knife.  The conversation was calm and pleasant.

84. – 86.       Denied. The initial encounter with Osaze was pleasant and without incident, however, in a matter of seconds, it became apparent to the SCPD officers that Osaze was holding a knife, and when asked to drop the knife, Osaze briefly moved out of sight and then immediately charged at the officers, knife in hand and presenting an immediate deadly threat to which Ofc. Pieniazek in fear of and protection of his own life, fired his weapon. By way of further denial, neither the mental health professionals from Strawberry Fields or Can Help who first encountered Osaze, confronted him, offered to assist SCPD or responded to the apartment to offer to assist the officers. Further, at no point did Dr. Osagie request SCPD contact him before making contact him with Osaze, should he be located. Finally, between the time that Officers went to the apartment to see if Osaze was there and he answered the door, to when he charged at the officers with a knife in his hand, was estimated to be only 25-30 seconds.

87.       Denied.  Any statement made by Lt. Robb, is a statement that speaks for itself and Plaintiff's characterization thereof is denied.  By way of further denial, Lt. Robb heard Ofc. Pieniazek tell Osaze "drop the knife."  The knife that Osaze was holding at the time of the incident was taken into evidence by the Pennsylvania State Police who were called to investigate this matter.

88.     Admitted in part and denied in part.  It is admitted that Ofc. Pieniazek drew his duty weapon and ordered Osaze to drop the knife that Osaze had previously concealed— to which Osaze refused.  It is also admitted that Lt. Robb told Sgt. Hill to get his taser ready.  Sgt. Hill unholstered his taser when he identified Osaze was holding a knife and Lt. Robb proceeded to move back up the stairs away from Osaze's apartment for protection.

89. – 94.     Denied as stated.  Following a brief interaction with Osaze, Ofc. Pieniazek noticed Osaze was concealing something in his right hand.  Osaze took a couple of steps back, held up a knife to approximately shoulder height and yelled "shoot me, kill me."  Ofc. Pieniazek responded, "No!" to Osaze's request and yelled for Sgt. Hill to tase Osaze.  Ofc. Pieniazek stepped back as far as the area would allow and continued to order for Osaze to drop the knife. At this point, Osaze disappeared out of sight into his apartment while Ofc. Pieniazek continued to back-up towards the stairs and ordered Osaze to drop the knife, as Osaze sprinted out of the apartment holding the knife at shoulder level.  Sgt. Hill attempted to tase Osaze, but the taser had no effect on Osaze.  The lapsed time from when Sgt. Hill unholstered his taser to the time it was fired was approximately ten (10) seconds.  Although the taser probes impacted Osaze, it was ineffective in stopping Osaze's attempted deadly attack.  Ofc. Pieniazek, falling backwards into Sgt. Hill, and in fear for his life, fired his weapon three (3) to four

30

(4) times at Osaze who was approximately two (2) to three (3) feet away – knife in hand.  After the shots and the threat ended, Lt. Robb went to obtain the medical kit from the police cruiser and called out a request for medical personnel. According to records and as determined in the investigation by the PSP, Ofc. Pieniazek, Sgt. Hill and Lt. Robb were on scene and at Osaze's apartment at approximately 1:49 p.m. on March 20, 2019.  At 2:03 p.m. on March 20, 2019, the report was made of shots fired.  Ofc. Pieniazek, Sgt. Hill and Lt. Robb estimated the total time between knocking on Osaze's door and shots being fired was about 25 to 30 seconds.

95.     Denied.  The autopsy report of Osaze Osagie is a written report that speaks for itself and Plaintiff's characterization thereof is denied.  By way of further answer, the pathology report confirmed the taser utilized by Sgt. Hill would probably not have disabled Osaze.  The autopsy report also indicated that Osaze, knife in hand, was turning towards Sgt. Hill when he was hit by the first bullet. The report further confirmed that the second and third shots fired by Ofc. Pieniazek occurred as he was moving away from Osaze and falling backwards towards Sgt Hill and Lt. Robb.[3]

---

[3] It is assumed that this paragraph refers to the autopsy performed as part of the official investigation of this incident, and not a second autopsy which, upon information and belief, was undertaken by the Osagie family, the results and report of which have not been shared, provided or disclosed.

96.     Denied.  By way of further answer, it is SCPD policy to review all incidents involving the use of deadly force.  Accordingly, Captain Matthew Wilson, Assistant Chief of SCPD, completed an internal review to be presented to SCPD's Conduct and Procedures Review Board. SCPD Captain Chris Fishel convened the Conduct and Procedures Review Board charged with reviewing the SCPD policy and procedure as it relates to this matter.  Captain Fishel played no role in Board's decision. The Review Board found the SCPD officers' actions, including the events leading up to the use of deadly force, were within policy limits.

97.     Admitted.  By way of further admission, The SCPD Board of Review unanimously found the SCPD officers' actions were within the SCPD Use of Force and Deadly Force policy.  Internal Affairs report found that "[t]his tragic event is unprecedented as it has never occurred before in our department's 103-year history."  The Centre County District Attorney's Office concluded that the shooting death of Osagie was a justifiable and reasonable use of force.

98. – 99.     Denied.  Officer Pieniazek served his Country in the United States Army and was highly decorated, including being awarded the Purple Heart. He was also part of the rescue and recovery effort at the Pentagon following the attacks of September 11, 2001.  He likewise served his community as a police officer with the SCPD for 12 years with many accolades and appreciation from

those he served in his role as a patrol officer including several life-saving awards; served as a member of the tactical unit, the bomb squad and as a Crisis Intervention Team Instructor; and voluntarily provided counseling to military veterans and officers interacting with veterans.  Officer Pieniazek successfully handled countless high stress incidents, including mental health crisis calls such as this, and received letters of appreciation and life-saving awards from those he helped.

There were no concerns raised or made to Chief Gardner, Captain Fishel or any member of SCPD that Officer Pieniazek was unfit to perform his duties as an officer, about Officer Pieniazek's conduct on-duty, and/or off-duty in his personal life about domestic violence, that would cause concern about Officer Pieniazek's fitness for duty.

Further, while Officer Pieniazek readily acknowledges that there was marital discord between he and his soon-to-be ex-wife, he adamantly denies that he ever engaged in violence towards his ex-wife. Indeed, no complaint of alleged violence was ever made by Ofc. Pieniazek's soon-to-be ex-wife to SCPD administrators, or to any police agency where the family resided prior to the incident at issue.

100. – 106.   Admitted in part. Denied in part. It is admitted that in early 2019, an individual relayed that Ofc. Pieniazek's soon-to-be ex-wife, raised concerns about Ofc. Pieniazek's off-duty conduct, which Capt. Fishel and SCPD

officials followed up on with Ofc. Pieniazek's then - wife. The ex-wife raised no concerns or complaints about violence, threats of violence or any safety concerns, and denied that there were any such concerns. Capt. Fishel and Chief Gardner met with Officer Pieniazek, who to his credit, acknowledged that he would welcome assistance, and thereafter voluntarily sought counseling for issues in his personal life wholly unrelated to his performance as an officer.  Contrary to the allegations in this paragraph, there were no concerns raised or made to Chief Gardner, Captain Fishel or any member of SCPD, involving violence or threats of violence, or that Officer Pieniazek was unfit to perform his duties as an officer. Nevertheless, his performance as an officer was monitored both before the counseling was sought, and when Ofc. Pieniazek returned to active patrol on March 11, 2019, and there were no indications that his performance or service was in any way impacted including his handling of two high-stress and dangerous incidents.  Further, Ofc. Pieniazek's personal, treating professional assured Ofc. Pieniazek and the Borough that Ofc. Pieniazek was fully fit to perform his functions as an officer with no restrictions or limitations.

The investigation of the March 20, 2019 shooting was comprehensive and included members of the Pennsylvania State Police and various professionals such as experts in ballistics, forensics, bias, and use of force.  It also included a standard

blood test of Ofc. Pieniazek immediately following the shooting for any indication of drugs or alcohol in his system – for which there was none.

107.    Admitted with clarification. It is admitted that on March 20, 2019 – *9 days* after Officer Pieniazek was fully cleared to return to duty and with no indication before or after this period of voluntary leave of any unfitness for duty – Officer Pieniazek, in response to Osage charging at the officers with a knife, and in defense of his life and that of his fellow officers, employed deadly force which, as determined by the Centre County District Attorney's Office and the Pennsylvania State Police, was reasonable, necessary, lawful, justifiable and in response to Osaze Osagie's deadly actions.

108.    Denied.

109.    Admitted in part. Denied in part.  It is admitted that Capt. Fishel was not interviewed by the Pennsylvania State Police[4] as to Ofc. Pieniazek's personal life as it had no bearing on Ofc. Pieniazek's use of force on March 20, 2019, nor was it relevant to what is an objective legal question – was the use of deadly force justified under the facts and law? As indicated above, the comprehensive, third-party investigation into the events of March 20, 2019 found the shooting to be reasonable, lawful, and justifiable in response to Osaze Osagie's deadly actions,

---

[4] It is presumed that "SCPE" referenced in Plaintiff's Amended Complaint is a typographical error and refers to the Pennsylvania State Police.

and included a standard blood test of Ofc. Pieniazek for any indication of drugs or alcohol in his system – for which there was none.

110.    Admitted in part. Denied in part.  It is admitted that Capt. Fishel, as part of his assigned duties, instructed the SCPD's Conduct and Procedures Review Board as to the process that they would follow. It is denied that Capt. Fishel was a witness to the shooting or played any role in the Board's analysis and determination that the use of deadly force and actions of the involved officers were proper and lawful – the same conclusion that two other investigative bodies – the Centre County District Attorney's Office and the Pennsylvania State Police – found.

111. – 115.  It is denied that Ofc. Pieniazek was mentally unstable and had a propensity for violence.  To the contrary, over his 12-year career with SCPD served his community as a police officer with the SCPD for 12 years with many accolades and appreciation from those he served in his role as a patrol officer, member of the tactical unit, and the bomb squad, and voluntarily provided counseling to military veterans and officers interacting with veterans.  Officer Pieniazek successfully handled countless high stress incidents, including mental health crisis calls such as this, and received letters of appreciation from those he helped and life-saving awards.

In March 2019, Ofc. Pieniazek's personal, treating professional assured Ofc. Pieniazek and the Borough that Ofc. Pieniazek was fully fit to perform his functions as an officer with no restrictions or limitations.  It is further denied that SCPD "created a danger" to Osaze.  On the contrary, SCPD's encounter with Osaze was dangerous for many reasons not created by or caused by SCPD or its officers, and became life-threatening when Osaze revealed a concealed knife and charged the SCPD officers while ignoring their commands.

113.    Denied.  As indicated above, Ofc. Pieniazek was "fit for duty" on March 20, 2019.  Further, Ofc. Pieniazek's actions in defense of his life and that of his fellow officers, were justified and part of a standard use of force response to a person brandishing a knife and charging at him and other SCPD officers.

114. – 115.    Denied.  In his twelve (12) year career with SCPD, Ofc. Pieniazek never exhibited erratic and/or violent behavior while on duty.  Any personal issues Ofc. Pieniazek may have had did not impact his duties as a SCPD Officer.  Further, Ofc. Pieniazek was found to be fully fit by his personal, treating professional in March 2019 prior to the events of March 20, 2019.  As determined by the Centre County District Attorney's Office and the Pennsylvania State Police, the force used by the SCPD officers was reasonable, lawful, justifiable and in response to Osaze Osagie's deadly actions.

116.   Admitted in part and denied in part.  It is admitted that SCPD Officers receive 40 hours of initial CIT training and a subsequent updated training. All SCPD officers involved in this matter completed CIT and de-escalation training.  It is denied that SCPD instituted CIT training because it believed, in the absence of training, encounters between people with mental illness and SCPD would be "highly likely" to result in injury or death to such persons.  On the contrary, SCPD implemented its CIT program to better equip its officers to provide help to those that are suffering from mental health issues.  SCPD had a crisis intervention training program in place for about ten (10) years when this incident occurred and all three officers involved at Osaze's apartment had extensive training and experience in CIT, serving mental health warrants, and interactions with persons with mental health issues.  Since 2009, SCPD served over 1400 mental health warrants such as this, including at least two (2) with Osaze, and handled thousands of other mental health related calls, including several with Osaze, with a number of these calls involving threats of violence and weapons, and none previously ended with a negative result and/or the need to deploy deadly force.

117.   Admitted.  By way of further answer, SCPD's Crisis Intervention Team was in place for about ten (10) years when this incident occurred.  All three officers involved at Osaze's apartment had extensive training and experience in CIT, serving mental health warrants, and interactions with persons with mental

38

health issues. Since 2009, SCPD has served over 1400 mental health warrants such as this, including at least two (2) with Osaze, and handled thousands of other mental health related calls, including several with Osaze, with a number of these calls involving threats of violence and weapons, and none previously ended with a negative result and/or the need to deploy deadly force.

Per the Task Force on Mental Health Crisis Services Final Report Presented to Centre County Commissioners & State College Borough Council, dated November 10, 2020:

> Since 2011, police officers in Centre County are provided yearly Crisis Intervention Team (CIT) training. CIT is designed to promote collaboration between law enforcement personnel, the community mental health system, individual and family advocates, and other stakeholders to improve safety. Centre County has the highest percentage of CIT trained police officers in Pennsylvania at 95-97%.[5]

118.    Admitted in part and denied in part. It is admitted that the "Memphis Model" is one of a number of approaches to responding to mental health calls that require police involvement. It is denied that the Memphis Model is mandatory or binding.

---

[5] *See* Task Force on Mental Health Crisis Services Final Report Presented to Centre County Commissioners & State College Borough Council, at 16, available at https://www.statecollegepa.us/DocumentCenter/View/22714/Mental-Health-Task-Force-Final-Report-111020?bidId= (last visited December 7, 2020).

119.    Denied.  It is specifically denied that the Borough was inept and deliberately indifferent in the implementation of its CIT program.  SCPD has extensive policies, and progressive training in a number of relevant areas to include policies regarding mental health encounters and use of force.  Further, SCPD's history of successful policing and effective policies is evident in SCPD's accreditation by The Pennsylvania Chiefs of Police Association ("PCPA").  SCPD had a CIT training program in place for about ten (10) years when this incident occurred and all three officers involved at Osaze's apartment had extensive training and experience in CIT, serving mental health warrants, and interactions with persons with mental health issues.  Since 2009, SCPD has served over 1400 mental health warrants such as this, including at least two (2) with Osaze, and handled thousands of other mental health related calls, including several with Osaze, with a number of these calls involving threats of violence and weapons, and none previously ended with a negative result and/or the need to deploy deadly force.

120.    Denied.  Plaintiff's cherry-picked portions of select sources – some of which are instructive, but none of which are mandatory - ignores and misstates the full text of the sources from which they are taken.  For example, Plaintiff's Complaint fails to note from one of the sources from which they quote that:

> The number of trained CIT officers available to any shift
> should be adequate to meet the demand load of the local

consumer community. Experience has shown that a successful CIT program will have trained 20-25% of the agency's patrol division. ***There are differences that exist between large urban communities and small rural communities. Smaller agencies may need to train a higher percentage of officers.*** Ultimately, the goal is to have an adequate number of patrol officers trained in order to ensure that CIT-trained officers are available at all times.[6]

Therefore, due to the size of the department and to adequately meet the demand for police officers with crisis intervention training, SCPD trained and certified most of its officers, who are an elite group of passionate, experience law enforcement personnel.

121.   Denied.  As a veteran of the U.S. Army and Iraq War, and recipient of the Purple Heart who assisted in the recovery efforts at the Pentagon in the days following September 11, 2001, Ofc. Pieniazek was well-qualified for crisis intervention and demonstrated such over the course of his career.  Ofc. Pieniazek past experiences made him empathetic to those in need.  During his twelve (12) year career with SCPD, Officer Pieniazek successfully handled countless high

---

[6] The University of Memphis, "Crisis Intervention Team Core Elements" at 10, *available at* http://www.citinternational.org/resources/Pcitures/CoreElements.pdf (last visited December 7, 2020) (emphasis added). *See also* Critical Issues in Policing Series, Use of Force: Taking Policing to a Higher Standard, 30 Guiding Principles, at 19, January 29, 2016 (**"Some agencies may choose to provide in-depth CIT training to all of their personnel."**) *available at* https://www.policeforum.org/assets/30guidingprinciples.pdf (last visited December 7, 2020).

stress incidents, including mental health crisis calls such as this, and received letters of appreciation from those he helped.

122.  Denied.  As stated in the preceding paragraph Ofc. Pieniazek was well suited for crisis intervention.  Any stressors that Ofc. Pieniazek may have had in his personal life, did not impact his duties as a SCPD officer.

123.–129.    Denied.  Plaintiff continues to cherry-pick portions of select sources—some of which are instructive, but none of which are mandatory—ignores and misstates the full text of the sources from which they are taken. Plaintiff cites to the opinion of an administrator of a <u>large</u> <u>urban</u> police department with ten (10) times the number of officers as SCPD, as to what he recommends for <u>large</u> <u>urban</u> police agencies as to CIT training.[7]  The sources selected by Plaintiff are hardly mandatory for police officers, nor are these sources applicable to police departments such as SCPD.  The only aspect of the Memphis Model that is potentially applicable to SCPD is the precept that "responding officers obtain and analyze *all available intelligence . . .* before responding."  However, this concept is

---

[7] It is important to note the allegations in the Amended Complaint suggest screening and training only a subset of the police department in the area of crisis intervention.  As a medium sized suburban police department SCPD is comprised of approximately 60 police officers.  If SCPD were to only train 25% of the patrol force, this would be approximately 15 police officers to handle all calls involving persons with mental health difficulties, 24-hours per day, 7 days per week, and 365 days per year. Of the calls for assistance received by SCPD, perhaps as many as 50% involve persons experiencing some form of mental health issues.

not only applicable in the Memphis Model, but is a common, core function of police work - which SCPD implements for every response it makes.

As a small, suburban police force, SCPD properly trained all its officers in crisis intervention. All approximately 60 police officers in the ranks of SCPD volunteered to join the force and are committed to serving the community and upholding the law. As part of that commitment, each SCPD officer was reviewed and carefully selected before being hired to join SCPD. Once selected and after attending the police academy, each SCPD officer receives training in the area of crisis intervention to be better able to serve the community and those with mental health needs. SCPD officers are evaluated on an annual basis to ensure each officer's performance is optimal. Furthermore, no officer would be allowed to respond to a call for assistance, especially a call involving a person in the midst of a mental health crisis, if SCPD did not believe the officer was capable of handling the situation.

As provided above, based on his experience and performance, Ofc. Pieniazek was well suited to not only receive crisis intervention training and respond to calls for crisis intervention—he was also a crisis intervention instructor. Ofc. Pieniazek had the requisite knowledge, training, and experience to be able to respond to the call on March 20, 2019.

130.   Denied.  By way of further Answer, although not required, Centre County Emergency Communications Center has attended CIT training prior to March 20, 2019 and continue to receive CIT training.

131. – 132.   Denied.  By way of further answer and specific to this incident, SCPD officers do obtain and analyze available intelligence before responding to all calls for police assistance, including in this instance when SCPD officers, including Ofc. Pieniazek, received and were aware of the Osaze's current condition, 302 warrant, and background before approaching his front door to see if was at his apartment. In sum, the policies, practices and training of SCPD as to service of 302 warrants and assisting those in mental health crisis were at all times progressive, thorough, appropriate and lawful.

133.   Denied.  Furthermore, SCPD Officers receive 40 hours of structured CIT training and a periodic refresher. SCPD has extensive policies, and progressive training in a number of relevant areas to include policies regarding mental health encounters and use of force.  SCPD had a crisis intervention training program in place for about ten (10) years when this incident occurred and all three officers involved at Osaze's apartment, had extensive training and experience in CIT, serving mental health warrant, and interactions with persons with mental health.  Since 2009, SCPD has served over 1400 mental health warrants such as this including, at least two (2) with Osaze, and handled thousands of other mental

health related calls, including several with Osaze, with a number of these calls involving threats of violence and weapons, and none previously ended with a negative result and/or the need to deploy deadly force.

The three SCPD officers responding of Osaze's apartment on March 20, 2019, combined, possessed over fifty (50) years of law enforcement experience, were CIT trained, had successfully handled numerous mental health calls including prior calls with Osaze, and demonstrated a dedication to CIT including that Ofc. Pieniazek was a CIT presenter, and Lt. Robb is a certified Crisis Negotiations Team member by the National Tactical Officers Association and the Phoenix Consulting Group in both Basic and Advanced Crisis Negotiations.

134.   Denied. Notably, Plaintiff's Complaint does not list any prior uses of deadly force by SCPD, much less any that were determined to be unjustified, because no such events occurred in SCPD's 103-year history.  Furthermore, the prior uses/threatened uses of tasers by SCPD in 2016 and 2017 were Board reviewed and found to be reasonable and within SCPD policy.  In 2016 and 2017, SCPD responded to approximately 139 and 162 calls involving mental health incidents, respectively.  Furthermore, in 2018 there were no threats, nor use of tasers by SCPD despite the approximately 142 cases involving persons with mental health issues.  In addition, in 2019 there were only three uses of tasers and three threats of tasers use by SCPD for approximately 139 cases involving persons with

mental health issues.  The incidents that involved the use of a taser in 2019 were found to be reasonable and within SCPD policy.

135.   Denied.  It is denied that SCPD failed to implement a meaningful and effective CIT program and policies. Prior to making contact with Osaze, Lt. Robb called Detective Albright to confirm the apartment and the location of the hard copy of the 302 warrant to ensure it was still active. The three SCPD offers were well aware they were serving a 302 warrant on an individual who had made threats against himself and others.  Per the SCPD Mental Health/Intellectual Disability (MHID) policy, "[i]n some cases there are incidents in which the person to be picked up may be a danger to him or himself or others . . . [t]his individual may require immediate police action prior to the arrival of the crisis worker with the warrant."  Here, the SCPD Officers made first contact with Osaze because Osaze's mental health caseworker from Strawberry Fields contacted Can Help who requested, via Centre County Emergency Communications Center, that SCPD to make first contact.  Further, upon receipt of the 302 warrant from the Emergency Department of Mount Nittany Medical Center, the 302 warrant was given to SCPD to serve on Osaze.

136.   Denied.

137.   Denied.  The caseworker, who is believed to have been familiar with Osaze, and was from Strawberry Fields Inc., a mental health service who is

46

believed to have provided services to Osaze, did not attempt to engage, intervene or assist Osaze or SCPD; but instead called Can Help, a mental health service who is believed to have provided services to Osaze who, perhaps tellingly, likewise did not attempt to engage, intervene or assist Osaze or SCPD; but instead called the Centre County Emergency Communications Center who then contacted SCPD to try to locate and make contact with Osaze.  At no point, did any of the above mental health providers send anyone to assist SCPD in locating or speaking with Osaze, nor volunteer to do so. By way of further answer, it is believed that Osaze had cut off all contact with his mental health providers, which is part of the reason why the 302 warrant was sought, and the police necessarily involved.

138.   Denied.  Mental health case workers do not serve 302 warrants.  In the majority of cases involving persons with mental health issues, the mental health case worker will only meet the SCPD officers at the hospital <u>after</u> the person has been taken into custody and the situation has been defused.  Further, upon receipt of the 302 warrant from the Emergency Department of Mount Nittany Medical Center, the 302 warrant was given to SCPD to serve on Osaze. The deference by the Strawberry Fields case worker and Can Help speaks to the deference and trust those mental health providers have in SCPD to handle a situation involving a person in mental health crisis.  Furthermore, the reliance by mental health

organization such as Strawberry Fields and Can Help on police departments, such as SCPD, speaks to the dangers that can be involved when a 302 warrant is served.

139.   Denied. To the contrary, as detailed in the above paragraphs, and as concluded by the Centre County District Attorney's Office and the Pennsylvania State Police, the actions of SCPD and its SCPD officers were proper, reasonable and lawful.

140.   Denied.  To the contrary, as detailed in the above paragraphs the policies, practices and training of SCPD as to service of 302 warrants and assisting those in mental health crisis were at all times appropriate, progressive and lawful.

## ALLEGED FIRST CAUSE OF ACTION
Alleged Fourth/Fourteenth Amendment – Excessive Force
(Against Defendants Pieniazek, Hill and Robb)

141.  Answering Defendants incorporate herein by reference their answers to paragraphs 1 through 140 of Plaintiff's First Amended Complaint as if fully set forth herein.

142. – 144.   Denied.   As determined by the Centre County District Attorney's Office and the Pennsylvania State Police, the force used by the SCPD officers was reasonable, lawful, justifiable and in response to Osaze Osagie's deadly actions.

WHEREFORE, Answering Defendants respectfully request This Honorable Court enter judgment in their favor and against Plaintiff, together with costs,

disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any

further relief deemed appropriate by This Honorable Court.

## ALLEGED SECOND CAUSE OF ACTION
Alleged violation of 42 U.S.C. § 1983 – *State Created Danger*
(Against the Borough of State College and Defendant Fishel)

145.   Answering Defendants incorporate herein by reference their answers

to paragraphs 1 through 144 of Plaintiff's First Amended Complaint as if fully set

forth herein.

146. - 147.   Denied.  Given SCPD's past experiences with Osaze wherein

he was cooperative and did not resort to violence, and the fact that Osaze was last

seen walking towards his apartment carrying groceries, it was not foreseeable that

SCPD's response would end with Osaze Osagie charging at the SCPD officers

with a knife forcing the officers to use force in self-defense.  Any police officer

placed in Ofc. Pieniazek's position would respond in the same self-defensive

manner to Osaze's charge with a knife. By way of further answer, the situation was

dangerous for many reasons not created by or caused by SCPD or its officers, and

became life-threatening to the officers when Osaze revealed a concealed knife and

charged the SCPD officers while ignoring their commands.

148. – 150.   Denied.  As per the prior responses, Ofc. Pieniazek did not

require "supervision" while on duty, and when he responded to Osaze's apartment,

Ofc. Pieniazek was accompanied by his fellow SCPD officers, Sgt. Hill and Lt.

49

Robb.  After arriving and making contact with Osaze, Ofc. Pieniazek, after seeing

Osaze was attempting to conceal a knife, responded by unholstering his service

weapon and ordering Osaze to drop the knife.  Refusing to listen to Ofc.

Pieniazek's commands, Osaze then charged the SCPD officers with knife in hand.

Only after Osaze charged the officers, and in an effort to protect the lives his

fellow officers and himself, Ofc. Pieniazek engaged Osaze with his service

weapon.  At no point prior to Osaze revealing he had a knife and charging the

SCPD officers, was *any* force used against him.

WHEREFORE, Answering Defendants respectfully request This Honorable

Court enter judgment in their favor and against Plaintiff, together with costs,

disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any

further relief deemed appropriate by This Honorable Court.

### ALLEGED THIRD CAUSE OF ACTION
Alleged violation of 42 U.S.C. § 1983 – *Failure to Supervise*
(Against Borough of State College and Defendant Fishel)

151.   Answering Defendants incorporate herein by reference their answers

to paragraphs 1 through 150 of Plaintiff's First Amended Complaint as if fully set

forth herein.

152. – 155. Denied.  It is admitted that in early 2019, an individual relayed

that Ofc. Pieniazek's soon-to-be ex-wife, raised concerns about Ofc. Pieniazek's

off-duty conduct, and Capt. Fishel and SCPD officials followed up on with Ofc.

Pieniazek's then - wife. The ex-wife raised no concerns or complaints about violence, threats of violence or any safety concerns, and denied that there were any such concerns. Capt. Fishel and Chief Gardner met with Officer Pieniazek, who to his credit, acknowledged that he would welcome assistance, and thereafter voluntarily sought counseling for issues in his personal life wholly unrelated to his performance as an officer.  There were no concerns raised or made to Chief Gardner, Captain Fishel or any member of SCPD, involving violence or threats of violence by Ofc. Pieniazek's soon-to-be ex-wife, or that Officer Pieniazek was unfit to perform his duties as an officer. Nevertheless, his performance as an officer was monitored both before the counseling was sought, and when Ofc. Pieniazek returned to active patrol on March 11, 2019, and there were no indications that his performance or service was in any way impacted including the Officer's successful handling and resolution of two high stress and high danger incidents.  Further, Ofc. Pieniazek's personal, treating professional assured Ofc. Pieniazek and the Borough that Ofc. Pieniazek was fully fit to perform his functions as an officer with no restrictions or limitations.

The investigation of the March 20, 2019 shooting was comprehensive and included members of the Pennsylvania State Police and various professionals such as experts in ballistics, forensics, bias, and use of force.  It also included a standard blood test of Ofc. Pieniazek immediately following the shooting for any indication

of drugs or alcohol in his system – for which there was none. As determined by the Centre County District Attorney's Office and the Pennsylvania State Police, Officer Pieniazek's use of deadly force, in response to Osage charging at the officers with a knife, was reasonable, lawful, justifiable and in response to Osaze Osagie's deadly actions

WHEREFORE, Answering Defendants respectfully request This Honorable Court enter judgment in their favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

## ALLLEGED FOURTH CAUSE OF ACTION

Alleged violation of 42 U.S.C. § 1983 – *Unlawful Policy and Practice*
(Against the Borough of State College)

156.   Answering Defendants incorporate herein by reference their answers to paragraphs 1 through 155 of Plaintiff's First Amended Complaint as if fully set forth herein.

157.   Denied.  Ofc. Pieniazek was immediately identified as a police officer as soon as Osaze opened his door in the afternoon of March 20, 2019 because he was in full SCPD uniform in a well-lit apartment hallway.  Once making contact with Osaze, Ofc. Pieniazek calmly asked if the officers could enter the apartment and speak with Osaze and/or if he would come out and speak with them.  Upon seeing the knife, Ofc. Pieniazek, in the few seconds he and his fellow officers had

before Osaze charged, drew his service weapon, announced that Osaze had a knife, and ordered Osaze to drop the knife.  At the same time, Sgt. Hill, drew his taser, and aimed it at Osaze, to which he replied, "no, I want to die."  Having no other options due to Osaze's sudden and expeditious charge, Sgt. Hill deployed his taser which made contact with Osaze but was ineffective.  At nearly the same time and since Osaze was not reacting to the taser, Ofc. Pieniazek was forced to fire his service weapon to stop Osaze's advance which threatened the lives of Officer Pieniazek, Sgt. Hill and Lt. Robb.

158. – 162.   Denied. There were no concerns raised by others, or concerns noted in his handling of numerous calls, about Officer Pieniazek's fitness to serve as an officer or handle high stress call such this. Additionally, Ofc. Pieniazek's personal, treating professional assured Ofc. Pieniazek and the Borough that Ofc. Pieniazek was fully fit to perform his functions as an officer with no restrictions or limitations.  Indeed, an investigation of the March 20, 2019 shooting was comprehensive and included members of the Pennsylvania State Police and various professionals such as experts in ballistics, forensics, bias, and use of force; included a standard blood test of Ofc. Pieniazek immediately following the shooting for any indication of drugs or alcohol in his system – for which there was none; and concluded that the actions of all SCPD Officers involved, including

Officer Pieniazek, acted reasonably, lawfully, and justifiably and in response to Osaze Osagie's deadly actions.

WHEREFORE, Answering Defendants respectfully request This Honorable Court enter judgment in their favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

## ALLEGED FIFTH CAUSE OF ACTION
Alleged Violation of 42 U.S.C. § 1983 – *Unlawful Policy and Practice*
(Against the Borough of State College)

163.   Answering Defendants incorporate herein by reference their answers to paragraphs 1 through 162 of Plaintiff's First Amended Complaint as if fully set forth herein.

164. – 166.   Denied.  SCPD has extensive policies and progressive training in a number of relevant areas to include policies regarding mental health encounters.  Further, SCPD's history of successful policing and effective policies is evident in SCPD's accreditation by The Pennsylvania Chiefs of Police Association ("PCPA").  SCPD's CIT was in place for about ten (10) years when this incident occurred, of which Ofc. Pieniazek, Sgt. Hill, and Lt. Robb, had extensive training and experience.  SCPD has handled hundreds of 302 warrants and other mental health calls without any other shootings, and without any known serious injury to the person being served.  SCPD has a record of handling these

calls very successfully, including past incidents involving Osaze.  Denied.  As

determined by the Centre County District Attorney's Office and the Pennsylvania

State Police, Osaze's death, while tragic, was a necessary act of self-defense, and a

justifiable and reasonable use of force by Ofc. Pieniazek in response to Osaze

charging at him and Sgt. Hill at full speed with a knife and placing the lives the

officers in imminent danger.

WHEREFORE, Answering Defendants respectfully request This Honorable

Court enter judgment in their favor and against Plaintiff, together with costs,

disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any

further relief deemed appropriate by This Honorable Court.

## ALLEGED SIXTH CAUSE OF ACTION
Alleged violation of Title II of the Americans with Disabilities Act
(Against the Borough of State College)

167.   Answering Defendants incorporate herein by reference their answers

to paragraphs 1 through 166 of Plaintiff's First Amended Complaint as if fully set

forth herein.

168.   Admitted.  By way of further Answer, SCPD has successfully served

over 1400 mental health warrants since 2009, and handled thousands of other

mental health calls without incident.

169.   Denied.

170.   Admitted in part and Denied in part.  It is admitted that Answering Defendant is responsible for ensuring compliance with Title II of the Americans with Disabilities Act which it did.  The remaining averments of this paragraph are denied.

171. – 174.  Denied.

WHEREFORE, Answering Defendants respectfully request This Honorable Court enter judgment in their favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

## **ALLEGED SEVENTH CAUSE OF ACTION**
Alleged Violation of the Rehabilitation Act of 1973
(Against the Borough of State College)

175.   Answering Defendants incorporate herein by reference their answers to paragraphs 1 through 174 of Plaintiff's First Amended Complaint as if fully set forth herein.

176. – 182.   Denied. It is denied that any actions or omissions by SCPD or any of its officers were in violation of the Rehabilitation Act of 1973.  To the contrary, at all times material hereto, the policies, practices and training of SCPD were appropriate, adequate and lawful and afforded all of the rights, privileges and immunities granted pursuant to the Constitution and laws of the United States including but not limited to The Rehabilitation Act of 1973 and Title II of the

Americans with Disabilities Act, and the Commonwealth of Pennsylvania to citizens, including in this instance Osaze Osagie.

WHEREFORE, Answering Defendants respectfully request that This Honorable Court enter judgment in its favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

**ALLEGED EIGHTH CAUSE OF ACTION**
Alleged Assault
(Against all Defendants)

183.  Answering Defendants incorporate herein by reference their answers to paragraphs 1 through 182 of Plaintiff's First Amended Complaint as if fully set forth herein.

184. – 185.  Denied. To the contrary, the force used by any and all SCPD officers was lawful, privileged and reasonable as concluded by the Centre County District Attorney's Office and the Pennsylvania State Police.

WHEREFORE, Answering Defendants respectfully request that This Honorable Court enter judgment in their favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

## ALLEGED NINTH CAUSE OF ACTION
Alleged Battery
(Against all Defendants)

186.   Answering Defendants incorporate herein by reference their answers to paragraphs 1 through 185 of Plaintiff's First Amended Complaint as if fully set forth herein.

187. – 188.   Denied. To the contrary, the force used by any and all SCPD officers was lawful, privileged and reasonable as concluded by the Centre County District Attorney's Office and the Pennsylvania State Police.

WHEREFORE, Answering Defendants respectfully requests This Honorable Court enter judgment in their favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

## ALLEGED TENTH CAUSE OF ACTION
Alleged Claim for Wrongful Death—42 Pa. C.S. § 8301
(Against all Defendants)

189.   Answering Defendants incorporate herein by reference their answers to paragraphs 1 through 188 of Plaintiff's First Amended Complaint as if fully set forth herein.

190. – 193.   Admitted upon information and belief.  It is denied that Osaze would have been entitled to damages for the injuries he sustained because the

actions of the SCPD officers were reasonable, justifiable, and lawful under the circumstances and has no viable cause of action.

WHEREFORE, Answering Defendant respectfully requests that This Honorable Court enter judgment in its favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

## ALLEGED ELEVENTH CAUSE OF ACTION
Alleged Claim Pursuant to Pennsylvania Survival Statute—42 Pa. C.S. § 8302
(Against all Defendants)

194.   Answering Defendants incorporate herein by reference their answers to paragraphs 1 through 193 of Plaintiff's First Amended Complaint as if fully set forth herein.

195. – 196.   Admitted upon information and belief.  It is denied that Osaze would have been entitled to damages for the injuries he sustained because the actions of the SCPD officers were reasonable, justifiable, and lawful under the circumstances and has no viable cause of action.

WHEREFORE, Answering Defendants respectfully request that This Honorable Court enter judgment in its favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

## **PRAYER FOR RELIEF**

It is specifically denied that Plaintiff is entitled to damages, as no viable claim exists. To the contrary, Answering Defendants respectfully requests that This Honorable Court enter judgment in their favor and against Plaintiff, together with costs, disbursements, and attorneys' fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by This Honorable Court.

## **AFFIRMATIVE DEFENSES**

Answering Defendants reserve the right to assert any and all applicable defenses to Plaintiff's claims. To date, Answering Defendants have not obtained adequate discovery from Plaintiff in connection with this action. Answering Defendants reserve the right to amend or otherwise supplement this pleading on that basis. Without limiting the generality of the foregoing and without regard to whether the defenses set forth below are affirmative defenses within the meaning of Fed. R.Civ.P. 8(c), and without conceding that any such defense must be set forth in their Answer, Answering Defendants asserts the following:

## **FIRST AFFIRMATIVE DEFENSE**

Plaintiff's First Amended Complaint fails to set forth a claim, in whole or in part, upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

No act or failure to act on the part of Answering Defendants or any SCPD officers violated the Constitution or laws of the United States, including but not limited to, The Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act, and the Commonwealth of Pennsylvania.

## THIRD AFFIRMATIVE DEFENSE

At all times material hereto, the policies, practices and training of SCPD were appropriate, adequate and lawful and afforded to all citizens including in this instance Plaintiff and Plaintiff's decedent all of the rights, privileges and immunities granted pursuant to the Constitution and laws of the United States including but not limited to The Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act, and the Commonwealth of Pennsylvania.

## FOURTH AFFIRMATIVE DEFENSE

Neither Plaintiff, nor Plaintiff's decedent suffered any injury or damages as a result of any improper acts or omissions by Answering Defendants or its officers.

## FIFTH AFFIRMATIVE DEFENSE

Any injury or damage sustained by Plaintiff or Plaintiff's decedent was a direct and proximate result of Plaintiff and/or Plaintiff's decedent's conduct.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's decedent assumed the risk of harm by his own conduct.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part or otherwise subject to reduction by reason of Plaintiff and/or Plaintiff's decedent's contributory negligence.

## EIGHTH AFFIRMATIVE DEFENSE

At all times material hereto, the actions of Answering Defendants were appropriate under the circumstances and based upon a reasonable good-faith belief that they were justified under the law.

## NINTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff seeks punitive damages, such a claim is limited and/or barred by the applicable state constitution, by the Fourteenth, Fifth and Eighth Amendments to the United States Constitution and by the laws of the United States and the Commonwealth of Pennsylvania.

## TENTH AFFIRMATIVE DEFENSE

Merely negligent or careless conduct on the part of a state actor is insufficient to maintain a cause of action pursuant to 42 U.S.C. § 1983.

## ELEVENTH AFFIRMATIVE DEFENSE

At no time material hereto were Answering Defendants deliberately indifferent to the safety or constitutional rights of Plaintiff or Plaintiff's decedent.

## TWELFTH AFFIRMATIVE DEFENSE

Answering Defendants are immune from all or part of the claims set forth in Plaintiff's First Amended Complaint.

## THIRTEENTH AFFIRMATIVE DEFENSE

At no time material hereto did Answering Defendants act in bad faith or wantonly, recklessly, or maliciously, or with a disregard for Plaintiff's or Plaintiff's decedent's health, safety and welfare.

## FOURTEENTH AFFIRMATIVE DEFENSE

Answering Defendants did not act willfully, nor intentionally committed any wrongful act causing injury or damage to the Plaintiff or Plaintiff's decedent.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or otherwise limited by the terms, provisions, immunities, and defenses set forth in the Pennsylvania Political Subdivision Tort Claims Act. 42 Pa. C.S.A. § 8541 *et seq.*  All defenses therein are incorporated by reference as though fully set forth at length herein.

## SIXTEENTH AFFIRMATIVE DEFENSE

Any injuries or damages suffered by the Plaintiff or Plaintiff's decedent, although same are denied by Answering Defendants, resulted solely from Plaintiff's decedent's wrongful acts, not from any violations of his civil rights by Answering Defendants or its officers.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The actions of Answering Defendants were justified by the doctrines of self-defense and defense of others.

## EIGHTEENTH AFFIRMATIVE DEFENSE

At all times material hereto, the actions of Answering Defendants were appropriate under the circumstances and the use of force was reasonable, necessary, lawful and justified.

## NINETEENTH AFFIRMATIVE DEFENSE

At all times, Answering Defendants' policies, procedures, and training were appropriate, progressive, and lawful.

## TWENTIETH AFFIRMATIVE DEFENSE

At no time did Answering Defendants' actions and/or inactions create a danger as alleged by Plaintiff. To the contrary, the situation was dangerous for many reasons not created by or caused by SCPD or its officers.

WHEREFORE, Answering Defendants respectfully request This Honorable Court enter judgment in their favor and against Plaintiff, together with costs, disbursements, attorney's fees under, *inter alia*, 42 U.S.C. § 1988 and any further relief deemed appropriate by this Court.

Respectfully submitted,

**MacMain, Connell & Leinhauser, LLC**

Dated: <u>March 26, 2021</u>    By:  <u>*/s/ David J. MacMain*</u>
                                     David J. MacMain
                                     Matthew S. Polaha
                                     Attorney I.D. Nos. 59320 / 320674
                                     433 W. Market Street, Suite 200
                                     West Chester, PA 19382
                                     *Attorneys for Defendants, Borough of State College, Officer M. Jordan Pieniazek, Sergeant Christopher Hill, Lieutenant Keith Robb and Captain Christian Fishel*

**<u>CERTIFICATE OF SERVICE</u>**

I, David J. MacMain, Esquire, hereby certify that on March 26, 2021, the foregoing *Defendants, Borough of State College, Officer M. Jordan Pieniazek, Sergeant Christopher Hill, Lieutenant Keith Robb and Captain Christian Fishel's Answer and Affirmative Defenses to Plaintiff's First Amended Complaint* was filed electronically and is available for viewing and downloading from the ECF system of the United States District Court for the Middle District of Pennsylvania. The following parties received notification of this filing via electronic notification:

Andrew G. Celli, Jr.
Earl S. Ward
David Berman
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue at Rockefeller Center
New York, New York 10020
*Attorneys for Plaintiff*

Andrew Shubin
SHUBIN LAW OFFICE
333 South Allen Street
State College, PA 16801
*Attorney for Plaintiff*

Kathleen Yurchak
STEINBACHER, GOODALL & YURCHAK
328 South Atherton Street
State College, PA 16801
*Attorney for Plaintiff*

Respectfully submitted,

**MacMain, Connell & Leinhauser, LLC**

Dated: <u>March 26, 2021</u>    By: <u>*/s/ David J. MacMain*</u>
                        David J. MacMain
                        Matthew S. Polaha
                        Attorney I.D. Nos. 59320 / 320674
                        433 W. Market Street, Suite 200
                        West Chester, PA 19382
                        *Attorneys for Defendants, Borough of State College, Officer M. Jordan Pieniazek, Sergeant Christopher Hill, Lieutenant Keith Robb and Captain Christian Fishel*

67