## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SYLVESTER OSAGIE, *Representative of the Estate of Osaze Osagie, Decedent*,

Plaintiff,

v.

BOROUGH OF STATE COLLEGE, *et al.*,

Defendants.

No. 4:20-CV-02024

(Chief Judge Brann)

## MEMORANDUM OPINION

### FEBRUARY 22, 2022

## I.   BACKGROUND[1]

In 2021, Sylvester Osagie ("Osagie"), as representative of the estate of Osaze Osagie ("Osaze"), filed an amended civil complaint against Defendants raising several federal and state law claims arising from the fatal shooting of Osaze by State College Police Department ("SCPD") Patrol Officer M. Jordan Pieniazek on March 20, 2019.[2] Osagie raises claims of: excessive force, in violation of the Fourth and Fourteenth Amendments (Count One); two counts of state created danger, under 42 U.S.C. § 1983 (Counts Two and Three); two counts of unlawful policies and practices, under § 1983 (Counts Four and Five); a violation of Title II of the

---

[1]   For the purposes of this motion the Court takes as true the allegations contained in the amended complaint.

[2]   Doc. 15.

Americans with Disabilities Act (Count Six); a violation of the Rehabilitation Act of 1973 (Count Seven); assault (Count Eight); battery (Count Nine); wrongful death (Count Ten); and a claim under the Pennsylvania Survival Statute (Count Eleven).[3]

Osagie alleges that Osaze—who was diagnosed with schizoaffective disorder—had stopped taking his medication and was in the midst of a mental health crisis on March 19, 2019, when Osagie called SCPD to help locate Osaze and provide him with assistance.[4] Osagie informed police of Osaze's mental health struggles and provided them with recent text messages that indicated Osaze wished to die and "that there would be trouble with the police."[5] Osagie also completed a petition and warrant for involuntary mental health evaluation and treatment, pursuant to Section 302 of the Pennsylvania Mental Health Procedures Act ("Section 302").[6] The Section 302 application clearly indicated that Osaze presented a danger to himself, but did not indicate that he posed a danger to anyone else.[7]

SCPD was unsuccessful in locating Osaze that day and, on the morning of March 20, 2019, SCPD Officer Keith Robb assumed responsibility for the investigation and, in that capacity, he read the Section 302 warrant, which included copies of Osaze's troubling text messages.[8] Robb did not, however, share any of the

---

3   *Id.*
4   *Id.* ¶¶ 1-3.
5   *Id.* ¶¶ 3, 5.
6   *Id.* ¶ 53.
7   *Id.* ¶ 54.
8   *Id.* ¶¶ 56-57.

materials in the Section 302 application or warrant with any of the SCPD officers who were actively searching for Osaze.[9] In the early afternoon, SCPD learned that Osaze was likely headed toward his apartment.[10]

Pieniazek was directed to respond to the situation, despite having no knowledge regarding Osaze's mental health history, possible risk of suicide, or any information regarding the Section 302 petition; accordingly, Pieniazek treated the call as a routine matter.[11] Pieniazek was the first to arrive at Osaze's apartment, followed by Robb and SCPD Officer Christopher Hill—two officers who had some awareness of Osaze's mental health crisis (collectively "the Officers").[12] Pieniazek was placed in charge of the situation.[13]

The Officers made no plans for how to approach Osaze, nor did they choose to approach Osaze in a manner best suited for approaching an individual experiencing a mental health crisis—openly, calmly, and without aggression or surprise.[14] To the contrary, the Officers "decided to take Osaze by surprise"[15] by hiding their police vehicles, failing to announce who they were when they knocked on Osaze's door, and covering the peephole on the door.[16] The Officers also

---

[9] *Id.* ¶ 59.
[10] *Id.* ¶ 61.
[11] *Id.* ¶ 62-63.
[12] *Id.* ¶ 68.
[13] *Id.* ¶¶ 68-69.
[14] *Id.* ¶¶ 70-72.
[15] *Id.* ¶ 73.
[16] *Id.* ¶¶ 74, 77.

deployed a tactic known as "contact and cover," wherein one officer—Pieniazek—approached Osaze's apartment while the other officers "provide a force presence nearby to send a message to the suspect that they are willing and able to protect the contact officer, including with deadly force if necessary."[17]

The Officers approached Osaze's apartment through a small hallway that provided no means of retreat and was too small to meaningfully deescalate any situation that arose.[18] After Pieniazek knocked on Osaze's door, Osaze answered but refused to allow the Officers inside and refused to come outside of his apartment; Robb and Hill described this initial contact as normal and non-confrontational.[19] The Officers failed to deescalate the situation, however, and when Pieniazek allegedly saw that Osaze was holding a steak knife, he immediately drew his firearm and ordered Osaze to drop the knife, while Hill unholstered his taser.[20]

Osaze "backed into the apartment, saying he wanted to die and that the officers should kill him" before eventually exiting the apartment with his knife and approaching the Officers.[21] When Osaze was approximately three feet from the Officers, Hill deployed his taser at Osaze but, nearly simultaneous to that, Pieniazek discharged his firearm, shooting Osaze three times in the back of his body.[22] Osaze

---

[17]   *Id.* ¶ 75.
[18]   *Id.* ¶ 76.
[19]   *Id.* ¶¶ 79-83.
[20]   *Id.* ¶¶ 84-88.
[21]   *Id.* ¶¶ 89-90.
[22]   *Id.* ¶¶ 91-95.

died from his wounds.[23] A Conduct and Procedures Review Board—composed of SCPD members—later concluded that the shooting was within SCPD policy.[24]

Osagie alleges that the fatal shooting of Osaze arose due to SCPD's policies and training, along with Pieniazek's particular lack of suitability to deal with an individual who is experiencing a mental health crisis. First, Osagie avers that Pieniazek was "mentally unstable and violent" and "unfit for duty."[25] Specifically, Pieniazek allegedly struggled with alcohol abuse and engaged in acts of domestic violence, including one incident in 2018 where he "used a pistol in a threatening manner while committing acts of domestic violence."[26] SCPD was allegedly notified of these issues in January 2019, but SCPD Captain Chris Fishel failed to treat the matter as a formal complaint and instead permitted Pieniazek to check himself into a rehabilitation facility.[27]

Fishel received unspecified "troubling information" regarding Pieniazek's mental state while in rehab but, in mid-March 2019, Pieniazek left rehab.[28] Although SCPD active-duty officers must be fit for duty, "no one from the SCPD ensured that Defendant Pieniazek had completed his rehab or took any steps to ensure that it was safe for him to return to work" before permitting him to return to work on March 18,

---

[23] *Id.* ¶ 26.
[24] *Id.* ¶¶ 96-97.
[25] *Id.* ¶¶ 12-13.
[26] *Id.* ¶¶ 98-99.
[27] *Id.* ¶ 101.
[28] *Id.* ¶¶ 102-03.

2019.[29] Pieniazek allegedly began drinking heavily and exhibiting concerning behavior the night before he returned to duty and, three days after returning to duty, Pieniazek shot and killed Osaze.[30] Osagie alleges that SCPD knew that Pieniazek was in a "vulnerable mental state" that caused "him to be overly sensitive to subjectively perceived danger" and likely to overreact to perceived threats.[31]

Osagie further avers that SCPD maintained constitutionally inadequate policies and practices for encounters with individuals experiencing a mental health crisis. The Borough of State College ("Borough") requires all SCPD officers to undergo Crisis Intervention Training ("CIT") so that the officers may respond appropriately to individuals who are suffering from mental health crises.[32] However, the Borough's implementation of its CIT training was "inept" and created a "heightened risk" that individuals suffering from a mental health crisis would be harmed by SCPD officers.[33]

In that vein, a core tenet of any well-implemented CIT program "is that CIT training and certification should be limited to a subset of officers within a department who self-select and volunteer to receive CIT training, and that those officers assume responsibility for responding to mental health crisis situations."[34] Police departments

---

[29]   *Id.* ¶¶ 104, 106.
[30]   *Id.* ¶¶ 105, 107.
[31]   *Id.* ¶¶ 113-15.
[32]   *Id.* ¶ 116.
[33]   *Id.* ¶ 119; *see id.* ¶¶ 126-28.
[34]   *Id.* ¶ 120.

should not require that all officers undergo CIT training, as many officers simply are not suited for such training or for responding to mental health crises.[35] "CIT is based on the idea that experienced officers who volunteer are best at responding to mental illness calls."[36] Osagie asserts that Pieniazek, given his alleged history of alcohol abuse, spousal abuse, and erratic behavior, was poorly suited to CIT training or to be a crisis response team member.[37]

Furthermore, SCPD's CIT program did not require that officers analyze all available intelligence before responding to mental health crises, nor did it require that emergency dispatchers ask appropriate questions or provide critical information to assist the responding officer, as it standard in effective CIT programs.[38] Due to these deficiencies, Pieniazek was never informed of Osaze's suicidal text messages, mental health issues, or any of the circumstances surrounding the Section 302 warrant.[39] Osagie alleges that, had the Borough implemented a proper CIT training program, Osaze's death would not have occurred.[40]

Defendants answered the amended complaint by largely denying the allegations, and the parties commenced discovery.[41] Currently pending before the

---

[35]  *Id.* ¶¶ 120, 123.
[36]  *Id.* ¶ 124.
[37]  *Id.* ¶¶ 121-22.
[38]  *Id.* ¶¶ 129-31.
[39]  *Id.* ¶ 132.
[40]  *Id.* ¶¶ 135-40.
[41]  Doc. 33.

Court is Osagie's motion to compel discovery related to certain information that Defendants have refused to disclose.[42]

Osagie "sought discovery related to Defendant Pieniazek's alcohol abuse and domestic violence history, what treatment he received, what the SCPD knew about these issues, when they knew it, and who within the Department knew."[43] Defendants refused to provide the requested discovery on the grounds that such information is irrelevant, overly broad, not reasonably tailored to lead to the discovery of admissible evidence, or is protected by spousal privilege or therapist-patient privilege.[44] Osagie argues that the discovery he seeks is relevant and would lead to admissible evidence, as it is geared toward gathering evidence of Pieniazek's fitness for duty, which is the foundation of several of Osagie's claims.[45] Osagie further contends that Pieniazek has waived any privilege and the Borough cannot invoke said privileges.[46] Finally, he asserts that information related to Fishel's retirement is relevant to his claims.[47]

Defendants respond that the requested discovery need not be turned over for several reasons.[48] First, they argue that the question of whether Pieniazek's actions were reasonable is governed by an objective standard and, accordingly, any

---

[42] Doc. 44.
[43] Doc. 46 at 10.
[44] *Id.*
[45] *Id.* at 12-16.
[46] *Id.* at 16-20.
[47] *Id.* at 20-21.
[48] Doc. 49.

information related to alleged episodes of domestic violence, alcohol abuse, or substance abuse treatment are irrelevant and would not lead to the discovery of admissible evidence.[49] Second, Defendants contend that providing information related to Pieniazek's voluntary substance abuse treatment may discourage other officers from voluntarily seeking such treatment; such information should therefore, as a matter of public policy, be protected from disclosure.[50]

Third, Defendants contest the assertion that they placed Pieniazek's mental state at issue, thereby waiving therapist-patient privilege.[51] Fourth, Defendants argue that Pieniazek may assert spousal privilege or therapist-patient privilege for any communications between himself and his wife, or himself and his therapist.[52] Finally, Defendants argue that Osagie is not entitled to any documents related to Fishel's retirement, as his retirement is not relevant to Osaze's death or Pieniazek's supervision, and is not calculated to lead to the discovery of admissible evidence.[53]

Osagie has not filed a reply brief and the time to do so has passed, rendering this motion ripe for disposition. For the following reasons, Osagie's motion to compel discovery will be granted in part and denied in part.

---

[49] *Id.* at 5-7.
[50] *Id.* at 7-8.
[51] *Id.* at 9.
[52] *Id.* at 9-11.
[53] *Id.* at 12-13.

## II.   DISCUSSION

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Such discovery must take into account "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."[54] Where a party receives what he deems to be "evasive or incomplete" answers, he may file a motion to compel with the district court.[55]

When such a motion is filed, "[t]he moving party must demonstrate the relevance of the information sought to a particular claim or defense. The burden then shifts to the opposing party, who must demonstrate in specific terms why a discovery request does not fall within the broad scope of discovery or is otherwise privileged or improper."[56] "Generally, courts afford considerable latitude in discovery in order to ensure that litigation proceeds with 'the fullest possible knowledge of the issues and facts before trial.'"[57] As such, the United States Court of Appeals for the Third

---

[54]   Fed. R. Civ. P. 26(b)(1).

[55]   Fed. R. Civ. P. 37(a)(1), (4).

[56]   *Miller v. McGinley*, No. 1:20-CV-2270, 2022 WL 212709, at *2 (M.D. Pa. Jan. 24, 2022) (internal quotation marks omitted).

[57]   *Naranjo v. T. Walter*, No. 1:20-CV-918, 2021 WL 4226062, at *3 (M.D. Pa. Sept. 16, 2021) (quoting *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)).

Circuit generally will not overturn an order regarding discovery unless "there has been an interference with a substantial right . . . or . . . the discovery ruling is seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the case."[58]

The Third Circuit has held that "all relevant material is discoverable unless an applicable evidentiary privilege is asserted. The presumption that such matter is discoverable, however, is defeasible."[59] Courts may therefore limit discovery that is "unreasonably cumulative or duplicative," that may "be obtained from some other source that is more convenient, less burdensome, or less expensive," if "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action" or if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)."[60]

"Discovery need not be perfect, but discovery must be fair."[61] "The responses sought must comport with the traditional notions of relevancy and must not impose an undue burden on the responding party."[62] "To determine the scope of discoverable information under Rule 26(b)(1), the Court looks initially to the pleadings."[63] "In ascertaining which materials are discoverable and which are not, a district court must

---

[58] *Marroquin–Manriquez v. I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983).
[59] *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).
[60] Fed. R. Civ. P. 26(b)(2)(C).
[61] *Westfield Ins. Co. v. Icon Legacy Custom Modular Homes*, 321 F.R.D. 107, 111 (M.D. Pa. 2017) (internal quotation marks omitted).
[62] *Id.* (internal quotation marks omitted).
[63] *Id.* (internal quotation marks omitted).

further distinguish between requests that appear reasonably calculated to lead to the discovery of admissible evidence, and demands that are overly broad and unduly burdensome."[64]

## A.    Relevance

First, the parties dispute the relevance of the sought-after materials, and dispute whether the discovery requests are geared toward uncovering admissible evidence. Defendants primarily contest the relevance of the discovery requests on the ground that claims of excessive force are governed by an objective standard and, accordingly, information related to Pieniazek's state of mind is not relevant.[65]

Defendants are correct that, in examining claims of excessive force, "[t]he test of reasonableness under the Fourth Amendment is whether, under the totality of the circumstances, 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'"[66] As such, the Court agrees with Defendants that Pieniazek's mental state, history of substance abuse, or past incidents of domestic abuse are irrelevant to a claim of excessive force.[67]

---

[64] *Id.* (brackets, citations, and internal quotation marks omitted).

[65] Doc. 49 at 5-7.

[66] *Est. of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003) (quoting *Graham v. Connor,* 490 U.S. 386, 397 (1989)).

[67] *See Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional"); *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018) ("Because the test is objective, we disregard any contentions relating to either party's subjective mental state"); *Flythe v. District of Columbia*, 4 F. Supp. 3d 222, 227 (D.D.C. 2014) (holding "expert toxicologist/pharmacologist report and deposition address

This does not mean, however, that such evidence is irrelevant to this case, as Osagie raises claims beyond excessive force that would require an examination of Pieniazek's mental state and history. Specifically, Osagie raises two claims of state created danger, both of which allege that "the Borough and Defendant Fishel were aware of Defendant Pieniazek's mental instability, alcohol abuse, and propensity for violence" and therefore could reasonably foresee that Pieniazek would respond with violence in crisis situations.[68]

With regard to such claims, the Third Circuit has held that, although "the Due Process Clause [of the United States Constitution] does not impose an affirmative obligation on the state to protect its citizens . . . [t]he state-created danger theory operates as an exception to that general rule."[69] To prevail on a state-created-danger claim, a plaintiff must

> meet a four-part test: (1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.[70]

Notably, at least three of these prongs rely to some extent on an examination of Pieniazek's alleged history. The first prong necessitates that the finder of fact

---

Officer Eagan's use of methamphetamines or other drugs around the time of the shooting" was irrelevant because "any evidence regarding Officer Eagan's subjective judgment is not probative on the issue of the objective reasonableness of his actions").

[68] Doc. 15 at 28-29.

[69] *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (internal citation omitted).

[70] *Id.*

eventually determine whether the harm to Osaze was reasonably foreseeable, which requires an assessment of whether the information within Defendants' possession should have reasonably led them to believe that Pieniazek posed a risk to the public. This necessarily includes an assessment of whether Defendants' history, expertise, or common sense "equipped them with concrete information about the risk" that was allegedly created when they authorized Pieniazek to return to active duty.[71] In other words, Osagie must demonstrate "an awareness on the part of the state actors that rises to [the] level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm."[72]

The second prong, whether "the state-actor acted in willful disregard for the plaintiff's safety,"[73] likewise calls for an examination of Pieniazek's mental state and history. The fact finder must ultimately determine whether the Borough and Fishel's failure to act differently after considering information regarding Pieniazek's history and mental state amounted to "deliberate[] indifferen[ce], establishing a level of culpability that was conscience-shocking."[74] Finally, the fourth prong also necessitates an examination of Pieniazek's history, as such history is necessary to determine whether the Borough and Fishel's alleged decision to permit Pieniazek to

---

[71] *Phillips*, 515 F.3d at 237-38.
[72] *Id.* at 238.
[73] *Id.* at 235.
[74] *Id.* at 241.

return to duty "create[d] an opportunity for danger that otherwise would not have existed."[75]

Information related to Pieniazek's mental state and history of alcohol abuse or spousal abuse is therefore relevant here, although such evidence is relevant only to establish that the Borough and Fishel knew of Pieniazek's mental state and fitness for duty.[76] With this caveat in mind, the Court simply cannot say that the requested information regarding Pieniazek is not geared toward obtaining admissible evidence in this matter. Consequently, the Court concludes that the requested discovery related to Pieniazek is both relevant and reasonably geared toward uncovering admissible evidence.

Defendants nevertheless argue that they should not be required to turn over the requested discovery on policy grounds. Specifically, Defendants believe that, should they be required to turn over information related to Pieniazek's voluntary therapy or substance abuse treatment, other police officers will be discouraged from similarly seeking voluntary help.[77]

The Court is not unsympathetic to Defendants' concerns, and to the potential consequences that may arise from discovery of materials related to voluntary mental

---

[75] *Id.* at 235.

[76] Some—perhaps much—of this evidence may well not be admissible at trial, but such evidence remains discoverable.

[77] Doc. 49 at 7-8.

health or substance abuse treatment by police officers.[78] Nevertheless, the Federal Rules of Civil Procedure are clear as to the contours of discovery, and as to what information falls outside of those Rules, and in this case such information is discoverable. The Court is mindful of the admonishment that "courts 'do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy.'"[79] The duty to provide exceptions to the discovery rules based on considerations of public policy falls to the legislative branch of this Government, not the judicial branch.

To that end, as Defendants note, Congress recently enacted the Confidentiality Opportunities for Peer Support Counseling Act—effective November 18, 2021—that provides for confidential peer support counseling services for federal law enforcement officers.[80] However, as Defendants acknowledge, that law was in not effect at the time that Pieniazek allegedly sought treatment.[81] Moreover, that law applies only to *federal* law enforcement officers,[82] and there is no evidence that

---

[78] Osagie disputes the contention that Pieniazek voluntarily sought treatment, rather than being forced to seek treatment to keep his job. Doc. 46 at 15. Because the Court concludes that the information Osagie seeks is discoverable regardless of the policy concerns raised by Defendants, there is no need to resolve the question of whether Pieniazek's treatment was truly voluntary.

[79] *Pellegrino v. U.S. Transp. Sec. Admin., Div. of Dep't of Homeland Sec.*, 937 F.3d 164, 200 (3d Cir. 2019) (Krause, J., dissenting) (quoting *United States v. Rutherford*, 442 U.S. 544, 555 (1979)).

[80] *See* 34 U.S.C. § 50901.

[81] Doc. 49 at 7-8.

[82] 34 U.S.C. § 50901(a)(2).

Pieniazek, as an SCPD officer, qualifies as a federal law enforcement officer.[83] Nor would it appear that the treatment Pieniazek obtained would qualify as a peer support counseling program.[84]

Thus, Congress has taken steps to permit confidential mental health treatment that would be shielded—to some extent—from the rules of discovery. This legislation does not, however, apply here, nor has the Pennsylvania General Assembly enacted similar measures that may apply to Pieniazek. In the absence of such action, the Court concludes that the information Osagie seeks remains discoverable, notwithstanding any public policy considerations that may militate in favor of maintaining confidentiality as to at least some of those records.[85]

Finally, the Court finds that—notwithstanding Osagie's arguments to the contrary—any evidence related to Fishel's retirement is not relevant to this case. Osagie asserts that Fishel was involved in the decision to permit Pieniazek to return to duty, participated in the committee review of Pieniazek's conduct, and personally wrote the report reviewing Pieniazek's conduct that day.[86] This may make relevant

---

[83] *See* 18 U.S.C. § 115(c)(1) (defining federal law enforcement officer as "any officer, agent, or employee of the United States authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal criminal law"); 34 U.S.C. § 50901(a)(2) (referencing 18 U.S.C. § 115(c)(1) for definition of federal law enforcement officer).

[84] *See* 34 U.S.C. § 50901(a)(4) ("The term 'peer support counseling program' means a program provided by a law enforcement agency that provides counseling services from a peer support specialist to a law enforcement officer of the agency").

[85] However, as discussed below, some of the records may be shielded by client-therapist confidentiality.

[86] Doc. 15 ¶ 106, 108, 110, 114-15, 145-55.

any information related to Fishel's knowledge of Pieniazek's conduct and history prior to the shooting, and perhaps raises questions as to Fishel's conduct in the investigation of the fatal shooting of Osaze. However, there is no information—or even allegation—that would connect Fishel's retirement to the shooting or its investigation. Absent such a connection, Fishel's retirement remains entirely disconnected from the decision to permit Pieniazek to return to duty or the subsequent investigation of Pieniazek's conduct on March 20, 2019. Because this information is not "relevant to any party's claim," it is not discoverable,[87] and Osagie's motion to compel will be denied as to this requested evidence.

## B.    Privilege

Finally, Defendants claim that much of the requested discovery is protected by spousal privilege and therapist-patient privilege. As to spousal privilege, it is well established that an individual may not be compelled to divulge communications between himself and his spouse, although his spouse may choose to divulge such communications in certain circumstances.[88] It is equally well established, however,

---

[87]  Fed. R. Civ. P. 26(b)(1).

[88]  *See Trammel v. United States*, 445 U.S. 40, 43-53 (1980) (discussing history of spousal privilege and concluding that "that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying"); *United States v. Breton*, 740 F.3d 1, 9-10 (1st Cir. 2014) ("The common law recognizes two related but distinct marital privileges: (1) the spousal testimony privilege, which allows one spouse to refuse to testify adversely against the other in criminal or related proceedings; and (2) the marital communications privilege, which permits a defendant to refuse to testify, and allows a defendant to bar his spouse or former spouse from testifying, as to any confidential communications made during their marriage").

that the privilege does not apply to testimony "concerning a spouse's conduct,"[89] "where a third party is present during a communication between spouses,"[90] if the communications are made with the "intention that the information conveyed be transmitted to a third person,"[91] or if an otherwise privileged communication is "voluntar[ily] disclos[ed] by [the individual invoking the privilege] to a third person."[92] Similarly, with regard to mental health treatment, "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure,"[93] although therapist-patient "privilege is waived when records are submitted to a third party."[94]

Here, the parties do not appear to genuinely dispute the contours of these privilege doctrines, and it is beyond peradventure that Pieniazek may invoke privilege for any confidential communications between he and his former wife that were made during their marriage, or between he and his therapist. However, Pieniazek would have waived confidentiality to the extent that he has voluntarily shared those communications with any third party—including State College

---

[89] *United States v. Hill*, 967 F.2d 902, 912 n.13 (3d Cir. 1992).

[90] *Id.*

[91] *Pereira v. United States*, 347 U.S. 1, 6 (1954).

[92] *Wolfle v. United States*, 291 U.S. 7, 14 (1934). *See also United States v. Burks*, 470 F.2d 432, 436 (D.C. Cir. 1972) ("a communication otherwise privileged loses its privileged character on coming into the hands of a third party").

[93] *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996).

[94] *Smart v. Cal. Highway Patrol*, No. 217CV01075TLNJDP, 2021 WL 1549698, at *2 (E.D. Cal. Apr. 20, 2021). *See United States v. Murra*, 879 F.3d 669, 681 (5th Cir. 2018) (privilege may be waived if "any portion of those confidential communications was revealed . . . to any third party").

Borough. Thus, the Borough may not invoke the privilege as to any information within its control that Pieniazek voluntarily shared with it.[95] Nor may Pieniazek invoke the privilege for any communications that he himself revealed to a third party.

Despite the existence of this privilege, Osagie contends that Pieniazek has waived any claim of therapist-patient privilege by putting his mental health at issue when he responded to allegations that he "was not fit for duty," and asserting that a treating professional assured Pieniazek and the Borough that Pieniazek was fit for duty.[96] Defendants argue that Pieniazek did not place his mental health at issue by simply responding to the allegations put forth in Osagie's amended complaint.[97]

Numerous courts have concluded that an individual may waive therapist-patient confidentiality by placing their mental health at issue in a case, under the theory that "allowing a plaintiff to hide behind a claim of privilege when that condition is placed directly at issue in a case would simply be contrary to the most basic sense of fairness and justice."[98] However, these courts appear to have universally applied the waiver rule only in circumstances where a plaintiff has

---

[95]   Moreover, as Osagie correctly points out, the privileges are Pieniazek's to assert, not the Borough's. Doc. 46 at 17.

[96]   *Id.* at 18-19.

[97]   Doc. 49 at 9.

[98]   *Sarko v. Penn-Del Directory Co.*, 170 F.R.D. 127, 130 (E.D. Pa. 1997) (ellipsis and internal quotation marks omitted).

affirmatively placed his or her mental health at issue in the case—typically by bringing claims that involve their mental health.[99]

The Court has been unable to locate any cases where waiver has been found when a defendant merely responds to allegations contained in a complaint. To the contrary, at least one other court has determined that a defendant does not waive therapist-patient privilege simply "by defending [a] § 1983 excessive force case brought against him."[100] This Court agrees that a defendant does not waive privilege simply by responding to allegations contained in a complaint; it would be incongruous to conclude that a defendant waives therapist-patient privilege by responding to factual allegations contained in a complaint, particularly since a failure to so respond would result in those allegations being deemed admitted.[101]

---

[99]  *See, e.g., id.* at 131 (concluding "Plaintiff alleges that her mental condition necessitated anti-depressant medication that made it difficult to wake up in the morning. Plaintiff may not now claim that records reflecting her need for this medication and whether it had the side effects she alleges to be privileged. These records are at issue in this litigation, thus Plaintiff must authorize their release as well"); *Katz v. Nat'l Bd. of Med. Examiners*, No. 3:15-CV-01187, 2016 WL 2744823, at *4 (M.D. Pa. May 10, 2016) (holding that any "privilege that might have existed has been waived by Katz's placement of his physical and mental condition at issue in this case" through the filing of Americans with Disabilities Act claim and intentional infliction of emotional distress claim); *Adams v. Ardcor*, 196 F.R.D. 339, 344 (E.D. Wis. 2000) (finding waiver where "plaintiff intends to the use the testimony of his treating psychotherapist to advance his claims of emotional distress"); *Topol v. Trustees of Univ. of Pa.*, 160 F.R.D. 476, 477 (E.D. Pa. 1995) ("Plaintiff has placed her mental state in issue by alleging that her sexual relationship with Woodfield caused her to become 'depressed, anxious, and fearful' and by seeking damages for mental and emotional suffering"); *Premack v. J.C.J. Ogar, Inc.*, 148 F.R.D. 140, 145 (E.D. Pa. 1993) (finding "plaintiffs waived the privilege by putting their mental condition directly at issue" by alleging that accident caused psychological problems that forever impacted their quality of life).

[100] *Kelley v. O'Malley*, No. 2:17-CV-01599-NBF, 2021 WL 1578179, at *4 (W.D. Pa. Apr. 22, 2021).

[101] *See* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied").

In an analogous situation, the Third Circuit has previously examined when a litigant may impliedly waive attorney-client privilege.[102] The Third Circuit noted that authority supported "the proposition that a party can waive the attorney client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation" by, for example, filing a malpractice claim against his attorney, or by "asserting reliance on the advice of counsel as an affirmative defense."[103] In such circumstances, "the client has made the decision and taken the affirmative step in the litigation to place the advice of the attorney in issue . . . [and thereby] has opened to examination facts relating to that advice."[104] The Third Circuit emphasized that:

> Advice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner. *The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication*.[105]

The Court concludes that these are sound contours to apply to therapist-patient privilege. Applying that rule to this case, here, Pieniazek has not asserted a claim or defense simply by contesting that he had serious mental health issues that allegedly should have prevented him from being an active-duty police officer. In so contesting Osagie's allegations, Pieniazek has not disclosed or described communications with his therapist in an attempt to "assert[] a claim or defense . . . [or] to prove that claim

---

[102] *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994).
[103] *Id.* at 363.
[104] *Id.*
[105] *Id.* (emphasis added).

or defense."[106] Importantly, the only claims levied against Pieniazek are claims of excessive force and related state law claims, and his mental health is not relevant to those claims. By responding to allegations of mental health issues, Pieniazek therefore was not presenting a defense or trying to prove a defense. Accordingly, Pieniazek has not waived therapist-patient privilege.[107]

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that, while some of the requested discovery may be protected by privilege or irrelevant, much of it is discoverable. Consequently, Osagie's motion to compel discovery will be granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[106] *Id.*

[107] There is one limited point upon which Pieniazek may arguably have waived privilege. In response to Osagie's amended complaint, Defendants assert that "Pieniazek's personal, treating professional assured [] Pieniazek and the Borough that [] Pieniazek was fully fit to perform his functions as an officer with no restrictions or limitations." Doc. 33 ¶¶ 100-07. This language does raise Pieniazek's mental health treatment as a defense, since it counters any notion that Defendants knew, or should have known, that Pieniazek was not fit to be an active-duty police officer. This defense, however, would only be applicable to the Borough and Fishel, and would be no defense in the allegations against Pieniazek. It is therefore not clear that *Pieniazek* waived therapist-patient privilege in this answer, and the remaining defendants may not waive a defense on Pieniazek's behalf. The Court need not, however, address this question. Since it is clear that Pieniazek's treating professional communicated information to a third party, anything that he or she revealed to that third party is not protected by privilege.