**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SYLVESTER OSAGIE, *Representative of the Estate of Osaze Osagie, Decedent*, | No. 4:20-CV-02024 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| BOROUGH OF STATE COLLEGE, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**NOVEMBER 27, 2023**

This case presents a tragic, and unfortunately familiar scenario in which an individual suffering from a mental health crisis was killed by the police. In March 2019, Sylvester Osagie ("Osagie") was worried that his son, Osaze Osagie ("Osaze"), was off his medication and could present a danger to himself or others as he had many times in the past. As Osagie had on prior such occasions, he enlisted the help of the State College Police Department ("SCPD"), this time asking them to find his son, take him into custody, and transport him to a medical facility so that he could receive the medical care he certainly needed. Unfortunately, SCPD officers never got that chance. When they found Osaze at his home, he charged at the officers with a knife in an apparent attempt to commit "suicide by cop." After an attempt to

subdue Osaze with non-lethal force failed, SCPD Officer M. Jordan Pieniazek, with nowhere to retreat and fearing for his life, shot and killed Osaze.

Sylvester Osagie now brings this suit, on behalf of his son, alleging that the officers who responded to Osaze's apartment failed to take proper precautions prior to confronting Osaze. Though the Court empathizes with the loss suffered by the Osagie family, that does not entitle them to relief. The State College Police Department is, as the name suggests, a department of police officers, not mental health professionals. They were police officers when Sylvester Osagie requested that they involuntarily commit his son to receive medical treatment, and they were police officers when his son charged at them with a knife. The Court, therefore, declines Mr. Osagie's invitation to hold the officers liable for failing to be something they are not, and a death they did not cause.

## I.   BACKGROUND

### A.   Procedural History

On November 2, 2020, Plaintiff Sylvester Osagie initiated this suit on behalf of his son, Osaze, against the Borough of State College and ten John Doe Defendant State College Police Department Officers filing an eight-count complaint.[1] Osagie amended his complaint on January 25, 2021, adding three new claims, bringing the total to eleven, and identifying the previously unknown Defendant SCPD Officers

---

[1]   Compl., Doc. 1.

as M. Jordan Pieniazek, Christopher Hill, Keith Robb, and Christian Fishel.[2] Osagie

subsequently agreed to dismiss Counts 4-7.[3] The remaining claims are:

- Count 1 – Excessive force in violation of the Fourth and Fourteenth Amendments against Pieniazek, Hill, and Robb (the "Officers");
- Count 2 – State created danger under 42 U.S.C. § 1983 against State College and Fishel;
- Count 3 – Failure to supervise under 42 U.S.C. § 1983 against State College and Fishel;
- Counts 8 and 9 – Assault and battery against the Officers;[4]
- Counts 10 and 11 – Damages under the Pennsylvania wrongful death and survival statutes against all Defendants.

Defendants moved, through two separate motions, for summary judgment as

to the remaining claims.[5] In this memorandum opinion, the Court addresses

Defendants' Motion for Summary Judgment on Counts 1 and 8-11.[6]

## B.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is

appropriate where "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to a judgment as a matter of law."  As

expressed by the Supreme Court of the United States in *Celotex Corp. v. Catrett*,

summary judgment is required where a party "fails to make a showing sufficient to

---

[2]   Am. Compl., Doc. 15.

[3]   Stipulated Dismissal, Doc. 85; Ord. Granting Dismissal, Doc. 100.

[4]   Osagie also withdrew his assault and battery claims against State College and Fishel in his brief opposing summary judgment. Opp., Doc. 111 at 10 n.8.

[5]   Mot. Summ J. Counts 1 and 8-11, Doc. 93; Mot. Summ. J. Counts 2-3, Doc. 89.

[6]   The parties' briefing on Defendants' Motion for Summary Judgment on Counts 2-3 contains extensive discussion of an SCPD officer's own mental health struggles and treatments. As a result, that briefing has been filed under seal, and the Court will address the parties' arguments as to that Motion in a separate sealed opinion accordingly.

establish the existence of an element essential to that party's case" on an issue that the "party will bear the burden of proof at trial."[7] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[8]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[9] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved by only a finder of fact because they may reasonably be resolved in favor of either party."[10] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[11] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[12]

---

[7]   477 U.S. 317, 322 (1986).
[8]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[9]   *Celotex*, 477 U.S. at 323.
[10]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[11]   *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).
[12]   *Port Auth. Of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[13] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[14] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[15] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[16]

Local Rule 56.1 requires all motions for summary judgment to be "accompanied by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." The party opposing summary judgment must then include with its papers an answer to the movant's statement of facts in which it identifies, in corresponding numbered paragraphs, those material facts which the nonmovant contends there is a genuine issue to be tried.[17] "Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the

---

[13]  *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 422, 448 (1871)).

[14]  *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[15]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[16]  Fed. R. Civ. P. 56(c)(3).

[17]  LR 56.1.

record that support the statements."[18] Material facts in the movant's statement "will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."[19]

## II.    UNDISPUTED FACTS

### A.    Osaze's Mental Health Struggles

In the years prior to the shooting, Osaze had struggled with his mental health; he had been diagnosed with schizophrenia and Asperger's syndrome and had been hospitalized for psychiatric reasons at least six times.[20] Though he functioned well when taking his mental health medications, off his medication Osaze could "present[] a danger to himself, his family, neighbors, and other members of the community."[21] Such incidents include: allegedly setting a fire at his parents' home; committing an armed robbery in which he, "acting on a 'commandment from God,' brandished a knife when taking someone else's basketball;" throwing a brick through a window at his parents' home; and other instances in which Osaze's parents "feared for their safety and for that of their other children."[22]

---

[18]   *Id.*

[19]   *Id.*

[20]   Pl. Counterstatement Statement of Material Facts ("CSF"), Doc. 108, pp. 18-29 ¶ 9; Defs. Resp. to Counterstatement of Facts ("RCSF"), Doc. 116 ¶ 9. Where a material fact in the parties' statements of facts is undisputed, the Court will cite them together and identify the relevant paragraph in a single citation. For example, the format for this citation is CSF and RCSF ¶ 9.

[21]   CSF and RCSF ¶ 11-12.

[22]   CSF and RCSF ¶ 12; Defs. Statement of Material Facts ("SMF"), Doc. 95, pp. 1-28 ¶ 4; Pl. Resp. to Statement of Undisputed Material Facts ("RSMF"), Doc. 108, pp. 1-18 ¶ 4.

On such occasions, law enforcement would be called to respond.[23] Following the armed robbery, Osaze was arrested and eventually pleaded guilty to criminal charges leading to a term of imprisonment.[24] When Osaze threw a brick through his parents' window and was no longer welcome in the home, Sergeant Christopher Hill used his personal credit card to pay for a hotel room so that Osaze would have somewhere to stay for the night until a "302 warrant"—a warrant for involuntary mental health evaluation and treatment—could be issued.[25]

## B.   Osaze's Death

From December 2018 to March 2019, Osagie noticed a decline in his son's mental health.[26] On March 19, 2019, Osagie received a distressing test message from his son, Osaze, which read in part:

> Tell him [mental health professional] I will not be able to attend any more of our appointments ... although the police hid the secret reason, I have run into trouble with them before for the very reason I am about to run into trouble with them again in a little bit. The detective's hidden reason for getting me in trouble in the past was because of my love for God and my love for his creation...

> God is dead in this country, and soon I hopefully will be dead also. My fast - approaching deep sleep will result from a struggle between God and evil ... and a battle between the citizens of the US and the American government.

> [I]f my mission is successful, if I die for my God today... Any poor soul whose life I take today, if any poor soul at all, may God forgive his sins

---

23   SMF and RSMF ¶ 3.

24   SMF and RSMF ¶ 4.

25   SMF and RSMF ¶ 32; *see also* Application for Involuntary Emergency Examination and Treatment ("302 Warrant Application"), SMF Ex. A, Doc. 95-1 at 4 (description of warrant).

26   CSF and RCSF ¶ 30.

if he has any. And I pray there is no friendly fire. Lets see how much time I have left before finding out what life after death is really about.[27]

Alarmed by his son's threat to "kill himself and hurt others," Osagie requested a 302 warrant for Osaze.[28] In the warrant application, Osagie noted that Osaze had been "acting erratically for about two weeks, the way he typically acts when he is off his medication."[29] Osagie met with two SCPD officers, Officer John Tlumac and Officer Kurt Stere, and "explained that Osaze had gone missing, had a history of mental illness," "had probably stopped taking his medication," and "that 'things get bad' when his son is off the medications."[30] Osagie's request for a 302 warrant was authorized, requiring law enforcement to take Osaze into custody and transport him to Mount Nittany Medical Center for treatment.[31]

Tlumac briefed Lieutenant Todd Scholton, who supervised the March 19-20, 2019 night shift and Scholton subsequently briefed the day shift supervisor Lieutenant Chad Hamilton.[32] During the morning patrol briefing attended by Officer M. Jordan Pieniazek and other patrol officers, Hamilton reviewed the 302 warrant and the texts, advising the officers "that there is a threat here" and "he's out there, we're going to find him, just be careful."[33]

---

[27] SMF and RSMF ¶ 1.
[28] 302 Warrant Application.
[29] *Id.*
[30] CSF and RCSF ¶ 32.
[31] SMF and RSMF ¶ 50; 302 Warrant Application; *see also* 50 Pa. C.S. § 7302(a)(1).
[32] CSF and RCSF ¶¶ 35-39.
[33] CSF and RCSF ¶ 42.

Scholton also requested that the SCPD records department provide Lieutenant Keith Robb with a "case jacket" containing Osagie's prior history.[34] Upon being briefed of the situation on the morning of March 20, 2019, Robb "'red flagged' Osaze's name because of his prior police contact history," "believ[ing] that Osaze was capable of harming himself and others."[35] Robb, based on his prior experience with Osaze, reached the same conclusion as Osagie: "Osaze was likely off his medications" and "[w]hen he's off his meds, he's a different person and he's just displayed to be a threat to the community."[36] Robb reached this conclusion despite not having read the text messages attached to the 302 warrant which he later said "read to him like a 'Columbine doomsday manifesto.'"[37]

Efforts by SCPD to locate Osaze and take him into custody began on March 19, 2019 and continued into March 20.[38] These efforts were unsuccessful and ultimately it was one of Osaze's mental health counselors who spotted Osaze near a grocery store close to his home.[39] At around 1:48 p.m., the counselor alerted the Centre County crisis agency Can Help that he saw Osaze, and Can Help in turn reported this to SCPD.[40] Officer Pieniazek was assigned to the call and responded,

---

[34]   CSF and RCSF ¶ 41; *see also* Scholton Dep., CSF Ex. 8, Doc. 115-8, at 85:1-86:2.
[35]   CSF and RCSF ¶ 44.
[36]   CSF and RCSF ¶ 45.
[37]   CSF and RCSF ¶ 46.
[38]   SMF and RSMF ¶¶ 7-8.
[39]   SMF and RSMF ¶¶ 9.
[40]   *Id.*; CSF and RCSF ¶ 52.

heading to Osaze's apartment.[41] Sergeant Hill, Pieniazek's direct supervisor, and Lieutenant Robb also responded to the call.[42]

At Osagie's apartment, the Officers briefly met outside of the building where Robb confirmed that the 302 warrant was still valid.[43] They did not make a "special plan" regarding how they would confront Osaze[44] or request the assistance of Centre County Mental Health Services ("CIT" or "MHID").[45] Familiar with the general layout of the building from previous calls, the Officers were aware that it presented tactical challenges, including limiting their ability to retreat in the event of a confrontation.[46] Believing that the only entrance to Osaze's basement apartment was from within the building, the Officers did not investigate whether there was an alternate means of entrance and proceeded to head down two small flights of stairs to Osaze's basement apartment to see if he had returned home.[47] Due to the tight quarters at the bottom of steps, Hill remained on "the next to last step of the stairwell" and Robb was behind him at or near the top of the steps.[48] Pieniazek, operating as the lead officer on the scene by virtue of having accepted the call from dispatch, knocked on Osaze's door and covered the peephole.[49]

---

[41] SMF and RSMF ¶¶ 11-14; CSF and RCSF ¶ 53.
[42] SMF and RSMF ¶ 16; CSF and RCSF ¶ 55.
[43] SMF and RSMF ¶¶ 17-18.
[44] CSF and RCSF ¶ 71.
[45] CSF and RCSF ¶ 26.
[46] CSF and RCSF ¶¶ 56-62.
[47] SMF and RSMF ¶ 17.
[48] CSF and RCSF ¶ 78.
[49] SMF and RSMF ¶ 19; CSF and RCSF ¶ 77.

Upon answering the door, Osaze refused Pieniazek's requests to speak with the Officers either inside or outside of his apartment.[50] Then, after Pieniazek asked Osaze what he had in his right hand, Osaze took a step back, revealing a knife, and said "kill me."[51] Pieniazek replied, "No, drop the knife," at which point Robb said "tase him." Osaze briefly disappeared into the apartment and Pieniazek took a couple steps back to create a "reactionary gap," repeating his order to Osaze that he drop the knife.[52] Osaze then "came rushing out past the door" and Hill attempted to subdue him with his taser.[53] Unfortunately, Hill's taser had no effect on Osaze's advance and Pieniazek fired his gun, killing Osaze.[54]

## III.   LAW

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity."[55] "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances."[56] As "the use of deadly force is a seizure subject to the

---

[50]   SMF and RSMF ¶ 20-21.

[51]   SMF and RSMF ¶ 22.

[52]   *Id.*

[53]   SMF and RSMF ¶¶ 23-25.

[54]   *Id.*

[55]   *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020) (quoting *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007)).

[56]   *Id.* at 366 (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182-83 (3d Cir. 2011)).

reasonableness requirement of the Fourth Amendment,"[57] "'reasonableness' [is] the ultimate—and only—inquiry."[58]

The United States Court of Appeals for the Third Circuit has identified a number of factors courts consider in determining the reasonableness of the use of force: "the severity of the crime at issue, whether the suspects pose an immediate threat to the safety of the officers or others, . . . whether they are actively resisting or attempting to evade arrest by flight," "the physical injury to the plaintiff, the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the polices officers must contend at one time."[59]

This lengthy, non-exhaustive list of factors underscores the Third Circuit's admonition that the reasonableness inquiry is to be "assessed in light of the totality of the circumstances."[60] This analysis is conducted "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' making 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

---

[57] *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

[58] *Johnson v. City of Philadelphia*, 837 F.3d 343, 349 (3d Cir. 2016).

[59] *Rush v. City of Philadelphia*, 78 F.4th 610, 620 (3d Cir. 2023) (citing *Graham*, 490 U.S. 386, 396 (1989); *El*, 975 F.3d at 336; *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).

[60] *Johnson*, 837 F.3d at 350 (citing *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999).

evolving—about the amount of force that is necessary in a particular situation.'"[61] However, officers cannot escape liability where they "unreasonably created the encounter that ostensibly permitted the use of deadly force."[62]

In *Johnson v. City of Philadelphia*,[63] the Third Circuit provided guidance for courts conducting this analysis in cases of officers encountering mentally disabled or disturbed persons, cautioning that there is no broad immunity from Fourth Amendment liability "whenever a mentally disturbed person threatens an officer's physical safety."[64] "Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual. It may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual."[65]

"However, qualified immunity exonerates even unreasonable officer conduct unless (1) the officer violated a constitutional right, and (2) the right was clearly established, 'such that 'it would [have been] clear to a reasonable officer that his

---

[61]   *Id.* (quoting *Graham*, 490 U.S. at 396-97).
[62]   *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993).
[63]   837 F.3d 343 (3d Cir. 2016).
[64]   *Id.* at 352-53.
[65]   *Id.* at 353.

conduct was unlawful.'"[66] The Court may conduct the qualified immunity inquiry "in the order . . . most appropriate for the particular case."[67] As discussed below, though the problem of police use of excessive force against the mentally ill may be clearly established,[68] the solution is not,[69] which is sufficient for the Court to grant the Officers' Motion under the second prong.

Nevertheless, the Court is mindful that the "two-step [qualified immunity] procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable."[70] Though a district court's role in the development of such precedent is limited[71]—nothing this Court says will suffice to resolve anything other than the dispute between these parties—conducting the full two-step analysis here is not merely an "academic exercise."[72] Cases of excessive

---

[66] *Rush v City of Philadelphia*, 78 F.4th 610, 619 (3d Cir. 2023) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011); *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).

[67] *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[68] *See* Karsyn Costello, *Disability As "Abnormal": Court Sanctioned Violence Against Individuals with Disabilities*, 57 Harv. C.R.-C.L. L. Rev. 755, 773-74 (2022) (observing that "thirty to fifty percent of all use of force incidents involve an individual with a disability"); *accord Johnson*, 837 F.3d at 356 & n.7 (Roth, J., dissenting).

[69] *See San Francisco v. Sheehan*, 575 U.S. 600, 616-17 (2015) (noting the "generality" of the officers' training for "dealing with the mentally ill" and the lack of consensus among courts regarding how officers are required to handle such situations).

[70] *Pearson*, 555 U.S. at 236.

[71] *See Jefferson v. Lias*, 21 F.4th 74, 81 (3d Cir. 2021) (observing that, to determine whether a right is "clearly established," courts first turn to Supreme Court precedent and binding Circuit precedent, then a consensus of cases among the Courts of Appeals, followed by district court cases).

[72] *Pearson*, 555 U.S. at 237.

force against the mentally ill arise with startling frequency, and this case does not present questions "so fact dependent that the result will be confusion rather than clarity."[73]

## IV.   ANALYSIS

### A.   Excessive Force

"We begin," as the Third Circuit did in *Johnson*, "with a proposition that can scarcely be disputed:" once Osaze ran at the Officers with a knife, Pieniazek was justified in using deadly force to defend himself and Hill.[74] However, the "the basis of [Osagie's] claim [is] that the Officers' actions *prior to Osaze opening his door* created the danger that necessitated the use of deadly force."[75] Osagie argues that "the officers' actions left themselves 'in a position where fatal force was the only option they had when Osaze—a mentally ill individual who was off his medication and had acted violently when off his medication in the past—did exactly what he had threatened to do in the text messages his father had shared with the police and which were attached to the 302 warrant.'"[76]

Defendants argue that Osagie's argument is "really just a 'second-guess' or 'bad tactics' argument that has been rejected by the Supreme Court and the Third

---

[73]  *Id.* at 237 (quoting *Scott v. Harris*, 550 U.S. 372, 388 (2007) (Breyer, J., concurring)).

[74]  *Id.* at 350.

[75]  Opp. 8 n.4 (emphasis in original).

[76]  *Id.* 8 (quoting Expert Report of Jeffery J. Noble, CSF Ex. 7, Doc. 108-7 ¶ 38).

Circuit."[77] Relying on *Johnson* and the Supreme Court's decision in *County of Los Angeles v. Mendez*,[78] Defendants insist that the Court may not "fault[] the Officers for [their] tactics such as the manner in which they initiated the encounter."[79] Neither *Johnson* or *Mendez* are to be read so broadly. In *Johnson*, the Third Circuit emphasized that "[a] proper Fourth Amendment analysis requires us to assess not only the reasonableness of [the officer's] actions at the precise moment of the shooting, but the 'totality of circumstances' leading up to the shooting."[80] In *Mendez*, the Supreme Court instructed the lower court on remand to consider whether the "bad tactics" of the officers *caused* the plaintiffs' injury.[81]

Evaluating whether the Officers' actions "unreasonably created the encounter that ostensibly permitted the use of deadly force,"[82] the Court is to examine the impact of preceding events through the lens of "ordinary ideas of causation, not doctrine about when the seizure occurred."[83] The task is to determine whether the

---

[77]   Reply, Doc. 118 at 9.
[78]   581 U.S. 420 (2017).
[79]   *Id.* 9-10.
[80]   837 F.3d at 350.
[81]   581 U.S. at 432. The plaintiffs in *Mendez* were shot by officers following an unconstitutional (thus, tactically flawed) entry of their home. *Id.* at 424-25. The Ninth Circuit applied its "provocation rule," which, in cases of excessive force claims, "instruct[ed] courts to ask whether the law enforcement officer violated the Fourth Amendment in some other way in the course of events leading up to the seizure." *Id.* at 427. Rejecting the provocation rule, the Supreme Court emphasized that the inquiry is not whether a separate Fourth Amendment violation preceded the use of force, rather whether the actions of the officers proximately caused the injury. *Id.* at 432. Notably, on remand the Ninth Circuit held that the warrantless entry of the home *was* the proximate cause of plaintiffs' injuries. *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018).
[82]   *Enyart*, 5 F.3d at 234.
[83]   *Abraham*, 183 F.3d at 292.

16

alleged failures of the Officers in responding to Osaze's apartment proximately caused his shooting.[84]

Osagie makes clear that "[t]his litigation is not about the[] police officers who received Sylvester's request for a 302 warrant."[85] He suggests that the "professionalism" of those officers "drew stark contrast with the Defendants who served the warrant and failed [to] ascertain the critical facts chronicled by other officers, including that this was a suicide by cop encounter."[86] Osagie asserts that the responding officers unreasonably "did not: (1) review text messages; (2) read the 302 petition; (3) review Osaze's history; (4) call a crisis center for on scene assistance despite a SCPD policy that required them to do; (5) make any plan for how they would de-escalate the situation if Osaze was not cooperative;" or (6) "investigate [an alternate] means of approach" despite "kn[owing] that the tactical realities left the officers with no choice but to use lethal force against Osaze if he made good on his suicide by cop promise."[87]

These purported failings on the part of the responding officers fall into two categories: The first three reflect a failure of the Officers to educate themselves regarding the risk Osaze posed to himself and the officers. The latter three suggest a failure to respond to that threat adequately. The Court finds that a reasonable juror

---

[84] *Mendez*, 581 U.S. at 432.
[85] Opp. 1.
[86] *Id.*
[87] *Id.* at 7 (numbering added).

could conclude that Osaze intended to commit suicide by cop and that the Officers should have responded to the scene accordingly.[88] The inquiry then turns on whether the Officers' response was, in fact, reasonable.

### 1.    Failure to Call a Crisis Center

Osagie argues that the failure to involve a crisis worker violated SCPD policy.[89] SCPD's Mental Health/Intellectual Disability policy Section 2.7.8 A.1 provides that, "[w]hen an MH/ID 302 warrant is issued, an officer will be dispatched to the scene of the incident to assist in serving the warrant or stabilizing the person or situation until a crisis worker arrives on scene."[90] It also provides that, in cases where "the person to be picked up may be a danger to himself or others[, t]his individual may require immediate police action prior to the arrival of the crisis worker with the warrant. It is expected members of [SCPD] will take whatever action is necessary to keep the situation under control until the arrival of the crisis worker and the warrant."[91] Further, Captain Chris Fishel testified that, while there are instances where a crisis worker is unavailable, officers called to serve a 302 warrant

---

[88]   *See* Hamilton Dep., Counts 2-3 SMF Ex. N, Doc. 92-14 at 37:12-14 ("Q: When you read the 302 petition, was it evident to you that there was a danger? A: Yes. Q: A danger to himself? A: Yes, and others. Q: And others. And did you view it as a potential suicide by cop kind of danger? A: Potentially, yes."); Robb Dep., SMF Ex. L, Doc. 95-12 at 151:3-4 (testifying that Osaze's text messages read like a "Columbine doomsday manifesto"); CSF and RCSF ¶ 48 (discussing Robb's testimony that he assumed Osaze was suicidal, would try to hurt those trying to help him, and that Robb "assumes every 302 is a suicide by cop situation").

[89]   Opp. 7.

[90]   MHID Policy, CSF Ex. 4, Doc. 115-4.

[91]   *Id.* Section 2.7.8 A.2(b).

should contact and seek the assistance of a crisis worker.[92] Defendants insist that reaching out to the Centre County Crisis Intervention Team prior to "secur[ing] the possibly violent"[93] Osaze would have been fruitless because it was the practice of the County CIT to "not become involved if there [are] threats of violence until the scene is secure."[94]

Even if the Court assumes there was a risk that Osaze would attempt suicide by cop, this does not compel the conclusion that, at the time the Officers arrived, the situation presented a danger greater than that of a "routine" 302 warrant.[95] As Pieniazek testified, Osaze purchasing groceries suggests that he was not "someone who would appear to be planning to take their life."[96] Instead, viewing the evidence in the light most favorable to Osagie, it was the Officers' actions which "triggered" Osaze's response.[97] In other words, a reasonable juror could conclude that the situation was "stable," and therefore SCPD policy required the Officers to seek the assistance of a crisis worker prior to confronting Osaze.

---

[92] *See* Fishel Dep., Counts 2-3 SMF Ex. B, Doc. 92-2 at 66:11-67-4.

[93] Reply 6.

[94] *E.g.*, RCSF ¶ 26.

[95] *E.g.*, *id.* ¶ 50 ("Pieniazek would have classified this as a routine 302 warrant if he was aware there were threats to harm others because a 302 warrant is specifically to harm yourself or others."); Hamilton Dep. 37:15-18 (Lieutenant Hamilton, the SCPD Critical Incident Training liaison, testified that officers "involved in 302s . . . must assume that those contacts can be dangerous," and that there is a risk the individual or an officer could be injured or killed.); Gardner Dep., Defs. Ex. E, Doc. 92-5, at 58:12-59:3 (Chief John Gardner testified that, though it is "not uncommon" for individuals to threaten "committing suicide by cop" such comments should be taken seriously.).

[96] Pieniazek Dep., SMF Ex. J, Doc. 97-3 at 287:14-18.

[97] Hamilton Dep. 111:13-17.

However, a violation of Department policy does not render the Officers' actions unreasonable *per se* under the Fourth Amendment.[98] "[I]n light of the facts and circumstances confronting them," the alleged policy violation is not so objectively unreasonable as to constitute a Fourth Amendment violation.[99] Gardner testified that, despite the Department policy, the Centre County Mental Health services has made it clear that it is not their responsibility or role to assist with the service of 302 warrants:[100]

> Q: Okay. And to your knowledge what steps, if any, were taken at the State College Police Department to comply with [the MHID Policy]?
>
> A: Okay. So the bottom line is what [MHID Policy] says there in practicality might be what it says, but in reality, mental health has never sent caseworkers out to serve 302 warrants with us. That simply has not occurred.
>
> What I think is being mistaken here or misconstrued is the fact years ago a crisis worker would, you know, go out to assess someone who was experiencing mental health issues -- they would ask us to go with them to secure the scene, you know, and then once they felt safe at the scene, they would release us. But never in my years of experience here has anyone, any crisis worker ever helped us serve a 302 warrant. . . .
>
> Q: Would you agree, Chief Gardner, that the policy as written contemplates a crisis worker is supposed to be called when a 302 warrant is to be served on somebody?

---

[98] *See Johnson*, 837 F.3d at 351 & n.47 (observing that, while "official police department policies may be considered among other things in the reasonableness inquiry," "police training and procedures 'do not, of course, establish the constitutional standard but may be relevant to the Fourth Amendment analysis'") (quoting *Stamps v. Town of Framingham*, 813 F.3d 27, 32 n.4 (1st Cir. 2016)).

[99] *Abraham*, 183 F.3d at 289 (quoting *Graham*, 490 U.S. at 396).

[100] Gardner Dep. 65:17-66:4.

A: It says that, but in practicality in reality it is not. They will not respond. We have made requests in the past and they have made it abundantly clear they are not going to respond to those calls.

Q: And right, I mean just looking at the next line down on the Policy 2.7.8.A.2, begins by saying, "A crisis worker will then meet us at the scene with the 302 warrant," right?

A: Right.

Q: And the "us" in that is the State College Police Department, right?

A: Right.

Q: When did you learn as chief that crisis workers were declining to appear at the scene of the service of a 302 warrant . . . as a regular matter?

A: It's been decades, is my understanding.

Q: And what steps have you taken in your role as a part of the command staff and ultimately Chief, to address the fact that in your experience crisis workers refused to appear when a 302 warrant was being served?

A: I've communicated that to the prior MHID director for the County, which was Natalie Corman and was provided with the law and what the law states is that a peace officer in Pennsylvania is the one who is tasked with the service of mental health warrants, that it was not their responsibility to do that. And she, you know, she very diplomatically told us that it's not their responsibility to serve mental health warrants. I know what this policy says, but I also know in practicality and reality what we're left with. I cannot dictate to another agency what they should or shouldn't do. I can only voice the concerns I have and I've done that over the years.

Q: So is it fair to say, Chief that prior to the shooting of Mr. Osagie on the 20th of March 2019, you were aware that crisis workers as a rule were declining to appear at the service of 302 warrants, but you didn't raise that with anybody at the mental health department?

A: Well, I don't think it's a question that they were declining it. It was in their policy that it was not their responsibility. That it was the responsibility of the police department and I know this issue has been raised in the past by other chiefs, as well, and I may have had that

conversation prior to his shooting, too, because we deal with this so often. But the one that sticks out in my mind was after the shooting, and it may have been months after or whatever, that I personally called Natalie Corman and voiced the concerns I had about the way, you know, 302s were being served and that, you know, we were getting no assistance from crisis workers. And she very diplomatically told me that it was not their responsibility to serve those. In fact, if you'll allow me, we met with the new -- the chief, when I say "we," the chiefs, the board of chiefs, we meet monthly. We met Friday, just this past Friday [March 24, 2023], and we had the current director of MHID, Cathy Arbogast there, and we discussed the issue of 302 commitments, and she again reinforced the notion that it is the responsibility of the police to serve those and they're not going to send caseworkers out to do that.[101]

Tracy Small, the Centre County Crisis Intervention Team Coordinator,[102]

confirmed that "Crisis does not respond when a 302 warrant is already issued;" they

"are no longer involved" "once that warrant is authorized and issued."[103]

---

[101] *Id.* 73:10-78:12.

[102] Small Dep., SMF Ex. H, Doc. 95-8 at 10:7-14.

[103] *Id.* 44:24-45:9. *See also id.* at 61:13-20 (MHID "would not accompany the police as it was believed that an officer with training in crisis intervention being dispatched (which in Centre County is the basic expectation) would be enough to deal with the situation.").

Osagie notes that "Small also stated, however, that 'a lot of times' officers will call crisis managers to help intervene with those types of calls, 'especially for people, you know, they've had calls on before. So it's a team effort." RSMF ¶ 49 (quoting Small Dep. 44:2-15). However, "those types of calls" refers to a "crisis situation," which Small distinguishes from an "emergency situation," or a situation in which a 302 warrant is already issued:

Q: When would it be appropriate [for officers to call a crisis manager or mental health expert]?
A: If the person is having maybe some thoughts of suicide that they haven't acted on that. *If there is not a 302 warrant involved*, because Crisis does not respond when a 302 warrant is already issued. So those are a couple examples.
Q: Why is it that crisis doesn't respond if a 302 is already issued?
A: Because that is an emergency situation then, so we have crisis services and emergency services, so *once that warrant is authorized and issued, crisis is no longer involved.*

Small Dep. 44:22-45:9 (emphasis added).

No reasonable juror could conclude that it is was unreasonable for the Officers, required by law to arrest Osaze pursuant to the 302 warrant, to forgo a futile request for assistance.[104] The Court recognizes that the "first line of defense against" "the death of individuals with mental health problems at the hands of the police" "is the establishment of police regulations to prevent interactions between police officers and mentally disabled people from escalating into deadly confrontations."[105] However, in this case, it is not the Officers' "disregard [of] such a regulation [which] renders the regulation toothless;"[106] but the policy of the Centre County CIT, an entity which is not a party to this suit and over which the SCPD has no authority.[107]

## 2.     Failure to Create a De-escalation Plan

The parties do not dispute that the Officers "made no 'special plan' regarding how they would confront Osaze."[108] Osagie asserts that the Officers should have established a plan "includ[ing] how to retreat if the situation becomes dangerous" and "take into account the layout of the area, whether there was a means of egress, and consider if there was a safer way of serving the warrant."[109] Further, Osagie faults the Officers for failing to "plan as to what to do if Osaze was not cooperative,"

---

[104] *See Rush*, 78 F. 4th at 620 (observing that courts should consider "whether the action takes place in the context of effecting arrest" in determining reasonableness).

[105] *Johnson*, 837 F.3d at 356 (Roth, J. dissenting).

[106] *Id.*

[107] Hamilton Dep. *supra*.

[108] CSF and RCSF ¶ 71.

[109] CSF ¶¶ 22-23.

because "circumstances seemed routine at the time."[110] Defendants insist that Officers "used the standard 302 warrant procedures" which included "a plan for the possibility that Osaze would run at them with a knife."[111]

The Officers' reliance on their training—the training that Centre County MHID believed sufficient to prepare officers to serve 302 warrants[112]—is presumptively reasonable.[113] The Court is not moved by Osagie's repeated suggestion that it was "reckless [for the Officers to] treat[] this call as 'routine' despite the overwhelming evidence of danger."[114] Being a police officer "involve[s] routine exposure to danger."[115] Every 302 warrant involves an individual who "poses a clear and present danger of harm to others or himself or herself."[116] Treating the situation as "routine" suggests that the Officers adhered to "[a] regularly followed procedure [or] an established or prescribed way of" serving 302 warrants.[117]

---

[110] *Id.* ¶¶ 72-73 (quotation and citations omitted).

[111] RCSF ¶ 71.

[112] Small Dep. 61:13-20

[113] *Cf. Johnson*, 837 F.3d at 351 (observing that "official police department policies may be considered . . . in the reasonableness inquiry"); *id.* at 356 (Roth, J., dissenting) (suggesting that the failure to follow police regulations caused an avoidable violent confrontation).

[114] Opp. 7; *accord id.* at 7 n.3; RSMF ¶ 43; CSF ¶¶ 49-50, 73.

[115] *See Pahler v. City of Wilkes-Barre*, 207 F. Supp. 2d 341, 351 (M.D. Pa. 2001), *aff'd* 31 F. App'x 69 (3d Cir. 2002) (quoting *Hartman v. Bachert*, 880 F. Supp. 342, 351 (E.D. Pa. 1995) and dismissing claim brought by officer who was shot by another officer during a raid). In the Fourth Amendment context, the Supreme Court has recognized "the dangers faced by police officers [even] during the course of routine traffic stops." *Ickes v. Grassmeyer*, 30 F. Supp. 3d 375, 390 (W.D. Pa. 2014) (citing *Maryland v. Wilson*, 519 U.S. 408, 412-15 (1997)).

[116] 302 Warrant Application at 906.

[117] *Routine*, Oxford English Dictionary (Online Ed.) (last accessed Nov. 16, 2023).

Following an established procedure evinces that the Officers' acted reasonably and did not violate any clearly established law.

Most significantly, Osaze never gave the Officers the chance to de-escalate the situation. When Osaze answered the door, Pieniazek, in a conversational tone, merely asked Osaze if the Officers could speak with him.[118] Osaze refused.[119] No reasonable juror could fault the Officers' actions to this point. Then, Pieniazek noticed that Osaze was holding a knife and, quite reasonably, asked him to drop it.[120] Again, Osaze refused.[121] Robb, contrary to Osagie's claim that he was unable to "participate in the interaction,"[122] then told Hill to tase Osaze.[123] Hill did so as Osaze charged at him and Pieniazek, but the taser had no effect.[124] Finally, left with no other option, Pieniazek shot Osaze.[125]

The Supreme Court addressed a similar situation in *City & County of San Francisco v. Sheehan*.[126] In *Sheehan*, police officers were also confronted with a mentally ill individual (in that case, a woman) wielding a knife.[127] After the woman expressed "her intent to resist arrest and to use the knife," one of the officers

---

[118] SMF and RSMF ¶¶ 20-21, 30.
[119] SMF and RSMF ¶ 21.
[120] SMF and RSMF ¶ 22.
[121] *Id.*
[122] Opp. 8.
[123] SMF and RSMF ¶ 22.
[124] SMF and RSMF ¶ 24.
[125] SMF and RSMF ¶¶ 25-26.
[126] 575 U.S. 600 (2015).
[127] *Id.* at 605.

attempted to subdue her with pepper spray.[128]   When that failed, the officers shot her.[129] The Supreme Court held that the officers' "use of potentially deadly force was justified" after they "tried to subdue [the woman] with pepper spray, but [she] kept coming at the officers until she was only a few feet away from a cornered officer."[130]

Osagie contends that *Sheehan* is "easily distinguishable" because "[t]here was no allegation that the officers did not adequately prepare for the encounter, and, in fact, they had made a plan to pepper spray the woman in the face as they opened the door and avoid the use of lethal force (the pepper spray just wasn't effective)."[131] On the contrary, the circumstances in *Sheehan* are not just "remotely analogous," they are virtually identical.[132] The Officers here were faced with a mentally ill Osaze who threatened them with a knife and, once he tried to follow through on that threat, shot him only after an attempt to subdue him with non-lethal force had no effect. The crux of Osagie's complaint is not that the Officers acted unreasonably, but that they acted reasonably without having talked about it first.

Osagie's argument that the Officers "tragically chose to approach Osaze in a tight hallway giving them nowhere to retreat" fares no better.[133] Osagie's expert,

---

[128]   *Id.*
[129]   *Id.* at 606.
[130]   *Id.* at 612-13.
[131]   Opp. 8 n.5
[132]   *Contra id.*
[133]   Opp. 7 (quotation and citation to the record omitted).

Jeffrey J. Noble, a former Deputy Chief of Police with the Irvine Police Department in California, opines:

> The fact that an immediate response was not required allowed the officers the opportunity to look for additional doors to the apartment and to locate the basement window that may have allowed the officers a view inside the apartment. An officer could have gone to the apartment manager's office to determine if there were other entrances to the apartment, especially after seeing the tactical disadvantage that the landing presented. Had they made some efforts, it is likely that they would have found the exterior door that offered a significant tactical advantage over the front door landing.[134]

Defendants unsurprisingly dispute Noble's conclusions and offer their own opposing expert report.[135] However, they do not argue that his report falls below the *Daubert* standard for admissibility.[136] Ordinarily, conflicting expert reports are sufficient to create a genuine issue of fact and preclude summary judgment.[137] Further, the Court agrees with Noble that an immediate response was not required, providing the Officers to investigate another means of approach. The Court also rejects Defendants' argument that it was reasonable not to investigate other means of approach because "99.9% of the apartments in State College have one door."[138] That it may have been unlikely that Osaze's apartment had a rear door does not excuse the Officers from looking for it.

---

[134]  Noble Expert Report ¶ 47(a).
[135]  RCSF ¶¶ 82-84.
[136]  *Id.* Referring to Noble as a "purported expert" is insufficient to raise such an objection.
[137]  *In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig.*, 2021 WL 8016522, at *3 (M.D. Pa. July 19, 2021) (collecting cases).
[138]  RCSF ¶ 24.

However, Osagie "cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless"[139] Any failure by the Officers to look for another means of entry was harmless because Osagie has not shown that any other entrance would have provided the Officers with the ability to retreat.[140] Osagie and Noble suggest that the rear door "offered a significant tactical advantage over the front door landing."[141] Though the Court is generally loath to reject the conclusions of a qualified expert at summary judgment, this "version of events is so utterly discredited by the record that no reasonable jury could . . . believe[ it]."[142] The rear door to Osagie's apartment is located at the landing of a staircase which provides barely enough room to turn around, let alone take "a couple steps back to create more of a reactionary gap."[143] Osagie's position is that, instead of "approach[ing] Osaze in a tight hallway giving them nowhere to retreat,"[144] the Officers should have approached him at the landing of a staircase which gave them even less room to retreat. No reasonable juror could accept that argument.[145]

---

[139] *See Sheehan*, 575 U.S. at 616 (holding that an opposing expert's report is insufficient to survive summary judgment where a "reasonable officer could have believed his conduct was justified") (quotations and citations omitted).

[140] *See Mendez*, 581 U.S. at 432 (holding that recovery is only permitted where a plaintiff's injuries are proximately caused by the police's error).

[141] Noble Report, *supra*.

[142] *Scott*, 550 U.S. at 380.

[143] RCSF Ex. A, Doc. 116-1 (pictures of rear door); SMF and RSMF ¶ 22.

[144] Opp. 7 (record quotation and citation omitted).

[145] Osagie offers that the rear door opening "directly into Osaze's kitchen and a hallway which connected a separate door to the hallway in front of Osaze's apartment door" made approaching

### 3.   Unreasonable Means of Approach

Osagie argues that Pieniazek acted unreasonably when he "covered Osaze's peephole to surprise him when he opened the door despite his compromised mental state."[146] Defendants clarify that Pieniazek "covered the peephole because they wanted Osaze to answer the door; they did not want Osaze to know it was police officers or how many there were to further exacerbate the situation."[147] Pieniazek also testified that he "covers the peephole on a door all the time to prevent a hostage situation or barricaded situation, to include a noise complaint, because if they see police, they will not answer the door."[148]

As a general matter, when officers undertake a dangerous assignment, it may well be appropriate for officers to use surprise to secure the premises.[149] However, where an officer chooses to employ the element of surprise, they risk creating a

---

from that door more advantageous. *Id.* There is no discussion of what area of the apartment that Osagie's front door opened into, or why it put the Officers at a tactical disadvantage. To the extent that Osagie suggests that the window in the rear door would have prevented the Officers from concealing their identity by covering the peephole, the Court addresses that issue separately below.

The Court also notes that, to the extent Osagie faults Robb for remaining at the top of the staircase, an approach at the rear door would not have allowed for better positioning.

[146]  *Id.* at 8.
[147]  RCSF ¶ 77 (citing Pieniazek Dep. 117:8-118:3).
[148]  *Id.* (citing Pieniazek Dep. 117:8-118:3).
[149]  *See Muehler v. Mena*, 544 U.S. 93, 108 (2005) (Stevens, J., concurring) (observing that employing "overwhelming force and surprise" may be appropriate when undertaking "a dangerous assignment to execute a warrant to search a property that is presumably occupied by violence-prone gang members"). While Osaze did not pose the same sort of danger as the situation in *Muehler*, the Officers did not use the same degree of force or surprise.

dangerous situation.[150] Among those risks is that they will confront an armed occupant.[151] Pieniazek suggests that the risk was justified because it would prevent a situation where Osaze barricaded himself in the apartment, perhaps with a hostage. However, Pieniazek admitted that he was not aware Osaze had a roommate and had no other reason to suspect that there would be a potential for a hostage situation.[152]

The Court also rejects Defendants' proffered justification that they did not want Osaze to know that they were police officers. It is well established that, as a general matter, "police officers entering a dwelling must knock on the door and announce their identity before attempting forcible entry."[153] Though the Officers here did knock and did not enter Osaze's apartment, this rule informs the reasonableness inquiry. Courts have found that officers may dispense with identifying themselves when (1) the occupant was aware of the officers' identity, or (2) announcement may lead to the occupant's escape or (3) put the officers in peril.[154] Pieniazek concedes that he did not want Osaze to know who they were. There is no evidence that they were concerned Osaze would escape; on the contrary, the Officers

---

[150] *See Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016) ("We agree that by choosing to conduct the raid with surprise and with guns drawn, APD created a dangerous situation that led to [the decedent's] death."). Though the officer who shot the decedent in *Cass* was not liable, the Fifth Circuit has rejected the "totality of the circumstances" test employed by the Third Circuit. *Id.* at 731-32.

[151] *Mendez*, 897 F.3d at 1081.

[152] CSF and RCSF ¶ 70.

[153] *Walker v. City of Wilmington*, 360 F. App'x 305, 313 (3d Cir. 2010) (quoting *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997)).

[154] *Id.* (citing *Richards*, 520 U.S. at 394; *Kornegay v. Cottingham*, 120 F.3d 392, 397 (3d Cir. 1997)). A fourth factor, potential destruction of evidence, is plainly inapplicable here.

were unaware that there was another exit to the apartment. Though the parties agree that Osaze posed a risk to others, Defendants do not argue that the Officers would have been in greater danger if Osaze knew who was at the door.

Further, the record belies the suggestion that there was any need for the Officers to conceal their identity. As Defendants note, "[d]uring past incidents Osaze [was] generally cooperative and complied with police commands no matter what emotional state he was in."[155] Not only have Defendants failed to demonstrate that a mere desire for an occupant to answer the door justifies officers concealing their identity, but they have also failed to show it was reasonable to assume Osaze himself was unlikely to answer the door.

Relatedly, it is far from obvious that there would have been any harm in Osaze not answering the door. If Osaze had attempted to barricade himself in the home, the Officers would have then been on notice that this situation was different than prior interactions between SCPD and Osaze. The Officers could have easily remained outside of Osaze's apartment and attempted to open a line of communication with him.[156] If that had failed, the Officers may have been justified in forcibly entering Osaze's home to execute the 302 warrant.[157]

---

[155] RCSF ¶ 14.

[156] *See* Noble Expert Report ¶ 53 (suggesting that the Officers "could have conducted a 'surround and callout,' a common tactic by which the Officers communicate with an individual or from the outside using a bullhorn or PA device to try to talk Mr. Osaze out of his apartment).

[157] *Young v. Scott Township*, 469 F. Supp. 3d 298, 309 (M.D. Pa. 2020).

To be sure, the Court recognizes that alternative means of approach may have presented their own complications. Noble's proffered alternative of opening a line of communication with Osaze from outside of the apartment assumes that this was possible.[158] Osaze's phone, aside from a brief moment earlier in the day, had been turned off and the Court is skeptical that a bullhorn or PA system is a particularly effective way to communicate with the occupant of a basement apartment. A forcible entry of a home creates its own risks. The Court takes no position as to the reasonableness of any of the suggested means of approach other than to conclude that, on the record before it, the Court cannot answer those questions on a motion for summary judgment.

### 4.    Totality of the Circumstances

Having considered each of the alleged failings separately, the Court now analyzes them together.[159] Ordinarily, courts should defer to the judgment of police officers who must confront an individual, such as Osaze, who is potentially armed and dangerous.[160]  However, the Officers' actions must withstand a higher level of scrutiny as Osaze had not actually committed a crime and they outnumbered him

---

[158] *See* Noble Expert Report *supra* n.156.

[159] *See United States v. Green*, 897 F.3d 173, 183 (3d Cir. 2018) (observing that a "divide-and-conquer analysis" is inconsistent with a "totality of the circumstances approach") (citing *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018)).

[160] *Rush*, 78 F.3d at 620 (identifying "the possibility that the persons subject to the police action are themselves violent or dangerous" and "the possibility that the suspect may be armed" as factors for courts to consider in evaluating an excessive force claim").

three-to-one.[161] Further, because the relevant conduct is the Officers' actions prior to Osaze opening the door, a reasonable juror could conclude that Osaze was not "actively resisting or attempting to evade arrest," and did not "pose an *immediate* threat to the safety of the officers or others."[162] Finally, to the extent that the Officers' actions caused Osaze's death, that alone warrants a greater level of scrutiny.[163]

"Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual."[164] Here, there was no reason to await backup because there were already three officers on the scene.[165] Even if the Court assumes that "backup" could refer to a member of a Crisis Intervention Team, that backup was never going to arrive due to Centre County CIT's policy that they had no role in serving 302 warrants.

Regarding whether the Officers should have retreated, the parties agree that there was nowhere to retreat in the hallway outside of Osaze's apartment.[166]

---

[161] *Id.* (identifying as factors "the severity of the crime at issue" and "the number of persons with whom the police officers must contend at one time").

[162] *Id.* (identifying both as factors). The Court notes that Osaze may have presented a threat to his roommate. However, neither party suggests that this was the case. To the contrary, Pieniazek was unaware that Osaze had a roommate, CSF and RCSF ¶ 70, and the Court must consider the Officers' actions from the perspective of a reasonable officer on the scene.

[163] *Rush*, 78 F.4th at 620 (identifying as a factor "the physical injury to the plaintiff") (citing *El*, 975 F.3d at 336).

[164] *Johnson*, 837 F.3d at 353.

[165] *Cf. id.* (discussing when it is reasonable for a single officer to approach a mentally disturbed individual or await backup).

[166] *E.g.*, CSF and RCSF ¶ 59.

However, a reasonable juror could find that the tactical challenges presented by the layout of the apartment complex combined with the Officers' decision to obfuscate their identity when they knocked on the door unreasonably increased the risk that Officers would have to employ lethal force because they had nowhere to retreat. Put differently, had the Officers not concealed their identity when Osaze knocked on the door, it may have decreased the risk that Osaze answers the door with a weapon, if he answers at all,[167] obviating the need to retreat.[168]

## B.    Qualified Immunity

Though the "fact-intensive nature of the reasonableness inquiry means it should often be resolved by a jury,"[169] "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[170] Defendants are entitled to summary judgment on qualified immunity grounds unless they violated right which "was clearly established at the time of [their] actions."[171] To determine whether a right is clearly established, the Court engages in the legal fiction that police officers, armed with a subscription to the Federal Reporter, have fair warning that their conduct was illegal

---

[167] *See supra* (noting that Osaze did not pose an immediate threat from inside his apartment).

[168] Robb testified that if the Officers had to "fight" Osaze, he was confident that the three of them could have subdued Osaze. RCSF ¶ 63. That Osaze possessed a weapon changed this calculus. *See also supra* (Officers' actions are subject to greater scrutiny as they outnumbered Osaze).

[169] *Berry v. City of Philadelphia*, 188 F. Supp. 3d 464, 471 (E.D. Pa. 2016).

[170] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

[171] *L.R.*, 836 F.3d at 247.

when it has previously been found unconstitutional by the Supreme Court, or "'a robust consensus of cases of persuasive authority' in the Courts of Appeals."[172] As the events here occurred on March 20, 2019, the Court looks to whether the right was clearly established as of that date.[173]

The Court agrees with Osagie that, as with the reasonableness inquiry, the qualified immunity analysis must consider the totality of the circumstances and is not "confined to the seconds before the shooting."[174] Arguing that Defendants are not entitled to qualified immunity, Osagie directs the Court to Eastern District of Pennsylvania Judge Edward G. Smith's opinion from earlier this year in *Ardo v. Pagan*.[175] Though Judge Smith's opinion was issued after Osaze was killed, the events of that suit occurred in 2017 so, to the extent that *Ardo* is factually analogous, a finding that a right was clearly established in that case would be instructive here.

As in this case, the officers in *Ardo* were aware that they were approaching an individual, confined to his property (sitting in his car and blocked in by the responding officers' cruisers), who was "suffering a mental health crisis and had expressed suicidal threats."[176] It is there, however, where the similarities end. In *Ardo*, the officers were warned the individual had an "improvised explosive device

---

[172] *Id.* at 247-48 (quoting *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016); *Taylor v. Barkes*, 575 U.S. 826 (2015)).

[173] *Bryan v. United States*, 913 F.3d 356, 363 (3d Cir. 2019).

[174] Opp. 9.

[175] 652 F. Supp. 3d 545 (E.D. Pa. 2023).

[176] *Id.* at 558.

35

strapped to his neck and that he would light it if he saw any police officers."[177]
Nevertheless, the officers "immediately drew their weapons upon exiting their patrol
cars" and shouted competing demands of the individual.[178] The court noted that, "the
Troopers had successfully blocked Mr. Ardo's vehicle before they got out of their
respective patrol cars" and, "until the Troopers began approaching Mr. Ardo's
vehicle, Mr. Ardo presented a threat to no one other than himself."[179] The court
found that it was the officers' decision to approach Ardo which created the danger
to their own lives if Ardo were to attempt to light the explosive device, as he did.[180]

Holding that the officers were not protected by qualified immunity, Judge
Smith relied heavily on the Tenth Circuit's decision in *Allen v. Muskogee*,[181] noting
that it had been "cited and acknowledged in numerous qualified immunity decisions
outside the Tenth Circuit between 1997 and 2017."[182] The *Allen* court held that "an
officer violates the Fourth Amendment when his or her reckless or deliberate
conduct results in the need for lethal force or when the officers rely on lethal force
unreasonably as a first resort in confronting an irrational suspect who is armed with

---

[177] *Id.*
[178] *Id.* at 559.
[179] *Id.* at 560.
[180] *Id.*
[181] 119 F.3d 837 (10th Cir. 1997).
[182] *Ardo*, 652 F. Supp. 3d at 562 (collecting cases).

only a weapon of short range lethality and who has been confined on his own property."[183]

Though *Allen* may have been instructive in *Ardo*, it is less so here. In *Tahlequah v. Bond*,[184] the Supreme Court reversed a denial of qualified immunity based on *Allen*. There, officers approached an intoxicated individual, engaged him in conversation and followed the man to his workbench where the man picked up a hammer.[185] After the man raised the hammer, the officers, roughly six feet away, drew their guns, ultimately shooting and killing the individual as he "took a stance as if he was about to throw the hammer or charge at the officers."[186] The Tenth Circuit found that a reasonable juror could conclude the officers' approach of the individual and their "subsequent 'cornering' of him in the back of the garage recklessly created the situation that led to the fatal shooting, such that their ultimate use of deadly force was unconstitutional."[187]

The Supreme Court found that "[n]ot one of the decisions relied upon by the Court of Appeals"—including *Allen* —"comes close to establishing that the officers' conduct was unlawful."[188] Notably, the Supreme Court found that the officers there,

---

[183] *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1219 (10th Cir. 2019) (citing *Allen*, 119, F.3d 837).
[184] 595 U.S. 9 (2021).
[185] *Id.* at 10-11.
[186] *Id.* at 11.
[187] *Id.* at 12. The Court notes that, while the Supreme Court did not disturb the Tenth Circuit's ruling that the underlying conduct was unconstitutional, Osaze's death preceded the decisions from both Courts.
[188] *Id.* at 13.

as here, attempted to engage in conversation, and did not yell at the decedent until he wielded a weapon.[189] Further, while "reckless preseizure conduct can render a later use of force excessive,"[190] "that formulation of the rule is much too general to bear on whether the officers' particular conduct here violated the Fourth Amendment."[191] "'Such specificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"[192]

Osagie also offers two other district court cases from within the Third Circuit in support of his argument that the Officers are not entitled to qualified immunity: *Luna-Diaz v. City of Hackensack Police Dept.*[193] and *Singletary v. City of Philadelphia.*[194] Not only do both cases also postdate the underlying events of this suit, again limiting their utility here, they are also insufficiently analogous as each presented significant factual disputes regarding key issues, including whether the officers were even in danger at the time they used lethal force.[195]

---

[189]   *Id.* at 13.

[190]   *See id.* at 13; *Johnson*, 837 F.3d at 351.

[191]   *Bond*, 595 U.S. at 13 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

[192]   *Id.* at 12-13 (quoting *Mullenix v. Luna*, 557 U.S. 7, 12 (2015)).

[193]   2022 WL 18024213 (D.N.J. Dec. 30, 2022).

[194]   2021 WL 5235232 (E.D. Pa. Nov. 10, 2021).

[195]   *Id.* at *10-11; *Luna-Diaz*, 2022 WL 18024213, at *15. Further, the governmental interests in this case are far greater than those in *Luna-Diaz*, where the officers were simply delivering a message for the individual to call his probation officer.

Nor has the Court's own review of the caselaw revealed any "robust consensus" that would have given the Officers fair notice that their conduct was constitutionally deficient. Given the uphill climb any plaintiff in Osagie's position faces, this is unsurprising. Several Courts of Appeals have rejected the "totality of the circumstances" approach adopted by the Third Circuit.[196] As a result, though many courts may "express disapproval and disappointment" with law enforcement's response to mentally ill individuals, whether "law enforcement personnel [take] unnecessary actions that heighten the risk of harm or death to mentally ill suspects" is often not part of the analysis, constraining the formation of any robust consensus.[197] In the Circuits that do apply the "totality of the circumstances"

---

[196] *See Sok Kong v. Burnsville*, 960 F.3d 985, 993-94 (8th Cir. 2020) ("Even if officers created the need to use deadly force by trying to disarm a mentally ill person, the reasonableness of force depends on the threat the person poses during the shooting.") (quotation and citation removed); *Ray v. Roane*, 948 F.3d 222, 225 (4th Cir. 2020) ("as we do in any case alleging unreasonable use of force under the Fourth Amendment, we focus on the facts and circumstances confronting the officer immediately prior to and at the very moment that force was used, and disregard information not known to the officer at that time") (quotation and citation removed); *Cass v. City of Abilene*, 814 F.3d 721, 732 (5th Cir. 2016) ("any of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit") (citation removed); *Felton v. City of Chicago*, 827 F.3d 632, 635 (7th Cir. 2016) ("preseizure conduct is not subject to Fourth Amendment scrutiny") (citation removed); *Terebesi v. Torreso*, 764 F.3d 217, 234 n.16 (2d Cir. 2014) ("courts in this Circuit and others have discarded evidence of prior negligence or procedural violations, focusing instead on the split-second decision to employ deadly force") (quotation and citation removed). *But cf. Young v. Providence*, 404 F.3d 4, 22 n.13 (1st Cir. 2005) (observing that "events *immediately* leading up to a shooting cannot be considered as part of the totality of the circumstances along with the *precise instant* surrounding a shooting") (emphasis added). *But see Allen, supra*; *Mendez*, 897 F.3d 1067 (9th Cir. 2018) (considering events leading up to shooting on remand).

[197] *See Rockwell v. Brown*, 664 F.3d 985, 996-97 (5th Cir. 2011) (DeMoss, J., concurring) (observing that law enforcement's decision breach a suicidal individual's door and shoot him to death, while "not legally actionable, neither is it admirable").

approach, courts "have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals."[198]

More fundamentally, the state of the law regarding how law enforcement should approach mentally ill individuals "remains relatively primitive."[199] Though today's police forces bear little resemblance to those of the 1800s, dealing with serious criminals has long been among the core responsibilities delegated to law enforcement. In contrast, the increasing reliance on police "to respond to crises arising from a mental illness" is a relatively recent phenomenon.[200] Thus, consensus regarding how law enforcement should respond to such situations remains elusive.[201]

---

[198] *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010); *see also Rush*, 78 F.4th at 620 (referring to the "crime at issue" and "suspects" in factors courts consider in Fourth Amendment cases).

[199] *Id.* at 996.

[200] *See* Andrew C. Hanna, *Municipal Liability and Police Training for Mental Illness: Causes of Action and Feasible Solutions*, 14 Ind. Health L. Rev. 221, 232-33 (2017) (discussing the process and effect of deinstitutionalizing individuals with mental illness into the 1980s).

[201] *See* Rafael A. Mangual, *Police Use of Force and the Practical Limits of Popular Reform Proposals: A Response to Rizer and Mooney*, 21 Federalist Soc' Rev. 128, 132-33 (2020) (observing that "[t]here is little evidence in the peer-reviewed literature that shows CIT's benefits on objective measures of arrests, officer injury, citizen injury, or use of force" and that empirical research "conclusions concerning the effectiveness of de-escalation training . . . were limited by the questionable quality of almost all evaluation research designs") (internal quotations and citations removed); Kathleen Giunta, *Slaying the Serpents: Why Alternative Intervention Is Necessary to Protect Those in Mental Health Crisis from the State-Created Danger "Snake Pit"*, 30 J.L. & Pol'y 497, 517-18 (2022) (discussing "problems with the Memphis CIT Model"); Small Dep. 18:12-14 ("Q: Would you consider the Memphis Model to be the sort of the gold standard for CIT training? A: Yes.").

One constant is that "[p]olice officers are not social workers [or] psychiatrists."[202] The officers of the State College Police Department were not mental health professionals when they successfully deescalated a situation where Osaze, "'acting on a commandment from God,' brandished a knife when taking someone else's basketball."[203] Nor were they mental health professionals when Hill used his personal credit card to pay for a hotel room for Osaze, not welcome in his parents' home after he threw a brick through a window, so that he would have somewhere to stay until a 302 warrant could be issued.[204] Nor were they mental health professionals when called to respond to Osaze setting a fire in his parents' home.[205] Or when they responded on any of the other occasions where Osaze's parents feared for their own and their other children's safety.[206] Finally, the officers of SCPD were not mental health professionals when Osagie, Osaze's father and the plaintiff in this suit, called upon them to arrest his son the day before Osaze's death.[207]

And yet, when the 302 warrant was issued, Pennsylvania law required SCPD to take Osaze into custody so he could get treatment.[208] Whereas Osaze's family

---

[202] *ACLU-PA Statement on the Officer-Involved Shooting Death of Osaze Osagie*, ACLU (Mar. 29, 2019), https://www.aclupa.org/en/press-releases/aclu-pa-statement-officer-involved-shooting-death-osaze-osagie

[203] RSMF ¶ 4 (citation to record omitted).

[204] SMF and RSMF ¶ 32.

[205] CSF and RCSF ¶ 12.

[206] *Id.*

[207] CSF ¶¶ 30-36.

[208] 50 Pa. C.S. § 7302(a)(1).

could evict him,[209] mental health facilities could "transition" him out when he overstayed his welcome,[210] and Centre County MHID could refuse to assist when they believed Osaze presented too great a danger, no such option was available to SCPD. Though this does not give law enforcement *carte blanche* to flagrantly violate the law, the alleged violations do not rise to that level. "[T]here is no suggestion that the Officers intentionally provoked" Osaze and their "immunity does not become less [because Osaze was] motivated to commit 'suicide by cop.'"[211]

Determining the solution for how to best fill the "gaps" through which individuals such as Osagie fall and law enforcement's role in that solution is beyond the purview of this Court.[212] But so long as the responsibility for filling those gaps falls upon police officers, the law affords them "the breathing room to make reasonable but mistaken judgments about" how to do so.[213] Accordingly, the Officers are entitled to qualified immunity, and therefore, also summary judgment on Osagie's excessive force claims.

---

[209]  CSF ¶ 12.

[210]  *See* Iyun Osagie Dep., CSF Ex. 2, Doc. 108-2, at 13: 9-24, 57:9-58:15 (discussing that, despite Ozase's family's desire for him to live at Strawberry Fields—a "halfway house" for those with mental illness—"forever," the facility has "to get people out because the waiting list is so long").

[211]  *Lal v. California*, 746 F.3d 1112, 1118 (9th Cir. 2014).

[212]  Iyun Depo. 59:7-14 (discussing the "gaps in the system" and that the government and social programs "can only do so much").

[213]  *al-Kidd*, 563 U.S. at 743.

## C.    Causation

Even if the Court assumes the Officers' actions violated the Fourth Amendment and that they were not entitled to qualified immunity for that violation, Osagie's excessive force claims would still fail because Osaze's "violent, precipitate, and illegal attack on [the Officers] severed any causal connection between [the Officers'] initial actions and [Pieniazek's] subsequent use of deadly force."[214] In *Johnson*, the Third Circuit cautioned that the "question of proximate causation in this case is made straightforward by the exceptional circumstances presented—namely, a sudden, unexpected attack that instantly forced the officer into a defensive fight for his life."[215] Though this case does lack some of the "extreme facts" present in *Johnson—i.e.*, Osaze was not walking through the street naked at 2 a.m. while in the throes of drug induced psychosis—the relevant circumstances are sufficiently analogous.

"While there is no precise test for determining when a civilian's intervening acts will constitute a superseding cause of his own injury," the Third Circuit identified as relevant considerations: "(1) whether the harm actually suffered differs in kind from the harm that would ordinarily have resulted from the officer's initial actions; (2) whether the civilian's intervening acts are a reasonably foreseeable response to the officer's initial actions; (3) whether the civilian's intervening acts are

---

[214] *Johnson*, 837 F.3d at 352.
[215] *Id.*

themselves inherently wrongful or illegal; (4) and the culpability of the civilian's intervening acts."[216]

Though the Court has found that a reasonable juror could conclude that the Officers employing the element of surprise created the risk that Osaze would answer the door with a weapon, it does not follow that Osaze's *use* of that weapon is the kind of risk that would have *ordinarily* resulted from that choice.[217] The Officers did not break down the door with weapons drawn to find Osaze innocently holding a firearm; they knocked on the door and attempted to engage him in conversation when he answered.[218]

However, whether Osaze's attack of the Officers was a reasonably foreseeable response to their actions here is a closer question. As the Court has found that a reasonable jury could conclude both that there was a risk Osaze would attempt suicide by cop and that the Officers' actions increased the likelihood he would possess a weapon, it follows that jury could then conclude that Osaze's intervening act—attacking the Officers with that weapon—was a reasonably foreseeable response.

---

[216] *Id.* (numbering added).

[217] *See Austin v. Town of Blacksburg*, 66 F. Supp. 2d 711, 774 (W.D. Va. 1998) (finding that arrestee set "deadly chain of events in motion" as officers used deadly force "[o]nly when [arrestee] seemingly threatened their lives").

[218] *See Mendez*, 897 F.3d at 1081 (contrasting case where officers' unconstitutional entry of a home resulted in shooting the occupant who possessed but did not threaten officers with a gun with situation where occupant did threaten the officers, finding that the occupant's actions is a superseding cause in only the latter circumstance).

Nevertheless, that tenuous causal chain is easily ruptured by the inherent wrongfulness and illegality of Osaze's actions as well as his culpability for them. Osaze's mental illness does not make it acceptable to attack another person, police officer or civilian, with a lethal weapon nor does it absolve him of responsibility for his actions and "oblige [the Officers] to passively endure a life-threatening physical assault, regardless of [Osaze's] mental state."[219]

Further, Osagie has not "produce[d] competent evidence that [Osaze's] illnesses . . . [made him] likely to respond to particular police actions in a particular way."[220] On the contrary, Osagie asserts that, when off his medication, Osaze was "less predictable, more volatile, and not stable."[221] In fact, to the extent that anybody could have predicted how Osaze would have responded to the police, the record suggests that it was likely Osaze would have peacefully complied with the Officers as he had done numerous times in the past, including an occasion where he dropped a knife he had been brandishing when ordered to do so.[222]

Because any allegedly unreasonable decisions made by the Officers did not proximately cause Osaze's death, the Officers are entitled to summary judgment.

---

[219] *Johnson*, 837 F.3d at 353.

[220] *Id.*

[221] CSF and RCSF ¶ 11; *see also Johnson*, 837 F.3d at 353 (suggesting that an individual's unpredictability severs the chain of causation). *Contra Luna-Diaz v. City of Hackensack Police Dept.*, 2022 WL 18024213, at *16 (D.N.J. Dec. 30, 2022) (finding that a plaintiff had introduced competent evidence that responding officers knew they were confronting an individual with schizoaffective disorder and a history of violent confrontations with police).

[222] CSF and RCSF ¶ 12.

### D.    Derivative Claims

As Osagie acknowledges, his state law claims for assault and battery "receive[] the same analysis as [his] excessive force claim"[223] Further, his wrongful death and survival action claims are not new liability claims but are only claims for certain categories of damages should Plaintiff's underlying claims prevail.[224] As the Court has found that the Officers are entitled to summary judgment on Osagie's excessive force claims, they are also entitled to summary judgment on his assault and battery claims, as well as his request for wrongful death and survival action damages as to those claims.[225]

## V.    CONCLUSION

For the foregoing reasons, the Court will GRANT Defendants' Motion for Summary Judgment.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[223] Opp. 10 (quoting *Singler v. Caterino*, 2023 WL 4089104, at *7 (W.D. Pa. June 20, 2023)).

[224] *Id.* 11.

[225] Osagie's wrongful death and survival action claims regarding his state create danger and failure to supervise claims will be discussed in a separate memorandum opinion.